**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF<br>100 Common Street<br>Suite 902<br>New Orleans, LA 70112,<br><br>FRIENDS OF THE EARTH<br>1101 15th Street, NW<br>11th Floor<br>Washington, DC 20005,<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N Main Avenue<br>Tucson, AZ 85701,<br><br>NATURAL RESOURCES DEFENSE COUNCIL<br>40 West 20th Street<br>11th Floor<br>New York, NY 10011,<br><br>and<br><br>SIERRA CLUB<br>2101 Webster Street<br>Suite 1300<br>Oakland, CA 94612,<br><br>      *Plaintiffs*,<br><br>  v.<br><br>DOUG BURGUM, in his official capacity as<br>SECRETARY OF THE INTERIOR<br>1849 C Street NW<br>Washington, DC 20240,<br><br><br>MATTHEW GIACONA, in his official capacity as<br>ACTING DIRECTOR, BUREAU OF OCEAN<br>ENERGY MANAGEMENT<br>1849 C Street NW<br>Washington, DC 20240, | Civil Action No.   25-cv-04016 |

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

and

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street NW
Washington, DC 20240,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs Healthy Gulf, Friends of the Earth, Center for Biological Diversity, Natural Resources Defense Council, and Sierra Club (collectively, "Plaintiffs") challenge the unlawful decision by Secretary of the Interior Doug Burgum, acting through his delegated authority to Matthew Giacona, Acting Director of the Bureau of Ocean Energy Management, the Department of the Interior, and the Bureau of Ocean Energy Management (the "Bureau" or "BOEM") (collectively, "Defendants") to hold the Gulf of America Outer Continental Shelf Oil and Gas One Big Beautiful Bill Act Lease Sale 1 (the "Gulf Lease Sale"). In finalizing the Gulf Lease Sale, Defendants failed to conduct the necessary environmental review, and improperly involved an agency official, in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").

2.      The Gulf of Mexico[1] is one of the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species ranging from simple invertebrates to highly evolved marine mammals including dolphins and whales. The Gulf includes habitat for five of the world's seven species of sea turtles and is the exclusive home of the critically endangered Rice's whale, a species that the National Marine Fisheries Service ("NMFS") currently estimates may have only 51 individuals remaining. Millions of people who live in Gulf Coast states depend on this productive marine environment to support coastal fisheries, tourism, and recreational opportunities.

---

[1] On January 20, 2025, President Trump issued Executive Order 14172 to rename this area as the "Gulf of America." 90 Fed. Reg. 8629 (Jan. 31, 2025). This Complaint refers to this area as the "Gulf of Mexico" in accordance with the historic name as reflected in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq*.

3.      Oil and gas operations in the Gulf have already caused grave harm to this ecosystem and surrounding communities. These adverse impacts have resulted from seismic activities, ship strikes, air and water pollution, and oil spills, including the massive Deepwater Horizon spill in 2010. For example, studies estimate that the Rice's whale suffered a 22 percent population loss from the 2010 disaster and nearly half of the species' habitat was coated by the spill, resulting in longer-term lethal and non-lethal impacts. Gulf communities have also suffered from the pollution impacts of oil and gas activities and infrastructure, including from refineries, petrochemical plants, and defunct offshore wells, pipelines, and platforms. The Gulf Lease Sale is expected to result in the production of over 750 million barrels of oil and 1 trillion cubic feet of natural gas over the next 50 years, locking in decades of additional greenhouse gas pollution that will exacerbate the climate crisis worldwide and increase harms to Gulf communities.

4.      On November 10, 2025, the Bureau published its Final Notice of Sale for the Gulf Lease Sale, providing that the lease sale will be held on December 10, 2025. The Gulf Lease Sale is the first of 30 region-wide Gulf sales required by the July 4, 2025 Reconciliation Act, Pub. L. No. 119-21, that will take place between 2025 and 2040. The Bureau declined to conduct any environmental review for this sale, and contends that NEPA is inapplicable because the Bureau's discretion was constrained by the Reconciliation Act.

5.      Separately, the Bureau had been preparing a programmatic environmental impact statement relevant to a different upcoming oil and gas lease sale in the Gulf of Mexico scheduled under the Bureau's five-year program for oil and gas lease sales. On August 19, 2025, the Bureau released a Final Programmatic Environmental Impact Statement ("Final PEIS") that was allegedly intended to assess the environmental effects of a "representative" oil and gas lease sale in the Gulf and "associated potential site and activity specific actions." The Bureau never issued

4

a Record of Decision based on the Final PEIS to explain its decision to hold the Gulf Lease Sale or to discuss the agency's plans for mitigation and monitoring.

6.      However, to the extent that the Bureau contends it relied on the Final PEIS to comply with NEPA, the Final PEIS is deficient in several ways. First, the Final PEIS failed to take the required "hard look" at the significant impacts of this massive project on the critically endangered Rice's whale, environmental justice communities in the Gulf, risks of oil spills and their impacts, or the growing scale of oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning. Second, the Bureau failed to properly evaluate reasonable scaled-back alternatives to the proposed action, including an alternative that would exclude Rice's whale proposed critical habitat with a 10-kilometer or greater buffer. The Bureau also incorrectly dismissed alternatives that would have resulted in reduced leasing and environmental impacts by claiming that such measures would "restrict oil and gas production," ignoring the conservation mandates of the Outer Continental Shelf Lands Act ("OCSLA") and the meaningful comparison of alternatives that NEPA requires.

7.      Defendant Giacona's involvement in the approval of the Gulf Lease Sale, a matter that directly overlapped with his prior lobbying work for the National Ocean Industries Association ("NOIA"), tainted the ultimate decision to hold this Sale. Upon his hiring by the Bureau in March 2025, the Department of the Interior Ethics Office specifically instructed Mr. Giacona to recuse himself from matters that would trigger federal impartiality rules, and ultimately prohibited him from participating personally and substantially in any particular matter he knew would have a direct and predictable effect on NOIA's financial interests until March 2026. Mr. Giacona's extensive participation in this matter further demonstrates that Defendants' approval of the Gulf Lease Sale was arbitrary and capricious and without observance of

procedure required by law.

8.      The Bureau's arbitrary and capricious decision to hold the Gulf Lease Sale violated NEPA and the APA and resulted in Defendants making this lease sale decision in an improper manner and without an adequate consideration or understanding of its environmental effects or a proper consideration of alternatives.

9.      Plaintiffs ask this Court to declare that Defendants' decision to hold the Gulf Lease Sale violates NEPA and the APA, to vacate the Final Notice of Sale for the Gulf Lease Sale and, to the extent relied on, the Final PEIS, and to vacate or enjoin any leases issued or actions taken pursuant to the unlawful Gulf Lease Sale unless and until Defendants comply with the law.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 702–706 (APA). The Final Notice of Sale for the Gulf Lease Sale is a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

11.     Venue is appropriate under 28 U.S.C. § 1391(e)(1) because the U.S. Department of the Interior and the Bureau's headquarters are located in this District, Defendant Burgum and Defendant Giacona reside in this District, a plaintiff resides in this District, and a substantial part of the events and omissions which gave rise to this action occurred in this District.

12.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

## PARTIES

13.     Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate

with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. For example, a member of Healthy Gulf is a small business owner of a Ship Island excursion company, which offers cruises to Ship Island, offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The business has been in his family for generations. He relies on a healthy environment, clean waters, and healthy marine life to continue the family business which has already been adversely impacted by oil and gas development activities in the Gulf, as well as resulting climate change. Healthy Gulf brings this action for itself and as representative of its members.

14.    Plaintiff FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization headquartered in Washington, D.C. FoE currently has over 1.5 million activists and over 140,000 members, located across all 50 states and the District of Columbia. FoE's primary mission is to defend the environment and champion a more healthy and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights. FoE and its members are dedicated to fighting to reduce greenhouse gas ("GHG") emissions and domestic reliance on fossil fuels and support a temporary pause on oil and gas leasing on federal public lands and water. Specifically, FoE's Climate & Energy and Oceans & Vessels programs directly engage in administrative and legal advocacy to protect the environment and society from climate change, pollution, and

industrialization associated with fossil fuel development and GHG emissions. FoE's members recreate and enjoy the waters and wildlife in the Gulf. For example, a Friends of the Earth member, who is also a member of Sierra Club, visits the Gulf of Mexico regularly with his family to fish and recreate, and hopes to continue doing so in the future. He enjoys fishing, surfing, viewing the wildlife habitats, and visiting rescued turtles on South Padre Island. His enjoyment depends on a healthy environment and abundant marine wildlife protected from oil and gas impacts. Friends of the Earth brings this action for themselves and as representatives of its members.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the United States and Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from the harmful impacts of offshore oil and gas drilling. The Center has more than 93,000 members, including members who live and recreate throughout the Gulf of Mexico region. These members appreciate and benefit from wildlife in the Gulf of Mexico, such as Rice's whales, sperm whales, loggerhead sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, and corals threatened by noise pollution, vessel traffic, oil spills, and/or climate pollution caused by oil and gas activity. For

example, the Center has a member who regularly visits the Gulf of Mexico to enjoy marine wildlife. They go to the Gulf of Mexico to observe whales, sea turtles, and other marine mammals. This member works to advocate for wildlife protections from threats such as oil and gas development, pollution, and habitat destruction. Additionally, the Center's member has a strong interest in conserving sea turtles, regularly visiting Gulf sea turtle habitat and nesting beaches to view and enjoy observing turtles there. The Center brings this action for itself and as representative of its members. The Center's members also enjoy seeing species that visit the Gulf of Mexico when those species have migrated to or are migrating through other parts of the country. For example, one Center member is an avid bird watcher and has traveled to Texas, Louisiana, Florida, Virginia, Maryland, Delaware, and New Jersey to see coastal waterbird species, including eastern black rails.

16.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a nationwide not-for-profit, tax-exempt membership organization incorporated under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members nationwide, including over 38,000 members in the Gulf. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to protect ocean and coastal ecosystems and wildlife, including the Gulf of Mexico and its marine life, from the harms of oil production dates back decades. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by the lease sale. Continued oil and gas development would injure their interests.

17.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring,

enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with more than 600,000 members nationally in 67 chapters in all of the 50 states, the District of Columbia, and Puerto Rico, including over 55,000 members in its Gulf chapters. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities. Sierra Club brings this action for itself and as representative of its members.

18.     Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from the marine and coastal environments of the Gulf, including waters within and adjacent to the five Gulf states, and plan to continue doing so in the future. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit from the presence of healthy marine and avian life within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird watching, scientific study, boat touring, underwater diving, fishing, photography, sculpture, and beach bathing.

19.     The Gulf Lease Sale will directly and irreparably injure these interests. The Gulf Lease Sale will, for example, increase vessel traffic and noise pollution and increase the risk of oil spills and other accidents. The Gulf Lease Sale will also contribute to environmental pollution from associated onshore oil and gas infrastructure located in Gulf communities. The abilities of Plaintiffs and Plaintiffs' members and staff to pursue these interests hinge on the health of the

marine, coastal, and estuarine ecosystems (with clean water and oil-free beaches) and the well-being of the species that live, migrate, feed, and breed in areas affected by oil and gas activities. Defendants are authorizing oil and gas development without a full and accurate analysis of its impacts or reasoned consideration of how to avoid or mitigate those impacts. As a result, Defendants are enabling new oil and gas development to negatively impact the environment in which Plaintiffs and Plaintiffs' members and staff have an interest. The interests of Plaintiffs and Plaintiffs' members and staff have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can be remedied only if Defendants are forced to comply with the requirements of NEPA and the APA. Were Defendants directed to complete the required NEPA analysis and fully comply with the requirements of the APA, they could avoid leasing and subsequent activities in sensitive habitats, require additional environmental mitigation of the lease sale's impacts, or the adoption of alternatives that would minimize or avoid such impacts in the first place. Plaintiffs have no other adequate remedy at law.

20.    Defendants' failure to comply with NEPA and the APA by not preparing the required environmental analysis or otherwise relying on a flawed analysis and failing to follow procedures required by law also deprives Plaintiffs and their members of procedural rights and information guaranteed by these statutes. Plaintiffs and their members have advocated and will continue to advocate for the protection of the Gulf and in opposition to oil and gas leasing and its environmental impacts; they also seek to discuss the issue with relevant decisionmakers to encourage consideration of alternatives that would avoid, minimize, or mitigate environmental harm. If Defendants had complied with NEPA and the APA, the process would have generated additional information on the lease sale's impacts to the species, Gulf communities, and other

environmental resources in which Plaintiffs and their members have an interest. Plaintiffs and their members would have access to this information and be better informed about the program and its impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation or alternatives that would protect their recreational, aesthetic, commercial, and scientific interests. With this information, Plaintiffs and their members can also make informed and safe decisions about their recreational pursuits and those decisions that affect their livelihoods and overall welfare. Defendants' failure deprives them of this information and the ability to comment on a draft NEPA analysis and a proposed notice of sale, or to meaningfully participate in the lease sale approval process. If Defendants are required to prepare a NEPA analysis and comply with the APA, these informational and procedural injuries would be redressed.

21.     Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior. He is the chief officer of the Department of the Interior charged with overseeing the proper administration and implementation of OCSLA. OCSLA vests authority in the Secretary of the Interior to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Secretary of the Interior is required to comply with the mandates of NEPA and OCSLA when taking any action affecting the environment.

22.     Defendant MATTHEW GIACONA is sued in his official capacity as the Acting Director, Bureau of Ocean Energy Management. He is the chief officer of the Bureau, the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Acting Director is required to comply with the mandates of NEPA and OCSLA when taking any action affecting the environment.

23.    Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary, under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Department of the Interior is required to comply with the mandates of NEPA and OCSLA when taking any action affecting the environment.

24.    Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Bureau is required to comply with the mandates of NEPA and OCSLA when taking any action affecting the environment.

## STATUTORY BACKGROUND

25.    To hold the Gulf Lease Sale, Defendants must comply with several federal statutes, including NEPA, OCSLA, the APA, and the 2025 Reconciliation Act, among others.

## I.    NATIONAL ENVIRONMENTAL POLICY ACT

26.    Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

27.    "NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015). This process both ensures that (1) agencies evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) that detailed information concerning significant environmental impacts "will be made available to the larger [public]

audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

28.     Under NEPA, all agencies of the federal government must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must analyze and describe the "reasonably foreseeable environmental effects" of the proposed action, "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented," as well as a "reasonable range of alternatives" that are technically and economically feasible, including a no action alternative. *Id.*

29.     In preparing an EIS, an agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document," and "make use of reliable data and resources." *Id.* § 4332(2)(D)–(E).

30.     According to the U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, when an agency prepares an EIS for a proposed action, it is required to document its decision on the action in a record of decision ("ROD"). 516 Department Manual § 4.1(a); *see Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 17 (D.D.C. 2017) ("Under NEPA, a federal agency is required to prepare an [EIS] and a Record of Decision before taking 'major Federal action[ ] significantly affecting the quality of the human environment.') (quoting 42 U.S.C. § 4332(2)(C)).

31.     The Bureau's decision to hold the Gulf Lease Sale is a major federal action subject to the requirements of NEPA. *See* 42 U.S.C. § 4336e(10) (defining "major federal action" as "an action that the agency carrying out such action determines is subject to substantial

Federal control and responsibility"); *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C.

Cir. 1972) (challenge to EIS for 380,000-acre lease sale offshore eastern Louisiana); 516

Department Manual § 15.4(1) ("Approval of offshore oil and gas lease sales" included in

category of "Major Actions Normally Requiring an EIS").

II.    OUTER CONTINENTAL SHELF LANDS ACT

32.    OCSLA governs the leasing, exploration, and development of oil and gas deposits

in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends

from the outer boundary of state waters—typically three nautical miles from shore—to the outer

boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.*

§§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

33.    In 1978, Congress amended OCSLA to provide, in part, for the development of

resources on the Outer Continental Shelf "subject to environmental safeguards." 43 U.S.C.

§ 1332(3).

34.    OCSLA charges the Secretary of the Interior with managing oil and gas activities

on the Outer Continental Shelf. *Id.* §§ 1334(a), 1344(a). Management of the Outer Continental

Shelf "shall be conducted in a manner which considers economic, social, and environmental

values of the renewable and nonrenewable resources contained in the [OCS]," as well as "the

potential impact of oil and gas exploration on other resource values of the outer Continental

Shelf and the marine, coastal, and human environments." *Id.* § 1344(a)(1).

35.    OCSLA prescribes four tiered stages for the Secretary to sell and allow

development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales;

(3) exploration plans; and (4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

36.    At the five-year program stage, the Secretary develops a schedule of proposed

lease sales indicating "the size, timing, and location of leasing activity" in identified regions over

an upcoming five-year period. *Id*. § 1344(a).

37.    At the lease sale stage, the Secretary decides whether and under what conditions to offer for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id.* § 1337. Prior to conducting an offshore lease sale, OCSLA requires that the Bureau issue a Proposed Notice of Sale that describes the proposed size, timing, and location of the sale, including lease stipulations to mitigate potential adverse impacts on the environment, terms and conditions, minimum bids, royalty rates, and rental rates. 30 C.F.R. § 556.304; *see* 43 U.S.C. § 1345.

38.    The Proposed Notice of Sale must be sent to the governors of affected States and a notice of its availability must be published in the Federal Register. 30 C.F.R. § 556.304(c). Within 60 days after receiving the Proposed Notice of Sale, governors of affected States and local governments may submit comments and recommendations to the Bureau regarding the Proposed Notice of Sale. *Id*. § 556.305(a). The Bureau is required to "consider all comments and recommendations received in response to the proposed notice of sale." *Id*. § 556.307(a).

39.    A Final Notice of Sale must be published at least 30 days before the date of a sale. 43 U.S.C. § 1337(b)(l); 30 C.F.R. § 556.308. This notice must describe the areas offered for lease, lease terms and conditions of sale, and "stipulations to mitigate potential adverse impacts on the environment." 30 C.F.R. § 556.308.

40.    The Secretary retains broad discretion to accept or reject bids that are made on such lease sales. *See id.* § 556.516(b) ("BOEM reserves the right to reject any and all bids received, regardless of the amount offered"). Once a lease is issued, a lessee may conduct ancillary activities on its lease without any further federal approval under OCSLA. *Id*. §§ 550.105, .207–.209. These activities include geological and geophysical exploration, such as

seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease. *Id.* §§ 550.105, .207.

41.     The third stage of Outer Continental Shelf planning involves exploration plans submitted to Interior by lessees, which should provide a schedule of anticipated exploration activities to be undertaken, a description of equipment to be used for such activities, and the general location of each well to be drilled. 43 U.S.C. § 1340.

42.     The fourth and final stage is the submission of development and production plans, which describe facilities and operations proposed by the lessee that will be constructed or utilized in the development and production of oil or gas from the lease area, as well as environmental and safety safeguards to be implemented. *Id.* § 1351.

43.     The Department of the Interior's manual and regulations provide categorical exclusions from NEPA for exploration plans and development and production plans in the western and central Gulf of Mexico. 516 Department Manual § 15.4(2); 30 C.F.R. § 550.269(a). For that reason, environmental review at the lease sale stage is particularly important in addressing NEPA's requirements. *See Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 133–34 (D.D.C. 2022), *vacated as moot and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ("[T]he lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico.").

44.     The Bureau is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and production of oil and gas resources on the Outer Continental Shelf under OCSLA. 30 C.F.R. § 550.101.

III.     ADMINISTRATIVE PROCEDURE ACT

45.     The APA confers a right of judicial review on any person who is adversely

affected by agency action. 5 U.S.C. § 702.

46.     The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

47.     Under the APA, a court shall also "hold unlawful and set aside" any agency action that was promulgated "without observance of procedure required by law." *Id.* § 706(2)(D).

48.     The adequacy of an agency's NEPA analysis and its compliance with NEPA's requirements are reviewed for arbitrary and capricious action under the APA's standard.

49.     "[W]here an agency concludes that NEPA does not apply to its actions at all, the agency's decision is 'not entitled to the deference that courts must accord to an agency's interpretation of its governing statute and is instead a question of law, subject to de novo review.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 22–23 (D.D.C.2013) (quoting *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 54 (D.D.C.2011)); *see Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001).

IV.     RECONCILIATION ACT

50.     Enacted on July 4, 2025, the Reconciliation Act establishes requirements for certain offshore lease sales in the Gulf between December 2025 and March 2040. Pub. L. No. 119-21, § 50102, 139 Stat. 72, 139–42 (2025).

51.     In particular, the Reconciliation Act provides that "the Secretary of the Interior shall conduct a minimum of 30 region-wide oil and gas lease sales, in a manner consistent with the schedule described in subparagraph (B), in the region identified in the map depicting lease terms and economic conditions accompanying the final notice of sale of the Bureau of Ocean Energy Management entitled 'Gulf of Mexico Outer Continental Shelf Region-Wide Oil and Gas Lease Sale 254.'" *Id.* § 50102(a)(1)(A). The Reconciliation Act states that the first such lease

sale shall be held by December 15, 2025. *Id*. § 50102(a)(1)(B).

52.     The Reconciliation Act provides that in conducting these lease sales, the Secretary of the Interior shall "offer the same lease form, lease terms, economic conditions, and lease stipulations 4 through 9 as contained in the final notice of sale" for Lease Sale 254 held in 2020, and "may update lease stipulations 1 through 3 and 10 described in that final notice of sale to reflect current conditions." *Id*. § 50102(b)(1)(A)–(B).

53.     The Reconciliation Act further provides that in conducting these lease sales, the Secretary of the Interior shall "offer not fewer than 80,000,000 acres" or "if there are fewer than 80,000,000 acres that are unleased and available, offer all unleased and available acres." *Id*. § 50102(b)(3).

## STATEMENT OF FACTS

I.     THE RICH ECOSYSTEM OF THE GULF OF MEXICO

54.     The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource to the five Gulf Coast states and the nation, supporting some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

55.     The Gulf is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals. In addition, five of the world's seven species of sea turtles, as well as hundreds of shore and coastal bird species, reside in or migrate through the Gulf of Mexico. Over 300 species of coral, as well as other hard-bottom communities, wetlands, seagrass beds, mangroves, and soft bottom communities, provide the habitats necessary to support this rich assemblage of marine life.

56.     Over two dozen marine and coastal species living in the Gulf of Mexico are listed as endangered or threatened under the Endangered Species Act. Among them is the Rice's

whale—the only whale species endemic to the Gulf of Mexico and one of the most endangered whales on the planet, with perhaps as few as 51 individuals remaining, according to NMFS' most recent estimates.

57. The Gulf of Mexico's environmental beauty and productivity also support a robust economy. The region produces more than one-third of the nation's domestic seafood supply. The Gulf's commercial fisheries and coastal tourism generate more than $40 billion annually in economic activity in the five Gulf Coast states.

II. ENVIRONMENTAL HARMS FROM OIL AND GAS DEVELOPMENT

58. Existing oil and gas exploration, development, and production on the Gulf of Mexico Outer Continental Shelf is extensive. As of November 2025, there were more than 2,000 active oil and gas leases across 11 million acres in the Gulf, including approximately 2,000 active oil and gas platforms.

59. Oil and gas leasing, exploration, development, and production, along with their associated operations, involve numerous activities that individually and collectively have myriad adverse effects on the Gulf's species and habitats. Lessees conduct seismic surveys to locate oil and gas deposits; drill wells; install pipelines and other structures on the seafloor and through coastal wetlands; pump oil and gas to the surface; load and transport oil, gas, and cargo on ships; produce liquid, solid, and gaseous waste; and conduct other activities with harmful environmental effects.

60. Effects from these activities on the environment include vessel strikes, noise (from vessels, seismic surveys, construction, and general operations), oil spills (both large and small), bottom habitat destruction, and marine debris and other water pollution. Oil and gas activities also degrade air quality, contribute to climate change, erode coastal wetlands, impair commercial and recreational fishing opportunities, harm archaeological resources, and degrade

recreational and aesthetic experiences.

61.    The harms from oil and gas activities can become catastrophic, such as when the

Deepwater Horizon rig exploded and sank on April 20, 2010, killing eleven people and causing

the biggest environmental disaster in the history of the Gulf. *See generally In re Oil Spill by Oil*

*Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F.Supp.3d 657 (E.D. La. 2014).

62.    The Deepwater Horizon explosion caused oil to gush from the well on the seabed,

nearly 5,000 feet below the ocean's surface, for months until the well finally was capped in mid-

July 2010. The result was the largest oil spill in the history of the United States and a cleanup

and containment effort that at its height enlisted 50,000 workers on land and sea. Over the 87

days during which the well remained uncapped, over 100 million gallons of oil and unquantified

amounts of natural gas flowed freely into the Gulf. In an effort to break apart large

concentrations of oil, responders released 1 million gallons of toxic dispersants into Gulf waters.

The spill contaminated over 112,000 square kilometers of ocean waters and over 2,100

kilometers of shoreline in the Gulf.

63.    Scientists estimate the spill caused death or serious harm to billions, if not

trillions, of animals, including over 100,000 individuals of species listed as threatened or

endangered. The Rice's whale, for example, experienced a 22 percent population loss as a result

of the 2010 Deepwater Horizon disaster, and it has not and may not ever recover. The spill

marred coastal and bottom habitats, causing severe damage to the ecosystems that support the

Gulf's biodiversity.

64.    The harm from the spill to marine and coastal species and the environment

persists to this day.

65.    Despite the lessons of the catastrophic Deepwater Horizon disaster, oil and gas

operations in the Gulf of Mexico continue to experience accidents, spill oil, and otherwise cause environmental harm on a daily basis. For example, a 26,000-barrel spill occurred in November 2023 resulting from degradation of the Main Pass Oil Gathering pipeline off the coast of Louisiana, while the Taylor Energy well platform spill has released over 3 million barrels of oil into the Gulf since the platform was struck by Hurricane Ivan in 2004 and continues leaking to this day. Hundreds of oil and chemical spills in the Gulf are reported to the Coast Guard each year.

66.     In recent years, drilling activity has been shifting to deeper waters and into high-heat and high-pressure geologic formations, where the risks of well blowouts and catastrophic oil spills are greater.

67.     Oil and gas activities in the Gulf have direct impacts on coastal and environmental justice communities. Refineries and petrochemical plants that rely on oil and gas produced in the Gulf region are more likely to be in low-income and communities of color, and certain communities in Louisiana and Texas have the highest concentration of refineries, petrochemical plants, and other oil and gas infrastructure in the United States. In Louisiana, for instance, an approximately 85-mile stretch along the Mississippi River, from Baton Rouge to New Orleans, has long been known as "Cancer Alley." The area contains more than 200 industrial facilities that release significant amounts of harmful air pollution and is marked by low income levels and high poverty levels. These communities are often overwhelmingly Black: 79 census tracts in Jefferson, St. John the Baptist, East Baton Rouge, and Orleans Parishes are made up of at least 90 percent Black residents. Locals have long experienced health problems including high rates of cancer, respiratory illnesses, and rashes.

68.     The extensive amount of oil and gas activity in the Gulf has also turned it into an

oil and gas junkyard. Thousands of wells and hundreds of platforms remain overdue for decommissioning. Decommissioning is the process of permanently plugging oil and gas wells and the clean-up and removal of pipelines, platforms, and other infrastructure used to develop wells. Oil companies are generally required to decommission oil and gas infrastructure after a lease terminates, or when the infrastructure is considered no longer useful for operations. But because decommissioning is expensive, companies use various tactics to delay, stall, and ultimately avoid fulfilling their decommissioning obligations; and the federal government regularly permits deviations from its decommissioning requirements.

69.     For example, according to a 2024 Government Accountability Office report, 75 percent of end-of-lease and idle infrastructure in the Gulf of Mexico was overdue for decommissioning as of 2023, representing over 2,700 wells and 500 platforms. Within that backlog, operators had not even temporarily plugged about 1,300 wells, "meaning[] they had not taken interim steps to install long-term barriers to prevent leaks before decommissioning." Moreover, a significant number of overdue idle wells had not been used for extended periods of time—more than 800 of them had not produced in more than 10 years. A 2021 Government Accountability Office report similarly found that the federal government has authorized 97 percent of Gulf pipelines—or roughly 18,000 miles—to be left on the seafloor at the end of their useful lives. The same report found that the federal government has authorized decommissioning-in-place of almost 250 umbilical lines, which provide electrical and hydraulic power to subsea infrastructure. The decommissioning backlog is only expected to grow.

70.     Available scientific information indicates that this delinquent infrastructure poses significant threats to the environment. For example, offshore infrastructure readily corrodes due to constant exposure to saltwater and the elements, which can cause equipment failure and

pollution. Old wells are particularly susceptible to oil spills or other accidents, especially when

they have not been properly maintained. These risks were highlighted recently on April 26, 2025,

when Well 59—a shut-in 82-year-old well that had not produced oil since 1997—blew out in the

state waters off Louisiana and leaked for over a week. The oily sheen appeared to enter

established and proposed critical habitat for protected species, including loggerhead sea turtles,

piping plovers, and Rice's whales. Federal pollution reports include many additional instances of

oil sheens associated with defunct oil and gas infrastructure. Unplugged and temporarily plugged

wells also leak methane—a powerful greenhouse gas—that can be released into the atmosphere

from wells in shallow waters or cause harm to marine life when leaking from wells in deeper

waters.

71.    Decommissioned-in-place pipelines are also subject to corrosion, hurricane

damage, seafloor erosion, mudslides, and damage from maritime activities. This is particularly

concerning in light of the Government Accountability Office's 2021 findings that the federal

government "does not have a robust process to address the safety and environmental risks posed

by leaving decommissioned pipelines in place on the seafloor." For example, mercury, one of the

most toxic metals in the environment, can accumulate within pipelines decommissioned-in-place

and pollute the seafloor and water if the pipelines are damaged. And defunct platforms topple

and cause spills or other accidents, and leach harmful chemicals into the marine environment.

The Government Accountability Office's 2021 report also notes that decommissioned-in-place

umbilical lines pose environmental risks because they "often contain hazardous chemicals, and it

is not feasible to properly clean them."

72.    Additionally, a growing number of oil and gas companies are going bankrupt,

which prolongs decommissioning delays and often leaves "orphaned" infrastructure with no

solvent operator to decommission it. As of August 2025, the U.S. Department of the Interior held over $197 million in orphan infrastructure liability from just ten operator bankruptcies, roughly 68 percent of which is not covered by surety bonds to defray the costs. The federal government is currently exposed to billions of dollars in potential decommissioning liability not backed by financial assurances, a figure that will increase with new offshore oil and gas leasing.

III.    CLIMATE CHANGE IN THE GULF OF MEXICO

73.     The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic temperatures, melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. Human activities, especially emissions of greenhouse gases, are primarily responsible. The main human activity that emits greenhouse gases is the combustion of fossil fuels—including oil and gas—for energy and transportation. This warming is expected to continue, and its effects will accelerate and intensify.

74.     Climate change will undoubtedly affect the habitat, behavior, abundance, and distribution of all species present in the Gulf of Mexico. It will bring increased storms, flooding, rising seas, and other severe harms to the region. In fact, the effects of climate warming are already being acutely felt by vulnerable Gulf communities.

75.     For example, an extreme marine heat wave in the summer of 2023 in the eastern Gulf led to severe coral bleaching that decimated populations of imperiled elkhorn and staghorn coral, which had been part of the Caribbean's coral reef systems for more than 250,000 years but are now functionally extinct in Florida.

76.     Storms are becoming increasingly severe in the Gulf region in the face of climate change. For example, Hurricane Harvey was a Category 4 storm when it hit the coast of Texas in

2017 and dumped 60.5 inches of rain during the multi-day onslaught, killed at least 63 people, affected millions of others in several states, and caused $125 billion in damage. In 2022, Hurricane Ian became the deadliest storm to strike the southwest coast of Florida since 1935, resulting in at least 148 deaths and $50 billion in damage. Scientists have concluded that climate change made these hurricanes more powerful and increased their deadly flooding.

77.    These strong storms also frequently cause damage to infrastructure such as oil pipelines and offshore platforms. For example, Hurricane Ivan in 2004 caused a massive seafloor shift that toppled a production platform and resulted in the longest recorded spill in U.S. history. In 2005, hurricanes Katrina and Rita destroyed 113 offshore platforms, damaged more than 450 pipelines, and led to six spills of 1,000 barrels or more. Hurricane Ike in 2008 caused 24 spills (18 from platforms and 6 from pipelines) totaling over 5,000 barrels of oil released into the environment. Deteriorated idle infrastructure is particularly susceptible to hurricane damage, and storm damage prolongs decommissioning delays. According to a 2015 Government Accountability Report, "decommissioning a storm-damaged structure may cost 15 times or more the cost of decommissioning an undamaged structure," as the salvage work involved is dangerous, difficult, and time-consuming.

78.    Flooding has become a common occurrence in Louisiana as a result of climate warming, bringing damage and destruction to the state. For example, in 2020, Hurricane Laura caused damage to industrial facilities that led to elevated toxic emissions along the Louisiana Coast.

79.    Sea level rise and coastal erosion is an acute threat in the Gulf Region. The Fourth National Climate Assessment issued in 2018 predicted that Texas alone will see as much as $21 billion in flood damage of coastal property by 2030. Communities in Gulf states, such as the

tribal community of Isle de Jean Charles in Louisiana, are being relocated because of severe land loss, sea level rise, and coastal flooding.

80.     The exploration, development, and production of oil and gas in the Gulf will release greenhouse gases from the use of combustion engines, construction, drilling, and through the deliberate or accidental release of methane.

IV.    THE 2024–2029 OUTER CONTINENTAL SHELF LEASING PROGRAM AND LEASE SALE 262

81.     Prior to 2017, Interior had never held a lease sale encompassing the entire Gulf of Mexico (excepting the area subject to a Congressional moratorium). Rather, it held separate lease sales for the three discrete planning areas of the Gulf: the Western, Central, and Eastern Planning Areas. The Western Planning Area extends offshore from the Texas-Louisiana border to the Mexico border. The Central Planning Area extends offshore from the Texas-Louisiana border to the Alabama-Florida border. The Eastern Planning Area covers Gulf waters offshore of Florida eastward of the state's border with Alabama. Most of the Eastern Planning Area has been withdrawn from leasing by Presidential moratorium.

82.     Interior changed its leasing approach with the 2017–2022 5-year leasing program, when it proposed to offer 10 region-wide lease sales in the Gulf. Interior repeated that approach in the current 2024–2029 program, which proposes to hold three region-wide lease sales: Lease Sales 262, 263, and 264. *See* 88 Fed. Reg. 67798 (Oct. 2, 2023).

83.     In December 2024, the Bureau released a Draft Programmatic Environmental Impact Statement for Gulf of Mexico Oil and Gas Regional Lease Sales ("Draft PEIS") to inform the decision for the first lease sale under the 2024–2029 program, Lease Sale 262. Under the Preferred Alternative for Lease Sale 262 (Alternative C), the Bureau would have offered approximately 64.7 million acres for lease in the Gulf. This alternative excluded certain blocks

from leasing, including the Rice's whale proposed core distribution area and proposed critical habitat, as well as other biologically-sensitive areas.

84.    On January 24 and 27, 2025, Plaintiffs submitted hundreds of pages of detailed technical and legal comments on this Draft PEIS. In particular, Plaintiffs raised numerous issues with the Bureau's unreasonably narrow statement of purpose and need, failure to take a hard look at the project's significant environmental impacts, and failure to properly consider alternatives that would reduce harm to the environment and coastal communities, among other issues. With regard to environmental impacts, Plaintiffs raised concerns regarding the Bureau's failure to fully analyze the lease sale's impacts to protected species such as the Rice's whale, its defective analysis of oil spill risks, impacts of deep- and ultra-deep water activities, contributions to climate change, air quality impacts, impacts of oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning, impacts from fracking and other well stimulation treatments, environmental justice impacts, and cumulative impacts.

85.    On June 27, 2025, the Bureau announced the availability of the Proposed Notice of Sale for Lease Sale 262. 90 Fed. Reg. 27675 (June 27, 2025). As required by OCSLA's implementing regulations, 30 C.F.R. § 556.304, the Proposed Notice of Sale described the proposed size, timing, and location of the sale, including lease stipulations, terms and conditions, minimum bids, royalty rates, and rental rates. The Proposed Notice of Sale was signed by Defendant Giacona. In an accompanying press release, Defendant Giacona stated, "This proposed lease sale demonstrates BOEM's commitment to advancing American Energy Dominance and fostering the production of affordable, reliable energy resources for the nation."

V.    THE FINAL PROGRAMMATIC EIS

86.    On August 22, 2025, the Bureau announced the availability of the Final PEIS, which claims that it "analyzes the potential impacts of a representative oil and gas lease sale in

28

available OCS areas of the Western, Central, and Eastern Planning Areas and the associated
post-lease site and activity specific actions." The announcement included a statement from
Defendant Giacona which provided, "Completing this programmatic environmental review
ensures that we are making well-informed decisions about future oil and gas activities in the Gulf
of America. This analysis strengthens our commitment to transparency, environmental
compliance, and providing greater certainty for American energy producers." The Preferred
Alternative in the Final PEIS (Alternative B) offers 80 million acres of the Gulf for lease.

87.     The Final PEIS did not fix the legal deficiencies cited by Plaintiffs and created
many others. For example, the Final PEIS failed to properly consider the impacts of a Gulf sale
on the Rice's whale. While the Final PEIS acknowledged the potential for impacts to the Rice's
whale from vessel strikes, noise, oil spills, and other actions resulting from this oil and gas
leasing, it arbitrarily concluded that such impacts would be "negligible to moderate." The Final
PEIS also failed to properly evaluate recent science regarding the distribution and persistent
occurrence of the species in the central and western Gulf, habitat suitability analyses conducted
by NMFS, and the significant threats posed by oil spills including catastrophic spills, noise from
seismic surveys, and the vulnerability of the species to vessel strikes.

88.     The Final PEIS arbitrarily dismissed the significant impacts that oil and gas
development and infrastructure—including refineries, gas processors, and petrochemical
plants—have on Gulf communities by claiming that it has no legal obligation to consider
environmental justice pursuant to Executive Order 14154 (Unleashing American Energy).
However, NEPA requires that Defendants consider any "reasonably foreseeable environmental
effects of the proposed agency action," 42 U.S.C. § 4332(2)(C)(i), and "OCSLA imposes binding
obligations on the Secretary to consider vulnerable communities," including at the lease sale

stage. *Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 193 (D.C. Cir. 2025) ("In amending the statute in 1978, Congress made clear that offshore leasing must not proceed without due regard for the communities and environments it affects.").

89.     The Final PEIS failed to adequately consider the risk and potentially devastating effects of oil spills resulting from a Gulf sale. In particular, the Bureau's methodology for assessing oil spill risks inadequately relied upon historical data from a decade ago that does not reflect current drilling operations and threats, ignored critical variables such as transportation distance, water depth, and climate change, and arbitrarily excluded agency data documenting small spills as well as catastrophic spills—such as Deepwater Horizon—from its analysis. Such catastrophic events that have in fact occurred are, by definition, reasonably foreseeable, and scientists have made determinations about the disaster-level impacts. The Final PEIS also failed to analyze the additional risks of oil spills from operations in deeper waters, which carry additional risks of blowouts and other disasters.

90.     The Final PEIS also failed to take a hard look at the growing scale of oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning; how a Gulf sale will intensify and prolong this problem; or the numerous foreseeable cumulative environmental impacts of delayed decommissioning. Instead, the Final PEIS presumed—contrary to the evidence before the agency—that infrastructure will be decommissioned timely, and in accordance with existing regulations. Moreover, while the Final PEIS contained a brief discussion of how operator bankruptcies could lead to detrimental impacts to government resources, the Bureau suggested that financial assurances regulations adopted in 2024 are sufficient to alleviate such impacts, without addressing concerns raised in comments that these rules provide only incremental protection. Moreover, while the Final PEIS acknowledged the

Trump Administration's plans to repeal or revise this rule, it did not explain how such a change may impact federal exposure to orphan liability. On August 26, 2025, Plaintiff Center for Biological Diversity submitted comments on the Proposed Notice of Sale for Lease Sale 262 raising many of these deficiencies.

91.    Furthermore, the Final PEIS failed to consider a reasonable range of alternatives for a Gulf sale, evaluating only three action alternatives that barely differ in terms of the expected impacts, despite offering vastly different amounts of acreage for lease and including different area exclusions. In addition, the Final PEIS failed to properly consider alternatives suggested by Plaintiffs and others through public comments, and incumbent on the Bureau as a result of federal agency science and proposals on endangered species protections, that would have significantly reduced environmental impacts while meeting the Bureau's legal obligations. For example, Plaintiffs requested that the Bureau consider an alternative that would have excluded not only Rice's whale proposed critical habitat, but also a 10-kilometer or greater buffer around this habitat to protect this critically endangered species. Yet the Final PEIS provided little justification for rejecting this alternative other than to say that NMFS has not yet designated critical habitat for the species.

## VI.    THE GULF LEASE SALE

92.    Following the passage of the Reconciliation Act, the Bureau announced on August 19, 2025, that "Lease Sale 262 is being deferred while the Department focuses on implementing the [Reconciliation Act's] required leasing provisions, which initiate a multi-year leasing program extending through March 2040. BOEM intends to hold the first required lease sale, GOA Lease Sale Big Beautiful Gulf 1 (BBG1) [i.e., the Gulf Lease Sale], on Dec. 10, 2025, the same day that Lease Sale 262 was originally scheduled to occur."

93.    The Bureau did not release a Proposed Notice of Sale for the Gulf Lease Sale.

94.    On November 10, 2025, the Bureau issued the Final Notice of Sale for the Gulf Lease Sale. 90 Fed. Reg. 50751 (Nov. 10, 2025). The Final Notice of Sale stated that the Gulf Lease Sale will be held on December 10, 2025. It described the lease blocks that are withdrawn from leasing and further states that the Bureau reserves the right to reject "any and all bids" as well as to withdraw any block from the lease sale prior to bid acceptance. The Final Notice of Sale further provided that each would be issued "pursuant to the [Reconciliation Act] and OCSLA, 43 U.S.C. 1331 *et seq.*, as amended, and is subject to OCSLA implementing regulations promulgated pursuant thereto in 30 CFR part 556, and other applicable statutes and regulations in existence upon the effective date of the lease, as well as those applicable statutes enacted and regulations promulgated thereafter, except to the extent that the after-enacted statutes and regulations explicitly conflict with an express provision of the lease." The Final Notice of Sale was signed by Defendant Giacona.

95.    In a press release issued along with the Final Notice of Sale, Defendant Giacona stated that the Reconciliation Act marked "the beginning of a new chapter for oil and gas development in the Gulf" that would "support offshore oil and gas development for decades to come." The Bureau further stated that the Gulf Lease Sale would support exploration and development of the Gulf "to unleash American energy dominance pursuant to Executive Order 14154 'Unleashing American Energy.'"

96.    According to a November 11, 2025 article in E&E News, Defendants maintain that NEPA is "inapplicable" to any of the lease sales established by the Reconciliation Act, including the Gulf Lease Sale, "[b]ecause BOEM does not have sufficient discretion to affect the outcome of these statutorily directed actions by making any changes based on environmental information."

VII.   DEFENDANT GIACONA'S IMPROPER INVOLVEMENT IN THE GULF LEASE
       SALE

97.    Defendant Giacona, the Acting Director of the Bureau, started his tenure with the

agency in March 2025. Prior to that, Defendant Giacona served as a lobbyist for the National

Ocean Industries Association ("NOIA"), which includes members that regularly bid on Gulf

lease sales.

98.    Upon information and belief, the Department of the Interior Ethics Office directed

Defendant Giacona to begin implementing recusals immediately to comply with federal ethics

rules that prohibit executive branch employees from participating in matters in which their

impartiality could reasonably be questioned or in which they have a personal or business

relationship involving a financial interest, absent written authorization. *See* 5 C.F.R. § 2635.502.

On March 27, 2025, the Ethics Office issued interim guidance requiring Defendant Giacona to

identify, implement, and adhere to recusals and screenings in real time while the office

completed its review. The Ethics Office provided briefing materials to Defendant Giacona which

expressly included "former employers" as covered relationships that would trigger federal

impartiality rules.

99.    Upon information and belief, on July 25, 2025, the Ethics Office finalized

Defendant Giacona's Recusals & Screening Arrangement and accompanying guidance,

categorically prohibiting Defendant Giacona from participating personally and substantially in

any particular matter he knew would have a direct and predictable effect on NOIA's financial

interests until March 2026.

100.   Despite these ethical obligations, Mr. Giacona has engaged in Gulf offshore

leasing, the same subject matter on which he lobbied while at NOIA during the interim-guidance

period and thereafter. For example, Defendant Giacona's official calendar reflects a May 7, 2025

33

meeting with Transocean and a May 8, 2025 meeting with Chevron on offshore issues. Both Transocean and Chevron are members of NOIA. Concurrently, Defendant Giacona worked internally on Lease Sale 262, writing on April 24, 2025, that he had "reviewed all documents in the 262 [Proposed Notice of Sale] package." Defendant Giacona conducted a directorate briefing regarding Lease Sale 262 on April 29, 2025, and additional internal meetings on May 12 and May 21, 2025. As discussed above, Defendant Giacona issued statements in support of the release of the Proposed Notice of Sale package for Lease Sale 262 on June 27, 2025, the release of the Final PEIS for a representative Gulf sale on August 19, 2025, the Final Notice of Sale for the Gulf Lease Sale on November 10, 2025, and signed the Final Notice of Sale.

101.    On October 8, 2025, members of the U.S. House of Representatives Committee on Natural Resources wrote to the U.S. Department of the Interior's Acting Inspector General requesting that the Office of the Inspector General investigate whether Defendant Giacona violated federal ethics rules by participating in matters that directly overlapped with his prior lobbying work for NOIA, including Gulf oil and gas leasing, or otherwise disregarded his federal ethics obligations.

## CLAIMS FOR RELIEF

### First Cause of Action

### Violation of NEPA and APA: Failure to Prepare an EIS for the Gulf Lease Sale

102.    The allegations made in paragraphs 1-101 are realleged and incorporated by this reference.

103.    NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

104.    Offshore lease sales have long been considered "major Federal actions" under NEPA. *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972). The U.S. Department of the Interior's Handbook of National Environmental Policy Act Implementing Procedures recognizes that the "[a]pproval of offshore oil and gas lease sales" is a major action normally requiring an EIS. 516 Department Manual § 15.4(1). Moreover, "the lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico." *Friends of the Earth*, 583 F. Supp. 3d at 133–34.

105.    Despite this authority, the Bureau has taken the position that it is not required to comply with NEPA for the Gulf Lease Sale due to the provisions of the Reconciliation Act, and has not issued any Record of Decision to document a final decision under NEPA or stated that it is relying upon the Final PEIS to satisfy its NEPA obligations. However, nothing in the Reconciliation Act exempts the Bureau from its legal obligations under NEPA with regard to the Gulf Lease Sale. *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 367 (D.C. Cir. 1981) ("Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act, we believe that, even when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances.").

106.    By failing to prepare an EIS to identify and assess the environmental effects of the Gulf Lease Sale, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedure required by law, in violation of NEPA, 42 U.S.C. § 4336a(c), and the APA, 5 U.S.C. §§ 701–706.

107.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

### Second Cause of Action

**Violation of NEPA and APA: Failure to Take a Hard Look at the Reasonably Foreseeable Environmental Effects of the Gulf Lease Sale**

108.    The allegations made in paragraphs 1–107 are realleged and incorporated by this reference.

109.    NEPA requires that the Bureau take a "hard look" at the environmental consequences of its actions in its EIS before action is taken. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). In particular, NEPA requires that the Bureau evaluate the "reasonably foreseeable environmental effects" of the proposed action, 42 U.S.C. § 4332(2)(C), and in doing so, "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id*. § 4332(2)(D)–(E).

110.    Here, the Bureau failed to take a hard look at the significant environmental effects of its decision to hold the Gulf Lease Sale. As discussed above, the Bureau failed to complete any NEPA process for the Gulf Lease Sale. To the extent that the Bureau relies on the Final PEIS, that analysis is inadequate to satisfy its NEPA obligations. This failure included its consideration of impacts related to the Rice's whale, oil spill harms and risks, environmental justice impacts, and delayed decommissioning.

111.    For example, the Bureau failed to properly consider the impacts of the Gulf Lease Sale on the critically endangered Rice's whale, despite evidence of significant impacts to this species from vessel strikes, seismic activities, pollution, and oil spills, and despite scientific evidence showing its presence in and use of the central and western Gulf and that oil and gas leasing activities present a direct threat of extinction to this species.

112.    On environmental justice, the Bureau arbitrarily ignored the significant impacts

that the Gulf Lease Sale, and oil and gas infrastructure serving and supporting this action, have on Gulf communities by claiming, contrary to law, that it has no obligation to consider such impacts.

113.    The Bureau also failed to adequately analyze the potentially devastating effects of oil spills resulting from the Gulf Lease Sale by ignoring the increased and additional risks posed by oil and gas development in deep and ultra-deep waters, arbitrarily excluding certain sized spills from its analysis, basing its coastal spill analysis on historical trends without justification, and addressing catastrophic spills only in an outside report incorporated by reference, which itself failed to provide resource-specific impacts analyses or any estimate of the likelihood of a catastrophic spill.

114.    The Bureau further failed to take a hard look at the impacts related to oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning by failing to analyze the growing scale of this infrastructure and failing to consider how the Gulf Lease Sale will intensify and prolong this problem. The Bureau also failed to adequately analyze the numerous foreseeable cumulative environmental impacts of delayed decommissioning that will result from the Gulf Lease Sale, such as the potential for long-term leaks of oil and methane, which can both pollute the environment and create use conflicts and hazards for other existing marine industries and for future development of offshore wind or other infrastructure in the region. The Bureau also failed to adequately consider the impacts of decommissioning-in-place of pipelines and umbilical lines, including potential leaching of heavy metals and hazards resulting from hurricane damage to pipelines. The Bureau also failed to consider the irreversible and irretrievable commitments of federal resources associated with operator bankruptcies, orphan liability, the financial assurances shortfall, and the failures of joint and several liability

that expose the federal government to liability for decommissioning costs.

115.    The Bureau also failed to consider the cumulative impacts on Rice's whale, oil
spill harms and risks, environmental justice impacts, decommissioning, and other environmental
resources given the Reconciliation Act's mandate that the Bureau hold 30 lease sales in the Gulf
between 2025 and 2040, in addition to Gulf lease sales that are planned under the existing and
future five-year leasing programs.

116.    In sum, the Bureau's failure to take a hard look at the reasonably foreseeable
environmental effects from the Gulf Lease Sale and its failure to take a hard look at the
irreversible and irretrievable commitments of federal resources from the Gulf Lease Sale prior to
issuing its Final Notice of Sale was arbitrary, capricious, an abuse of discretion, and not in
accordance with law, and without observance of procedure required by law, in violation of
NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. §§ 701–06.

117.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at
law.

## Third Cause of Action

### Violation of NEPA and APA: Failure to Consider a Reasonable Range of Alternatives

118.    The allegations made in paragraphs 1–117 are realleged and incorporated by this
reference.

119.    NEPA requires agencies to study a reasonable range of alternatives to their
proposed actions. 42 U.S.C. § 4332(2)(C)(iii). The description of alternatives is considered the
"heart" of an EIS. *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999). An agency's
consideration of alternatives serves the twin purposes of fostering informed decisionmaking and
public participation. *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). The existence of
reasonable but unexamined alternatives renders an EIS inadequate. *Friends of Southeast's Future*

*v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

120.    Here, the Bureau did not consider a reasonable range of alternatives for the Gulf Lease Sale. The Bureau did not prepare the required NEPA analysis for the Gulf Lease Sale. To the extent it relies on the Final PEIS, its analysis is inadequate. The Bureau evaluated only three action alternatives that barely differed in terms of their anticipated impacts, despite offering vastly different amounts of acreage for lease and including different exclusions. This failure denied Plaintiffs and the public a meaningful comparison of alternatives that NEPA requires.

121.    The Bureau failed to properly consider alternatives suggested by Plaintiffs and others, and consistent with federal agency conclusions and proposals for critical habitat designation, that would have significantly reduced environmental impacts while still meeting the Bureau's legal obligations. For example, Plaintiffs requested that the Bureau consider an alternative that would have excluded all or even part of Rice's whale proposed critical habitat and a 10-kilometer or greater buffer around that area to protect this critically endangered species. Based on a recommendation from NMFS, the Bureau in 2022 excluded Rice's whale proposed critical habitat from offshore wind leasing, deeming it "unsuitable" for development. Yet, here, without considering the need to protect this species, the Bureau simply rejected this alternative based on the sole fact that NMFS has not yet designated final critical habitat for the species.

122.    The Bureau also failed to properly consider alternatives suggested by Plaintiffs and other commenters that would have reduced impacts by, for example, prohibiting the issuance of leasing to companies with overdue decommissioning obligations, limiting the number of wells that could be drilled or the amount of oil and gas that could be developed, or restricting the acreage of new leasing to the amount of relinquished undeveloped leases. The Bureau's rejection of these alternatives because they are "out of scope" of the Final PEIS or would "restrict oil and

gas production" is contrary to the conservation purposes of OCSLA and otherwise arbitrary and contrary to the record.

123.    By failing to consider a reasonable range of alternatives for the Gulf Lease Sale prior to issuing its Final Notice of Sale, including alternatives that would have resulted in avoidance or minimization of significant adverse effects, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedure required by law, in violation of NEPA, 42 U.S.C. § 4332, and the APA, 5 U.S.C. §§ 701–706.

124.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

**Fourth Cause of Action**

**Violation of the APA: Improper Involvement of Defendant Giacona**

125.    The allegations made in paragraphs 1–124 are realleged and incorporated by this reference.

126.    In reviewing an agency action, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious under the APA where the agency (i) has relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) offered an explanation that is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983).

127.    Upon information and belief, upon onboarding with the Bureau in March 2025, Defendant Giacona was directed by the Department of the Interior Ethics Office to recuse himself from matters which he knew would have a direct and predictable effect on the financial interests of his former employer's financial interests, including oil and gas lease sales in the Gulf. On July 25, 2025, the Ethics Office finalized Defendant Giacona's Recusals & Screening Arrangement and accompanying guidance, categorically prohibiting Defendant Giacona from participating personally and substantially in such matters until March 2026.

128.    Upon information and belief, despite these ethics rules and direction from the Department of the Interior Ethics Office, Mr. Giacona participated personally and substantially in the review and approval of oil and gas lease sales in the Gulf throughout his tenure with the Bureau, including the Gulf Lease Sale.

129.    Given Defendant Giacona's extensive involvement in the approval of the Gulf Lease Sale, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 701–706.

130.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that Defendants' decision to hold the Gulf Lease Sale violates NEPA and the APA, and is arbitrary and capricious, not in accordance with law, and without observance of procedure required by law in violation of the APA;

2.    Declare that the Bureau violated NEPA by failing to conduct an environmental review for the Gulf Lease Sale;

3.    Declare that the Final PEIS issued by the Bureau is unlawful, in violation of NEPA and the APA;

4.    Declare that the Final Notice of Sale is arbitrary and capricious, in violation of the APA;

5.    Declare that any bids received by the Bureau in connection with holding the Gulf Lease Sale are not acceptable given Defendants' violations of NEPA and the APA;

6.    Vacate the Final PEIS;

7.    Vacate the Final Notice of Sale for the Gulf Lease Sale;

8.    Vacate or enjoin any bids accepted or leases executed pursuant to the Gulf Lease Sale, and any activity on leases executed pursuant to the Gulf Lease Sale;

9.    Enter any other appropriate declaratory or injunctive relief to ensure that Defendants comply with NEPA and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

10.    Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

11.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 18th day of November 2025.

*/s/ Stephen D. Mashuda*
Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-741-1148 Telephone
206-343-1526 Fax
smashuda@earthjustice.org

George Torgun (*pro hac vice* forthcoming)
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Ava Ibanez Amador (*pro hac vice* forthcoming)
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8043 Telephone
415-217-2040 Fax
alamador@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, and Center for Biological Diversity*

*/s/ Rachel Mathews*
Rachel Mathews (DC Bar No. VA211)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(828) 774-5636
rmathews@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

/s/ Devorah Ancel
Devorah Ancel (*pro hac vice* forthcoming)
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*


/s/ Jared Solomon
Jared Solomon (DC Bar admission pending)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-289-6868 Telephone
jsolomon@nrdc.org

Julia K. Forgie (*pro hac vice* forthcoming)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

Irene Gutierrez (*pro hac vice* forthcoming)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st Floor
San Francisco, CA 94104
415-875-6187 Telephone
igutierrez@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*