**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, et al.,<br>*Plaintiffs*,<br>v.<br>DOUG BURGUM, et al.,<br>*Defendants*,<br>and<br>CHEVRON U.S.A. INC., et al.,<br>*Intervenor-Defendants*. | Case No. 1:25-cv-04016-APM |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

INTRODUCTION ........ 1

STATUTORY BACKGROUND ........ 2

I. National Environmental Policy Act ........ 2

II. Outer Continental Shelf Lands Act ........ 3

III. Endangered Species Act ........ 6

IV. The Reconciliation Act of 2025 ........ 8

V. Administrative Procedure Act ........ 8

FACTUAL BACKGROUND ........ 9

I. The Gulf of Mexico and Impacts of Oil and Gas Leasing ........ 9

A. Impacts of Oil and Gas Development on Rice's Whale ........ 11

B. Impacts of Defunct Wells, Pipelines, and Platforms ........ 13

C. Impacts of Oil and Gas Development on Gulf Communities ........ 15

II. The Bureau's Process for Lease Sale 262 and Pivot to BBG1 ........ 16

STANDARD OF REVIEW ........ 20

STANDING ........ 21

I. Plaintiffs Have Demonstrated Concrete, Actual Injuries ........ 22

II. Plaintiffs' Injuries Are Fairly Traceable to the Bureau's Failure to Comply with the Law Prior to Finalizing BBG1 ........ 23

III. Plaintiffs' Injuries Will Be Redressed by a Favorable Decision Requiring the Bureau to Comply with NEPA, OCSLA, the ESA, and the APA ........ 24

ARGUMENT ........ 24

I. The Bureau Violated NEPA by Failing to Prepare an EIS for BBG1 ........ 25

II. The Bureau's Approval of BBG1 Violated the Endangered Species Act ........ 31

III. The Bureau Violated OCSLA by Failing to Study the Impacts of Derelict Infrastructure or Consider Available Relevant Environmental Information in its Decision to Hold BBG1 ....................35

IV. The Bureau Violated OCSLA by Failing to Publish a Proposed Notice of Sale....................38

V. Defendant Giacona's Improper Involvement Tainted the Decision to Finalize BBG1 ....................39

CONCLUSION....................43

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allina Health Servs. v. Sebelius*,
746 F.3d 1102 (D.C. Cir. 2014) ....................39

*Am. Forest Res. Council v. United States*,
77 F.4th 787 (D.C. Cir. 2023) ....................33, 34

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) ....................35

*California v. Norton*,
311 F.3d 1162 (9th Cir. 2002) ....................3

*Chickasaw Nation v. United States*,
534 U.S. 84 (2001) ....................30, 34

*City of Tacoma v. FERC*,
460 F.3d 53 (D.C. Cir. 2006) ....................7

*Cook Inletkeeper v. U.S. Dep't of the Interior*,
740 F. Supp. 3d 767 (D. Alaska 2024) ....................26, 31

*Ctr. for Biological Diversity v. Burgum*,
No. 1:24-CV-02014, 2026 WL 180258 (D.D.C. Jan. 23, 2026) ....................22, 23

*Ctr. for Biological Diversity v. Ross*,
349 F. Supp. 3d 38 (D.D.C. 2018) ....................20

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
563 F.3d 466 (D.C. Cir. 2009) ....................24

*Del. Riverkeeper Network v. FERC*,
45 F.4th 104 (D.C. Cir. 2022) ....................20

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ....................3

*False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984) ....................37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....................21, 22, 24

*Friends of the Earth v. Haaland*,
583 F. Supp. 3d 113 (D.D.C. 2022) ....................3, 23

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) .......... 21

*Hawksbill Sea Turtle v. FEMA*,
11 F. Supp. 2d 529 (D.V.I. 1998) .......... 34

**Healthy Gulf v. Burgum*,
775 F. Supp. 3d 455 (D.D.C. 2025) .......... *passim*

*Healthy Gulf v. U.S. Dep't of the Interior*,
152 F.4th 180 (D.C. Cir. 2025) .......... 4, 22, 31

*Hunter v. FERC*,
711 F.3d 155 (D.C. Cir. 2013) .......... 29

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987) .......... 30, 31

*Izaak Walton League of Am. v. Marsh*,
655 F.2d 346 (D.C. Cir. 1981) .......... 30

*Karuk Tribe v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) (en banc) .......... 33

*Kerr-McGee Corp. v. Watt*,
517 F. Supp. 1209 (D.D.C. 1981) .......... 29

*Larson v. Valente*,
456 U.S. 228 (1982) .......... 24

*Louisiana v. NMFS*,
No. 2:25-CV-00691, 2026 WL 184236 (W.D. La. Jan. 23, 2026) .......... 35

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 22, 23

**Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*,
463 U.S. 29 (1983) .......... *passim*

*Nat. Res. Def. Council, Inc. v. Daley*,
209 F.3d 747 (D.C. Cir. 2000) .......... 21

*Nat. Res. Def. Council, Inc. v. Morton*,
458 F.2d 827 (D.C. Cir. 1972) .......... 3

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) .......... 32

*NRDC v. Jewell*,
749 F.3d 776 (9th Cir. 2014) (en banc) ....................33

*In re Operation of Mo. River System Litig.*,
421 F.3d 618 (8th Cir. 2005) ....................33

*Res. Ltd., Inc. v. Robertson*,
35 F.3d 1300 (9th Cir. 1993) ....................34

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)....................2

*Rodriguez v. United States*,
480 U.S. 522 (1987)....................33

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984)....................4

*Sierra Club v. EPA*,
755 F.3d 968 (D.C. Cir. 2014)....................21

*Sierra Club v. FERC*,
827 F.3d 36 (D.C. Cir. 2016)....................21

*Sierra Club v. NFMS*,
No. CV DLB-25-1627 (D. Md. filed May 20, 2025)....................35

*Sierra Club v. U.S. Army Corps of Eng'rs*,
803 F.3d 31 (D.C. Cir. 2015)....................2

*Sierra Club v. U.S. Dep't of the Interior*,
899 F.3d 260 (4th Cir. 2018) ....................24

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)....................39

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)....................22

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)....................6, 7, 34

*W. Watersheds Proj. v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011) ....................20

*W. Watersheds Project v. Fish & Wildlife Serv.*,
535 F. Supp. 2d 1173 (D. Idaho 2007) ....................40

*WildEarth Guardians v. Zinke*,
368 F. Supp. 3d 41 (D.D.C. 2019) ....................26

**Statutes**

5 U.S.C. § 702 ....................8

*5 U.S.C. § 706 ....................9, 20, 43

15 U.S.C. § 2625 ....................36

16 U.S.C. § 1531 ....................6

*16 U.S.C. § 1536 ....................6, 7, 31, 36

16 U.S.C. § 1538 ....................6

16 U.S.C. § 1540 ....................8

42 U.S.C. § 4321 ....................2

*42 U.S.C. § 4332 ....................2

43 U.S.C. § 1301 ....................3

43 U.S.C. § 1332 ....................35

43 U.S.C. § 1334 ....................4

43 U.S.C. § 1337 ....................4, 5, 29

43 U.S.C. § 1340 ....................4, 5

43 U.S.C. § 1344 ....................4

43 U.S.C. § 1345 ....................4

*43 U.S.C. § 1346 .................... *passim*

43 U.S.C. § 1349 ....................6

43 U.S.C. § 1351 ....................4, 5

43 U.S.C. § 1802 ....................35

Pub. L. No. 119-21, 139 Stat. 72 (2025) .................... *passim*

**Federal Regulations**

5 C.F.R. § 2635.101(b)(14)....41

5 C.F.R. § 2635.502(a)(3)....41

5 C.F.R. § 2635.502(b)(1)....41

30 C.F.R. § 550.101....4

30 C.F.R. § 550.269....3

*30 C.F.R. § 556.304....4, 17, 38

30 C.F.R. § 556.305....5

30 C.F.R. § 556.307....5, 39

30 C.F.R. § 556.516....5, 29

30 C.F.R. § 556.1300....6, 37, 38

40 C.F.R. § 702.33....36

50 C.F.R. § 402.01....6

50 C.F.R. § 402.02....7

50 C.F.R. § 402.03....32

50 C.F.R. § 402.13....7

50 C.F.R. § 402.14....7, 29, 31, 36

50 C.F.R. § 402.15....7, 34

**Federal Register Notices**

48 Fed. Reg. 10605 (Mar. 14, 1983)....3

84 Fed. Reg. 15446 (Apr. 15, 2019)....11

88 Fed. Reg. 47453 (July 24, 2023)....11, 27, 31

89 Fed. Reg. 101044 (Dec. 13, 2024)....16

90 Fed. Reg. 8629 (Jan. 31, 2025)....1

90 Fed. Reg. 27675 (June 27, 2025)....17

90 Fed. Reg. 42243 (Aug. 29, 2025)....................18

**Other Authorities**

H.R. 1, 119th Cong. (May 20, 2025)....................28, 29, 30, 34

U.S. Dep't of Interior, Secretarial Order No. 3299 (Aug. 29, 2011)....................4

** Authorities upon which we chiefly rely are marked with an asterisk*

## INTRODUCTION

On November 10, 2025, the Bureau of Ocean Energy Management ("the Bureau") finalized its decision to hold the "Gulf of America – Big Beautiful Gulf 1" lease sale (hereinafter, "BBG1"). BOEM187.[1] BBG1 is one of the largest offshore oil and gas lease sales in U.S. history, and the first of 30 such sales under the 2025 Reconciliation Act. Pub. L. No. 119-21, 139 Stat. 72 (hereinafter, "the Reconciliation Act"). While the Reconciliation Act directed the Bureau to hold this lease sale, nowhere did it require a sale that would maximally benefit the fossil fuel industry at the expense of the Gulf of Mexico[2] ecosystem and communities already suffering from the significant impacts of oil and gas development. Nor did it excuse the Bureau from analyzing the significant impacts of the sale, as required under the National Environmental Policy Act ("NEPA"), or complying with the legal mandates of the Endangered Species Act ("ESA") and the Outer Continental Shelf Lands Act ("OCSLA").

The Bureau's position that NEPA and ESA compliance is not required because the agency lacks sufficient discretion to affect the outcome of the lease sale is not supported by any legal authority and ignores the Bureau's ample discretion to protect the environment both at the lease sale stage and during post-lease sale activities. With regard to OCSLA, the Bureau failed to study the impacts of derelict infrastructure prior to conducting the lease sale and offered no justification for failing to consider available relevant environmental information in its decisionmaking. It also denied the public the ability to comment on BBG1 by failing to publish a Proposed Notice of Sale. Furthermore, the extensive involvement of Defendant Giacona, the

---

[1] The administrative record in this case is cited as "BOEM[page number]," excluding leading zeros.

[2] On January 20, 2025, President Trump issued Executive Order 14172 to rename this area as the "Gulf of America." 90 Fed. Reg. 8629 (Jan. 31, 2025). Plaintiffs refer to this area as the "Gulf of Mexico" in accordance with the historic name as reflected in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq*.

Acting Director of the Bureau, in the decision to hold BBG1 despite a prohibition on his participation in such matters by the Department of the Interior Ethics Office rendered the decision arbitrary and capricious and in violation of the Administrative Procedure Act ("APA").

## STATUTORY BACKGROUND

### I. National Environmental Policy Act

Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321. "NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015). This process ensures both (1) that agencies evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) that detailed information concerning significant impacts "will be made available to the larger [public] audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Under NEPA, all agencies of the federal government must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must analyze and describe the "reasonably foreseeable environmental effects" of the proposed action as well as a "reasonable range of alternatives" that are technically and economically feasible. *Id.*

Offshore lease sales have long been considered "major Federal actions" that require an

EIS under NEPA. *See Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972). Indeed, the devastating environmental impacts from the 1969 Santa Barbara oil spill were a major impetus for the passage of NEPA. *See California v. Norton*, 311 F.3d 1162, 1165–68 (9th Cir. 2002). At the time the Bureau held BBG1, the U.S. Department of the Interior's Handbook of National Environmental Policy Act Implementing Procedures ("Handbook") recognized that "[a]pproval of offshore oil and gas lease sales" is a major action normally requiring an EIS. 516 Department Manual § 15.4(1) (2025).

The lease sale stage is a critical time to analyze environmental impacts because it is "the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf." *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 133–34 (D.D.C. 2022), *vacated as moot and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). The Bureau has determined that post-lease exploration plans and development and production plans in the western and central Gulf are categorically excluded from NEPA compliance. 30 C.F.R. § 550.269(a); 516 Department Manual § 15.4(C)(10).

## II. Outer Continental Shelf Lands Act

OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf ("OCS"). *See* 43 U.S.C. § 1331 *et seq*. The OCS extends from the outer boundary of state waters—typically three nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, typically 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983). Congress enacted OCSLA to govern the development of offshore oil and gas resources "while recognizing the crucial need to balance resource development with the protection of the human, marine, and coastal environments." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 864 (9th Cir. 2022) (citing 43 U.S.C. § 1332(3)). The statute makes "clear that offshore leasing must not

proceed without due regard for the communities and environments it affects." *Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 193 (D.C. Cir. 2025).

OCSLA charges the Secretary of the Interior with administering OCS lease sales. 43 U.S.C. §§ 1334(a), 1337. The Secretary has delegated leasing authority to the Bureau, and authority over compliance and environmental enforcement to the Bureau of Safety and Environmental Enforcement ("BSEE"). *See* 30 C.F.R. § 550.101; U.S. Dep't of Interior, Secretarial Order No. 3299 (Aug. 29, 2011).

OCSLA prescribes four stages for the development of offshore oil and gas: (1) five-year leasing programs, 43 U.S.C. § 1344; (2) lease sales, *id.* § 1337; (3) exploration plans, *id.* § 1340; and (4) development and production plans, *id.* § 1351. "Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). At the five-year program stage, the Secretary develops a schedule of proposed lease sales indicating "the size, timing, and location of leasing activity" in identified regions over a five-year period. 43 U.S.C. § 1344(a).

At the lease sale stage, the Bureau decides whether and under what conditions to offer leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area." 43 U.S.C. § 1337(b)(4). Prior to conducting an offshore lease sale, the Bureau must issue a Proposed Notice of Sale that describes the proposed size, timing, and location of the sale, including lease stipulations to mitigate potential adverse impacts on the environment, terms and conditions, minimum bids, royalty rates, and rental rates. 30 C.F.R. § 556.304; 43 U.S.C. § 1345. The Bureau must send the proposed notice of sale to the governors of affected States and publish a notice of its availability in the Federal Register. 30 C.F.R. § 556.304(c). Following a

60-day comment period, *id.* § 556.305(a), the Bureau must "consider all comments and recommendations received in response to the proposed notice of sale," *id.* § 556.307(a).

The Bureau retains broad discretion to accept or reject bids made for leases. *Id.* § 556.516(b). Only "responsible qualified" bidders are eligible to hold oil and gas leases, and OCSLA prohibits submission of bids by companies "not meeting due diligence requirements on other leases." 43 U.S.C. § 1337(a)(1), (d).

At the third stage of OCS planning, lessees submit exploration plans, which should include a schedule of anticipated exploration activities, a description of equipment to be used for such activities, and the general location of each well to be drilled. 43 U.S.C. § 1340. At the fourth stage, lessees submit development and production plans, which describe facilities and operations the lessee will construct or use in the development and production of oil or gas from the lease area, as well as environmental and safety safeguards to be implemented. *Id.* § 1351. The Bureau retains substantial discretion to approve, disapprove, or modify plans at these stages. *See, e.g.*, 43 U.S.C. § 1351(h).

The Bureau must "consider available relevant environmental information in making decisions" under OCSLA, "including those relating to exploration plans, drilling permits, and development and production plans[], in developing appropriate regulations and lease conditions, and in issuing operating orders." *Id.* § 1346(d). OCSLA also requires that the Bureau "shall conduct a study of any area or region included in any oil and gas lease sale . . . in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments" that may be affected by oil and gas development. *Id.* § 1346(a)(1). The study "shall be designed to predict impacts on the marine biota" resulting from, *inter alia*, "chronic low-level pollution," "large spills," and "the laying of pipe." *Id.*

§ 1346(a)(3). It must also be designed to predict "the impacts of development offshore on the affected and coastal areas." *Id.*

The Bureau's regulations further provide that such studies should include "analyses of the impacts of pollutants introduced into the environments and impacts of offshore activities on the seabed and affected coastal areas," should generally "not duplicate studies done under other laws," and must commence at least six months prior to the sale. 30 C.F.R. § 556.1300(a)–(c). The "[i]nformation available or collected by the studies program will, to the extent practicable, be provided in a form and in a timeframe that can be used in the decision-making process associated with a specific leasing action or with longer term OCS minerals management responsibilities." *Id.* § 556.1300(e), (c).

OCSLA allows lawsuits "to compel compliance with [OCSLA] against any person, including the United States, and any other government instrumentality or agency . . . for any alleged violation of any provision of" OCSLA or its implementing regulations. 43 U.S.C. § 1349(a)(1).

## III. Endangered Species Act

Congress enacted the ESA in 1973 to provide for the conservation of endangered and threatened fish, wildlife, plants, and their natural habitats. 16 U.S.C. § 1531. The ESA imposes substantive and procedural obligations on all federal agencies with regard to species that are listed or proposed for listing under the Act, as well as their critical habitats or proposed critical habitats. *See id.* §§ 1536(a)(1), (a)(2), (a)(4), 1538(a); 50 C.F.R. § 402.01. The ESA is widely considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and embodies the "plain intent" of Congress to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). The statute reveals a conscious decision by Congress to give endangered

species priority over the "primary missions" of federal agencies. *Id*. at 185.

In particular, section 7(a)(2) of the ESA and its implementing regulations require each federal agency, in consultation with the appropriate wildlife agency, to ensure that any action authorized, funded, or carried out by the agency is not likely to (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.14(a). An action agency must engage in formal or informal consultation with the expert wildlife agency whenever a proposed action "may affect" listed species or critical habitat. 50 C.F.R. §§ 402.13, 402.14. Formal consultation concludes with the issuance of a biological opinion that determines whether the action is likely to jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(h). Jeopardy exists if an action reasonably would be expected, directly or indirectly, to appreciably reduce the likelihood of the survival and recovery of a listed species in the wild. 50 C.F.R. § 402.02. If the wildlife agency concludes that the proposed action is likely to jeopardize the species, it must specify reasonable and prudent alternatives that would avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

After the issuance of a biological opinion, it is up to the action agency to "determine whether and in what manner to proceed with the action in light of its section 7 obligations and the [wildlife agency's] biological opinion." 50 C.F.R. § 402.15(a). The substantive duty to ensure against jeopardy to listed species remains in effect regardless of the outcome of the consultation. *City of Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006).

Section 1540(g) of the ESA allows any person to commence a civil suit in federal district court "to enjoin any person, including the United States and any other governmental

instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

## IV. The Reconciliation Act of 2025

Enacted on July 4, 2025, the Reconciliation Act establishes requirements for certain offshore lease sales in the Gulf between December 2025 and March 2040. Pub. L. No. 119-21, § 50102. In particular, the Reconciliation Act provides that

> the Secretary of the Interior shall conduct a minimum of 30 region-wide oil and gas lease sales, in a manner consistent with the schedule described in subparagraph (B), in the region identified in the map depicting lease terms and economic conditions accompanying the final notice of sale of the Bureau of Ocean Energy Management entitled "Gulf of Mexico Outer Continental Shelf Region-Wide Oil and Gas Lease Sale 254."

*Id.* § 50102(a)(1)(A). The first lease sale shall be held by December 15, 2025. *Id.* § 50102(a)(1)(B)(i). In conducting these lease sales, the Secretary of the Interior shall "offer the same lease form, lease terms, economic conditions, and lease stipulations 4 through 9 as contained in the final notice of sale" for Lease Sale 254, and "may update lease stipulations 1 through 3 and 10 described in that final notice of sale to reflect current conditions." *Id.* § 50102(b)(1)(A)–(B). The Reconciliation Act also provides that in conducting these lease sales, the Secretary of the Interior shall "offer not fewer than 80,000,000 acres," or "if there are fewer than 80,000,000 acres that are unleased and available, offer all unleased and available acres." *Id.* § 50102(b)(3)(A)(i)–(ii). The Reconciliation Act does not contain any provision exempting these sales from the legal requirements of NEPA, OCSLA, or the ESA.

## V. Administrative Procedure Act

The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." *Id.* § 706(2)(A), (D). An agency action is arbitrary and capricious where the agency (i) has relied on factors which Congress has not intended it to consider; (ii) entirely failed to consider an important aspect of the problem; (iii) offered an explanation for its decision that runs counter to the evidence before the agency; or (iv) offered an explanation that is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### I. The Gulf of Mexico and Impacts of Oil and Gas Leasing

The Gulf of Mexico provides immense ecological and economic value to the region. It houses biodiversity hotspots that provide important habitat to a vast range of marine species, including a variety of corals, marine mammals, and sea turtles—many of which are listed as endangered or threatened under the ESA. *See* Decl. of Ava Ibanez Amador Supp. Pls.' Mot. Summ. J., Ex. F, at 4-77 to 4-78, 4-143; 4-169.[3] Communities in the Gulf "depend on the ocean economy for employment and income." *Id.* at 4-7. The recreation and tourism industries provide over half of the jobs in the Gulf's ocean economy. *Id.* at 4-7 to 4-8. The Gulf is also home to one of the world's most productive fisheries, accounting for about 20 percent of domestic catch. *Id.* at 4-8. People, as much as marine wildlife, depend on the health of the Gulf for fish habitat, tourism, and shoreline protection. *Id.* Ex. B, at 26–27.

At the same time, extensive federally-approved oil and gas exploration, development, and

---

[3] Plaintiffs requested that the materials attached to the Amador Declaration be included in the administrative record. *See* Amador Decl. Ex. H. Although these materials were not included, Defendants do not object to Plaintiffs' citation of these materials. *Id.*

production activities in the Gulf have significantly harmed this ecosystem and Gulf communities. The region accounts for about 97 percent of all U.S. offshore oil and gas production. *Id*. at 5. As of November 2025, there were more than 2,000 active oil and gas leases across 11 million acres in the Gulf, including an estimated 1,274 active oil and gas platforms. First Am. Compl. ¶ 69, Dkt. 40; Fed. Defs.' Answer First Am. Compl. ¶ 69, Dkt. 47. There are also approximately 8,600 miles of active pipelines on the seafloor. Ibanez Amador Decl. Ex. B, at 60. The expansive pipeline network crisscrosses the Gulf's seafloor to transport liquid and gaseous products, and numerous transport vessels, storage facilities, and onshore terminals support offshore operating platforms. *Id*. Ex. F, at 3-11.

Oil and gas related activities, such as drilling wells, constructing pipelines, installing entire subsea production systems, pumping oil and gas, decommissioning, and loading and transporting oil, gas, and cargo on ships, *see id*. at 3-4 to 3-15, adversely affect the Gulf's marine ecosystems and coastal communities in many ways. These activities inflict harm to wildlife and the environment in the form of oil spills and other water pollution, vessel strikes, noise pollution (from vessels, construction, and general operations), air pollution, and underwater explosions. *See id*. Ex. B, at 12–48.

Oil spills can harm wildlife's health in a variety of ways and kill them. *Id*. Ex. G, at 11–13. Oil can coat animals' fur, feathers, or skin, making it harder for them to control their body temperatures, repel water, or breathe. *Id.* at 11. Animals can also eat, drink, or inhale oil, causing poisoning, organ damage, or breathing problems. *Id.* at 11–12. Oil can contaminate the water and the seafloor, damaging coral, fish, and other animal habitat. *Id.* at 12. A growing body of evidence demonstrates that even brief exposures to crude oil and its components can have severe impacts on fish and invertebrate species. *Id.*

### A. Impacts of Oil and Gas Development on Rice's Whale

Rice's whale, also known as the Gulf of Mexico whale (and formerly, Bryde's whale), is the only endemic whale species in the Gulf. It was listed as an endangered species in 2019, 84 Fed. Reg. 15446 (Apr. 15, 2019), and is one of the most endangered marine mammals in existence; as few as 51 individuals remain. Complaint ¶ 67; Answer ¶ 67. Given the small population size, the loss of a single reproductive female could lead to the species' extinction. Amador Decl. Ex. B, at 44. The most recent stock assessment determined that Rice's whales can only afford to lose one individual every fifteen years to achieve their optimum sustainable population. *Id*. at 40, 44 n.335.

Although the whale was once believed to inhabit the northeastern Gulf exclusively, current science demonstrates that the whale also persistently occurs in the western and central Gulf along the continental shelf break, in waters between 100 and 400 meters deep. *Id*. at 35; *id*. Ex. F, at 4-144. This range is consistent with the best available science on Rice's whale habitat, including the results of a five-year study completed in 2021 by the National Marine Fisheries Service ("NMFS"). *Id*. Ex. B, at 35. The study developed a "comprehensive ecological understanding" of the species' habitat use, ultimately confirming the year-round presence of the species outside of the DeSoto Canyon in the eastern Gulf. *Id*.

Following this study, in July 2023, NMFS proposed a critical habitat designation for Rice's whales comprising 100- to 400-meter-deep waters along most of the northern Gulf. 88 Fed. Reg. 47453, 47461 (July 24, 2023).[4] In the proposed designation, NMFS emphasized the "genetically confirmed sighting of a Rice's whale in the western [Gulf]," and acoustic

[4] *See also id*. at 47454 (pointing to maps on NMFS's website); and NOAA, *Proposed Rice's Whale Critical Habitat* (2023), https://www.fisheries.noaa.gov/s3/2023-07/Rices-Whale-Proposed-CH-Map-508-Final.pdf.

monitoring data detecting Rice's whale calls year-round in the western and central Gulf. *Id.* at 47457, 47462; *see also* Ibanez Amador Decl. Ex. B, at 36. There have been numerous documented sightings of Rice's whales in the western Gulf since 2019. *See* Ibanez Amador Decl. Ex. B, at 36–37; *id.* Ex. F, at 4-144.

Oil and gas activities in the Gulf pose the most significant threat to Rice's whales' survival. Oil spills can kill Rice's whales, lead to reproductive failure, and otherwise harm their health. *Id.* Ex. B, at 38. Indeed, the Programmatic Damage Assessment and Restoration Plan published by the *Deepwater Horizon* Trustees estimated that the catastrophic 2010 BP spill led to the loss of 22 percent of the Rice's whale population. *Id.*; Answer ¶ 74. The long-term damage caused by the spill continues to affect Rice's whale. Ibanez Amador Decl. Ex. B, at 38.

Further, noise from exploratory seismic surveys and other oil and gas operations can result in hearing damage, behavioral disturbance, chronic stress, constant interference with communication, and other behavioral and physiological distress to Rice's whales. *Id.* at 41–42. Seismic airgun noise is of particular concern, since it travels hundreds of kilometers and can persist for months at a time. *Id.* at 43. In fact, NMFS has hypothesized that the lower number of Rice's whales detected in the western and central Gulf compared to the eastern Gulf may be due to the higher levels of ambient noise in those areas. *Id.* at 43.

Vessel strikes also present a significant threat to Rice's whales. *Id.* at 44–45. Rice's whales rest at night near the water's surface, making them particularly vulnerable to strikes from vessels traveling at fast speeds. *Id.* Given the species' small population size, "[s]hould one accidental strike occur, the impact could have population-level impacts for the Rice's whale." *Id.* Ex. F, at 4-168. Oil and gas industry vessels traveling at all speeds account for 40 percent of the strike risk to Rice's whales, while industry vessels traveling at speeds greater than 10 knots

account for 32 percent of the risk. *Id*. Ex. B, at 45.

**B. Impacts of Defunct Wells, Pipelines, and Platforms**

BSEE regulations and the terms and conditions of offshore oil and gas leases require operators to plug wells and remove infrastructure within one year of lease termination or when it is no longer useful for operations. *Id.* Ex. F, at 3–11. Yet offshore leasing has turned the Gulf into an oil and gas junkyard, with thousands of wells overdue for plugging, hundreds of platforms overdue for removal, and many thousands of miles of defunct pipelines littering the seafloor. *Id.* Ex. C (Exs. 4 p. 12, 15 p. 12).

A 2024 Government Accountability Office ("GAO") report found that 75 percent of end-of-lease and idle infrastructure in the Gulf of Mexico was overdue for decommissioning as of 2023, representing over 2,700 wells and 500 platforms. *Id*. (Ex. 4 p. 12). Within that backlog, operators had not even temporarily plugged about 1,300 wells, "meaning[] they had not taken interim steps to install long-term barriers to prevent leaks before decommissioning." *Id.* at 14. Moreover, a significant number of overdue idle wells had not been used for extended periods of time—more than 800 of them had not produced in more than ten years. *Id.* at 19. A 2021 GAO report similarly found that the federal government has authorized 97 percent of Gulf pipelines—or roughly 18,000 miles—to be left on the seafloor at the end of their useful lives. *Id.* Ex. C (Ex. 15 p. 12). The same report found that the federal government has authorized decommissioning-in-place of almost 250 umbilical lines, which provide electrical and hydraulic power to subsea infrastructure. *Id.* (Ex. 15 p. 17–18). The decommissioning backlog is only expected to grow. *Id.* (Ex. 4 p. 24).

This defunct infrastructure poses significant threats to the environment. *Id.* Ex. C, at 13–15; *id.* Ex. G, at 15–19; *see also id.* Ex. F, at C-15. Offshore infrastructure readily corrodes due to constant exposure to saltwater and the elements, and that causes equipment failure and

pollution. *Id*. Ex. C, at 13–14; *id*. Ex. G, at 6–10. Old wells may blow out or leak oil and methane, especially when they have not been properly maintained. *Id.* Aging pipelines are also subject to corrosion, seafloor erosion, mudslides, and damage from maritime activities, all of which can cause pipelines to leak. *Id*. Ex. C (Ex. 15 p. 1). For instance, in 2005, Hurricane Katrina dragged nine miles of buried pipelines 4,000 feet across the seafloor. *Id*. at 14. Deteriorated platforms are also highly susceptible to damage and toppling in hurricanes, which makes decommissioning them significantly more expensive and dangerous. *Id*. Ex. C (Ex. 4 pp. 10–11).

The decommissioning backlog is a consequence of both lax enforcement and profit-maximizing incentives for industry. *Id*. Ex. G, at 16–17; *id*. Ex. C, at 4–6. Because the money spent on exploration will likely pay off in future profits, oil companies awarded new leases have every incentive to focus on their new investments and neglect or sell the old ones. *See id.* Ex. G, at 16–17. Moreover, according to the GAO, BSEE does not effectively ensure that industry operators meet decommissioning deadlines for offshore wells and platforms at the end of their useful lives. *Id*. Ex. C (Ex. 4 p. 12).

Finally, the decommissioning backlog creates a substantial financial risk to the public. Decommissioning delays signal that an operator is at risk of defaulting on its cleanup obligations and that the federal government may be stuck with the responsibility of decommissioning infrastructure “orphaned” by bankrupt companies—at great expense to taxpayers. *Id*. (Ex. 4 p. 2). Currently, Interior holds around $196 million in offshore orphan liability from just twelve operator bankruptcies. Complaint ¶ 82; Answer ¶ 82. Although the Bureau requires some companies to post surety bonds to secure their decommissioning obligations, it has not required nearly enough to protect the public from bearing the private costs of decommissioning. Ibanez

Amador Decl. Ex. C ( Ex. 4 p. 26). As of June 2023, the Bureau had collected a mere $3.5 billion in surety bonds to cover between $40 billion and $70 billion in decommissioning liability. *Id.* This exposes the federal government to billions of dollars in potential decommissioning liability. Moreover, operator bankruptcies can further delay decommissioning for years, compounding the environmental risks of corroding infrastructure.

**C. Impacts of Oil and Gas Development on Gulf Communities**

Gulf communities, including Black, Indigenous, and other communities of color, have been disproportionately impacted by pollution from oil and gas activities and the extensive infrastructure system that supports it. *Id.* Ex. B, at 64. Communities in Louisiana and Texas have the highest concentration of refineries, petrochemical plants, and other oil and gas infrastructure. *Id*. at 57–58. Indeed, the Gulf has been treated as a sacrifice zone while other parts of the United States benefit economically from that sacrifice. *Id.* Ex. B, at 57. Nearly half of the nation's petroleum refining and over half of its natural gas processing happens along the Gulf coast. *Id.* at 58.

In Louisiana, an approximately 85-mile stretch along the Mississippi River, from Baton Rouge to New Orleans, is known as "Cancer Alley." *Id*. at 59. The area, marked by low levels of income and high levels of poverty, contains more than 200 industrial facilities that release significant amounts of harmful air pollution. *Id*. Locals have long experienced health problems including high rates of cancer, respiratory illnesses, and rashes. *Id*. Similarly, in Texas, Black residents of Jefferson County have cancer rates that are 15 percent higher than the average Texan. *Id*. Accordingly, since as early as 1981, the area around Port Arthur and its neighboring cities has been known as Texas' "Cancer Belt." *Id.*

In addition to the health risks from pollution exposure, industrial facility accidents in the oil and gas industry and offshore oil spills pose significant risks to Gulf communities. The

increasing number and intensity of storms in the Gulf exacerbate these risks. *Id*. at 24, 60–61. In 2017, Hurricane Harvey damaged two ExxonMobil refineries, leading to the release of hazardous pollutants, including volatile organic compounds and sulfur dioxide. *Id*. at 70. Exposure to oil, other chemicals, and dispersants has an adverse impact on human health. *See id*. at 62. A study of U.S. Coast Guard Deepwater Horizon oil spill responders found statistically significant positive associations between crude oil exposure and coughing, shortness of breath, headaches, dizziness, diarrhea, nausea, vomiting, and other health problems. *Id*. The study also found that responders had higher relative risks for skin conditions, asthma, and chronic respiratory conditions. *Id*. Further, mental health distress in both adults and children is linked to exposure to oil spills. *See id*.

## II. The Bureau's Process for Lease Sale 262 and Pivot to BBG1

In December 2024, the Bureau released a Draft Programmatic Environmental Impact Statement for Gulf of Mexico Oil and Gas Regional Lease Sales ("Draft PEIS") to inform its decision to hold the first lease sale under the current 2024–2029 five-year program, Lease Sale 262. 89 Fed. Reg. 101044 (Dec. 13, 2024). Under the Preferred Alternative in the Draft PEIS, the Bureau would have offered approximately 64.7 million acres for lease in the Gulf. Ibanez Amador Decl. Ex. A, at 2-5 to 2-6. This alternative excluded certain blocks from leasing, including the Rice's whale proposed core distribution area and proposed critical habitat, as well as other biologically sensitive areas. *Id*. at 2-6. Plaintiffs submitted hundreds of pages of comments on this Draft PEIS, raising concerns about the Bureau's failure to take a hard look at the project's significant impacts and to consider alternatives, among other issues. *See id*. Exs. B, C. The National Ocean Industries Association ("NOIA") and other industry groups also submitted comments. *See id*. Exs. D, E.

On June 27, 2025, the Bureau announced the availability of the Proposed Notice of Sale

for Lease Sale 262. BOEM2–18; 90 Fed. Reg. 27675 (June 27, 2025). As required by OCSLA, 30 C.F.R. § 556.304, the Proposed Notice of Sale described the proposed size, timing, and location of the sale, including lease stipulations, terms and conditions, minimum bids, royalty rates, and rental rates, and set a 60-day comment period that closed on August 26, 2025. *Id.* The Notice of Availability of the Proposed Notice of Sale was signed by Defendant Giacona. 90 Fed. Reg. at 27675.

On July 4, 2025, President Trump signed into law the Reconciliation Act, which required that the Bureau conduct the lease sale at issue here. *See* Pub. L. No. 119-21, § 50102. However, the Bureau waited for several weeks to determine that it would be deferring Lease Sale 262 and, instead, "pivoting to BBG1 mid-process." BOEM19. On August 8, 2025, the Bureau's legal counsel advised that "it would be preferable to publish a PNOS for the first [Reconciliation Act] sale to comply with OCSLA to the maximum extent possible. It would be one less item we'd have to defend in a challenge." BOEM23. Despite this advice, the Bureau's staff decided that they did not have enough time to publish a PNOS and "still hold the sale as planned on December 10, 2025." BOEM22. Bureau staff then invented a new procedure to give the appearance of "making a good faith effort to maintain the processes outlined in our regulations." *Id*.

On August 19, 2025, just one week before the Lease Sale 262 Proposed Notice of Sale comment period was to close, the Bureau issued a press release announcing that BBG1 would take place on the same day as Lease Sale 262. BOEM24–27. The press release said nothing about the status of Lease Sale 262 or how the announcement would impact the comment period for the Proposed Notice of Sale. *Id*. At some point, however, the Bureau updated the Lease Sale 262 website to state that the sale was being "deferred." *See* BOEM160. On August 20, 2025, the

Bureau also sent letters to affected state governors notifying them that Lease Sale 262 was being deferred and that it was instead moving forward with BBG1. BOEM33–42. Plaintiff Center for Biological Diversity submitted comments on the Proposed Notice of Sale on August 26, 2025, expressing confusion and asking that its comments be considered on both Lease Sale 262 and BBG1. *See* Complaint ¶ 105; Answer ¶ 105; Ibanez Amador Decl. Ex. G.

On August 22, 2025, the Bureau announced the availability of the Gulf of America Regional OCS Oil and Gas Lease Sales and Post-Lease Activities: Final Programmatic Environmental Impact Statement ("Final PEIS"). *See* 90 Fed. Reg. 42243 (Aug. 29, 2025). The Final PEIS claims it "analyzes the impacts of a representative Gulf of America (GOA) Outer Continental Shelf (OCS) oil and gas lease sale, and the associated potential site and activity specific actions," and "is expected to be used and supplemented as appropriate for decisions on future proposed Gulf of America OCS oil and gas lease sales." Ibanez Amador Decl. Ex. F, at iii. The Preferred Alternative in the Final PEIS offers 80 million acres of the Gulf for lease. *Id.* at 2-4 to 2-5. A sale of this size is expected to result in the production of more than 750 million barrels of oil and almost 1 trillion cubic feet of natural gas over the next 40 years. *Id.* at 3-16. The Bureau noted the publication of the Final PEIS in a September 2025 briefing on Reconciliation Act lease sales and claimed that it would "provide coverage for ongoing post-lease activities including exploration, development, and production" in the Gulf. BOEM64.

In another September 2025 briefing on Reconciliation Act lease sales, the Bureau included a slide entitled "Environmental Review and Consultation" which stated that "DOI's Office of the Solicitor (SOL) has advised that the environmental statutes listed below no longer apply at the lease sale stage for [Reconciliation Act] mandated sales." BOEM140. Among the six statutes listed were NEPA and the ESA. *Id.*

On November 5, 2025, Defendant Giacona sent a 27-page memorandum to Jacob M. Tyner, the Deputy Assistant Secretary for Land and Minerals Management, entitled, "Recommendations for Decision on the Final Notice of Sale for Gulf of America Outer Continental Shelf Oil and Gas One Big Beautiful Bill Act Lease Sale 1 (Lease Sale BBG1, scheduled for December 10, 2025)" (the "Decision Memo"). BOEM160–86. Among other items, the Decision Memo discussed the "Discretionary Terms and Conditions of the Sale," including sale size, information to lessees, and royalty rates, and requested Mr. Tyner's decision on these issues. BOEM169–79. Defendant Giacona exercised this discretion to recommend the largest lease sale with the lowest royalty rates to incentivize the maximum amount of oil and gas production. BOEM170–71, 179. The Decision Memo also contained Defendant Giacona's determination that NEPA and the consultation provisions of the ESA and several other statutes "are not applicable at the lease sale stage" for Reconciliation Act lease sales, including BBG1. BOEM181–82. Mr. Tyner signed and concurred with the statements in the Decision Memo approximately 30 minutes after it was signed by Defendant Giacona. BOEM160, 186.

On November 10, 2025, the Bureau published a Final Notice of Sale for BBG1, stating that the sale would be held on December 10, 2025. BOEM187–96. The Final Notice of Sale describes the lease blocks withdrawn from leasing and states that the Bureau reserves the right to reject "any and all bids" and to withdraw any block from the lease sale prior to bid acceptance. BOEM188–89, 195. Defendant Giacona signed the Final Notice of Sale. BOEM196. In addition, the Bureau issued Lease Stipulations and Information to Lessees for BBG1. BOEM213–51; BOEM197–212. The Bureau did not issue a Record of Decision. In a November 10, 2025 letter to affected state governors, the Bureau stated that "[s]ince Lease Sale BBG1 contains the same acreage as BOEM proposed for Lease Sale 262, BOEM is treating the section 19 comment

period on Lease Sale 262 as the comment period for this Lease Sale BBG1," but noted that it did not receive any such comments. BOEM254.

On December 10, 2025, the Bureau held BBG1, offering over 80 million acres of the Gulf for oil and gas leasing, and received 219 bids on 181 tracts across more than one million acres. BOEM169; Complaint ¶ 113; Answer ¶ 113. The vast majority of bids were for tracts in deepwater (greater than 1,000 feet in depth) and ultra-deepwater (greater than 5,000 feet in depth). *Id.* At least seven bids were within or adjacent to Rice's whale proposed critical habitat. *Id.*

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Challenges to an agency's NEPA compliance are reviewed under the APA. *Del. Riverkeeper Network v. FERC*, 45 F.4th 104, 108 (D.C. Cir. 2022). Challenges raised under the citizen suit provisions of the ESA and OCSLA are also reviewed under the APA standard of review. *See W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). For claims arising under the APA, courts are generally limited to reviewing "the whole record" compiled by the agency. 5 U.S.C. § 706. But for claims arising under the ESA and OCSLA, the scope of review is not limited to an administrative record. *See Kraayenbrink*, 632 F.3d at 497; *Ctr. for Biological Diversity v. Ross*, 349 F. Supp. 3d 38, 43 (D.D.C. 2018).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In doing so, a court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463

U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Courts "do not hear cases merely to rubber stamp agency actions," *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), but instead consider "whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995); *accord State Farm*, 463 U.S. at 43.

## STANDING

Plaintiffs have demonstrated standing with regard to the claims and relief sought in this action. *See* Declarations of Robert Wiygul, Kenneth Saxon, Louis Skrmetta, William Foster, Jasmine Fournier, James Reeves, Dale Hensley, and Michael Guckian, filed herewith. Plaintiffs are organizations that have associational standing to sue "on behalf of [their] members when [their] members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).[5] For members to establish standing, they "must show (1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 180–81.

---

[5] To establish associational standing, Plaintiffs must demonstrate that: (1) "at least one of their members would otherwise have standing to sue in his or her own right"; (2) "the interests they seek to protect are germane to their organizations' purposes"; and (3) "neither the claim[s] asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014). The second and third factors should not be in dispute. The interests that Plaintiffs' members seek to protect are germane to their institutional purposes. *See, e.g.*, Skrmetta Decl. ¶¶ 4–7; Saxon Decl. ¶¶ 4–6; Fournier Decl. ¶¶ 3–9. Moreover, the relief sought does not require the participation of individual members. *See Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016).

## I. Plaintiffs Have Demonstrated Concrete, Actual Injuries

In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by "aver[ring] that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (cleaned up); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to . . . the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").

Here, the declarations submitted by Plaintiffs sufficiently demonstrate injury-in-fact through their members' use of the Gulf for recreational, aesthetic, commercial, and scientific purposes, which will be injured by the Bureau's decision to approve BBG1 in violation of NEPA, OCSLA, the ESA, and the APA. *See, e.g.*, Wiygul Decl. ¶¶ 7–28; Fournier Decl. ¶¶ 15–25; Skrmetta Decl. ¶¶ 10–49; Reeves Decl. ¶¶ 4–21; *see Healthy Gulf v. Burgum*, 775 F. Supp. 3d 455, 470 (D.D.C. 2025) (finding standing where Plaintiffs' members "identified specific wildlife areas along the coasts of Texas, Louisiana, and Mississippi that they use and enjoy, both now and in the future" and agency concluded that "such areas will likely be affected by oil and gas operations" from challenged lease sale); *Healthy Gulf*, 152 F.4th at 189 (finding injury-in-fact based on members' alleged "recreational and aesthetic injury resulting from increased oil and gas activity under the [5-year] Program"); *Ctr. for Biological Diversity v. Burgum*, No. 1:24-CV-02014, 2026 WL 180258, *3–8 (D.D.C. Jan. 23, 2026) (finding injury-in-fact and standing in challenge to Gulf-wide environmental assessment on decommissioning oil and gas infrastructure).

## II. Plaintiffs' Injuries Are Fairly Traceable to the Bureau's Failure to Comply with the Law Prior to Finalizing BBG1

With regard to the second factor, the Supreme Court has explained that Plaintiffs' injuries must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned up). Here, the Bureau opened over 80 million acres of the Gulf to oil and gas leasing by approving BBG1, an action the Bureau has predicted will result in up to 250 new exploration and development wells, 60 new production structures, over 1,000 kilometers of new pipelines, and over 150,000 service vessel round trips. Ibanez Amador Decl. Ex. F, at 3-18 to 3-20. Production from the sale includes up to 756 million barrels of oil and almost 1 trillion cubic feet of natural gas over the next 40 years. *Id*. at 3-16. The Bureau failed entirely to comply with multiple environmental laws, thereby failing to consider decommissioning impacts or mitigate harm to Rice's whale and Gulf communities, among other harms. *See infra* Arg.

Consequently, Plaintiffs' alleged injuries from expanded oil and gas operations in the Gulf are fairly traceable to the Bureau's inadequate compliance with NEPA, OCSLA, the ESA, and the APA in approving BBG1, which allows for activities that will harm the interests of Plaintiffs' members. *See, e.g.*, Wiygul Decl. ¶¶ 29–32; Fournier Decl. ¶ 25; Skrmetta Decl. ¶ 50; *Friends of the Earth*, 583 F. Supp. 3d at 130 n.3 (finding that defendants' "alleged failure to comply with NEPA led directly to the Record of Decision and the holding of Lease Sale 257," enabling the oil and gas development causing Plaintiffs' personal, recreational, aesthetic, and commercial injuries); *Healthy Gulf v. Burgum*, 775 F. Supp. 3d at 472 (causation established where "BOEM's alleged failure to adequately evaluate the environmental impacts of Lease Sale 259 is plainly connected to its decision to approve Lease Sale 259" and "the activities associated with the lease sale would likely degrade coastal habitats like the ones Plaintiffs' members use

and enjoy"); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (in challenge to 5-year leasing program, "Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to [plaintiffs'] enjoyment of the animals affected by the offshore drilling").

## III. Plaintiffs' Injuries Will Be Redressed by a Favorable Decision Requiring the Bureau to Comply with NEPA, OCSLA, the ESA, and the APA

To demonstrate redressability, Plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. Plaintiffs "need not show that a favorable decision will relieve [their] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Here, if the Court were to find that the Bureau failed to comply with NEPA, OCSLA, the ESA, and the APA and required the agency to conduct an environmental analysis and properly consider harms to local communities, wildlife, and the Gulf ecosystem, Plaintiffs' members' injuries would likely be redressed through a proper consideration of the harms posed by BBG1 and the implementation of measures that could address such impacts. *See, e.g.*, Skrmetta Decl. ¶¶ 51–53; Saxon Decl. ¶¶ 28–29; Wiygul Decl. ¶¶ 30–31. As this Court found in a prior lease sale challenge, "even if Lease Sale 259 were not vacated, Plaintiffs could still obtain meaningful relief from a court order directing BOEM to augment its NEPA analysis, which could, in turn, prompt BOEM to reexamine the terms of the leases issued. That is enough for redressability." *Healthy Gulf v. Burgum*, 775 F. Supp. 3d at 474; *see Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 285 (4th Cir. 2018) ("Petitioners' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harm."). Thus, Plaintiffs' injuries are redressable.

## ARGUMENT

There is no legal basis for the Bureau's attempt to bypass multiple environmental laws

and procedural requirements in its decision to approve BBG1. Given the significant adverse impacts of the action on local communities and the Gulf ecosystem, as well as the agency's ample discretion over the sale, the Bureau was required to prepare an EIS under NEPA and comply with the ESA's section 7 consultation provisions. The Bureau also had no justification for ignoring OCSLA's mandates to study the impacts of derelict infrastructure, consider available relevant environmental information in its decisionmaking, and publish a Proposed Notice of Sale for review and comment by affected states and the public. The Bureau's decision was also arbitrary and capricious given the extensive involvement of Defendant Giacona, who had previously worked for an offshore oil and gas trade association and ignored the direction of the Department of the Interior Ethics Office to not participate personally and substantially in matters that involved his prior employer and its members.

## I. The Bureau Violated NEPA by Failing to Prepare an EIS for BBG1

BBG1 will have enormous consequences for the Gulf region and the global environment. It will degrade air quality, erode coastal wetlands, impair commercial and recreational fishing opportunities, exacerbate climate change, raise the risk of catastrophic oil spills, and threaten wildlife like the critically endangered Rice's whale. *See supra* at 9-16. Despite the certainty of these harms, the Bureau declined to prepare an EIS to evaluate the sale's potential effects. By failing to conduct any environmental review for BBG1, the Bureau violated NEPA.

The Bureau claims that NEPA does not apply here because the agency "does not have discretion to consider environmental impacts" of BBG1 under the Reconciliation Act. BOEM274. The Bureau is wrong. As this Court has recognized, "the touchstone of NEPA is discretion." *Healthy Gulf v. Burgum*, 775 F. Supp. 3d at 475 (citing *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001)). NEPA applies unless the Bureau's action is "'merely ministerial,' such that BOEM lacked 'sufficient discretion to affect

the outcome of'" a sale. *Id.* (quoting *Citizens Against Rails-to-Trails*, 267 F.3d at 1151). Here, despite placing some conditions on BBG1, the Reconciliation Act does not eliminate the Bureau's discretion over the lease sale's size, shape, and stipulations or otherwise release the Bureau from its NEPA obligations. *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 51–52 (D.D.C. 2019) (where agency retains "discretion to determine where" and "under what terms and conditions oil and gas development should occur on shore," agency must "consider" environmental impacts before holding lease sales); *Healthy Gulf*, 775 F. Supp. 3d at 478 (NEPA applied to statutorily-mandated lease sale because the Bureau "retained its usual discretion to decide the scope of the sale"); *Cook Inletkeeper v. U.S. Dep't of the Interior*, 740 F. Supp. 3d 767, 777–78 (D. Alaska 2024) (same), *appeal dismissed*, No. 24-5787, 2024 WL 5277211 (9th Cir. Sept. 26, 2024).

First, the Bureau retained and exercised discretion to determine BBG1's size and shape. The Act requires the Secretary of the Interior to "offer not fewer than 80,000,000 acres; or . . . if there are fewer than 80,000,000 acres that are unleased and available, offer all unleased and available acres," but it does not mandate a precise lease sale size, dictate which blocks within the region should be offered for sale, or define what constitutes "available" acres to be sold. Pub. L. No. 119-21, § 50102(b)(3)(A). And, in fact, the Bureau offered more than 81,180,600 acres for leasing.[6] Even without considering what acres were "available," the Bureau could have decreased the sale size by over a million acres or otherwise shifted which blocks were offered for leasing while still complying with the Act's mandates. For instance, approximately 6 million of the acres the Bureau offered for leasing were classified as "Rice's whale proposed critical

[6] *See* BOEM, *Sale Day Statistics* 1 (Dec. 10, 2025), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-BBG1-Stats_0.pdf.

habitat" at the time of sale, while about 560,000 acres were classified as "Rice's whale proposed core distribution area."[7] The Bureau retained authority to exclude all of the proposed core distribution area and much of the proposed critical habitat.[8] An environmental analysis under NEPA would help it decide which acres to exclude. *Cf.* BOEM169–71 (identifying sale area as a "discretionary term and condition of the sale" and acknowledging the discretion to "choose a different sale area comprising of a different set of blocks").

Second, the Bureau retained and exercised discretion to set royalty rates. The Reconciliation Act mandates that royalty rates be set between 12.5 and 16.67 percent but leaves the final rate determination to the Bureau. Pub. L. No. 119-21, § 50102(b)(1)(C). In its own materials, the Bureau identified rate-setting as an area of discretion and noted that "[r]oyalty rates can have a significant impact on bidder interest." BOEM86, 91–96; *see also* BOEM173. The agency opted to impose a flat 12.5 percent royalty rate, the minimum the Act allows, to "increase production by incentivizing activity and reducing breakeven prices." BOEM91, 191. Had it imposed different rates, by its own admission the Bureau could have discouraged lease activity in certain areas, suppressed production, and shaped BBG1's environmental impacts.

Third, the Bureau retained and exercised discretion to alter the sale's environmental stipulations. The Reconciliation Act specifically authorizes the Bureau to update certain lease stipulations that broadly empower it to designate military areas and impose terms on military-

---

[7] *See* Endangered and Threatened Species; Designation of Critical Habitat for the Rice's Whale, 88 Fed. Reg. 47453 (July 24, 2023) (proposed); NOAA Fisheries, *Rice's Whale Core Distribution Area Map & GIS Data*, https://www.fisheries.noaa.gov/resource/map/rices-whale-core-distribution-area-map-gis-data (last visited Apr. 1, 2026).

[8] *See* BOEM, *Gulf of America Region, Blocks and Active Lease by Planning Area* (March 2, 2026), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/regional-leasing/gulf/Lease%20Statistics%20Mar%202026%20Map.pdf?VersionId=ESLqI.GlEONV4nvKlPrAWxLSj_jBLDoT; *see also* BOEM188–89.

lessee interactions (Stipulations 1–3), and to restrict certain lease blocks to sub-seabed activities (Stipulation 10). BOEM191, 213–20, 232.[9] Indeed, the Bureau exercised that discretion by applying those stipulations to new areas. *Compare id. with* 85 Fed. Reg. 8010, 8013 (Feb. 12, 2020).[10]

Even some of the Lease Sale 254 stipulations required for this Gulf sale expressly affirm the Bureau's commitment to uphold species protection laws and preserve the Bureau's authority to update and expand lease conditions. The Act requires that this sale offer "the same lease form, lease terms, economic conditions, and lease stipulations 4 through 9" as those in Lease Sale 254. Pub. L. No. 119-21, § 50102(b)(1)(B). However, Stipulation 4 expressly states that the Bureau and BSEE are required to comply with wildlife conservation laws in the Outer Continental Shelf. *See infra* Arg. § II (applicability to the ESA). It also discusses lessees' compliance with "new or updated versions of these [Notice To Lessees] or a new biological opinion" through which the Bureau and BSEE "more fully describe measures to be implemented in support of [conservation laws] and regulations," in accordance with "conservation recommendations, rulemakings pursuant to the [Marine Mammal Protection Act], or consultations." BOEM221–22. The Bureau also has authority to later update and expand Stipulation 5. That stipulation makes a lessee "responsible for carrying out the specific mitigation measures outlined in the *most current* Notice

---

[9] Earlier versions of the Reconciliation Act would have required the Bureau to offer the same Stipulation 10 as was included in Lease Sale 254. *See* H.R. 1, 119th Cong. § 80171(a)(1)(E)(i) (as reported in House, May 20, 2025). But Congress ultimately changed that language to explicitly empower the Bureau to update the Stipulation. *See* S. Amdt. 2360 to H.R. 1, 119th Cong. § 50102(b)(1)(B); Pub. L. No. 119-21, § 50102(b)(1)(B). By doing so, Congress protected agency discretion in shaping this sale's terms and impacts.

[10] BOEM, *Final Notice of Sale, Gulf of Mexico Region-wide Oil and Gas Lease Sale 254, Lease Stipulations* 1–7, 19 (2020), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-254-Lease-Stipulations.pdf.

To Lessees and Operators (NTLs)," expressly contemplating that the Bureau would establish and require new mitigation measures over time, as appropriate. BOEM224 (emphasis added).

Fourth, the Reconciliation Act does not constrain the Bureau's discretion to accept or reject bids made for leases (e.g., to reject bids in particularly sensitive habitats). 30 C.F.R. § 556.516(b). OCSLA merely "authorize[s]" the Bureau to grant leases to the "highest responsible qualified bidder." 43 U.S.C. § 1337(a)(1). This gives the Bureau ample leeway to determine whether to accept or reject any bid. *Kerr-McGee Corp. v. Watt*, 517 F. Supp. 1209, 1211 (D.D.C. 1981); 30 C.F.R. § 556.516(b); BOEM189. Indeed, Congress considered overriding this discretion by directing the Secretary to accept the highest bid and issue a lease but ultimately declined to do so. *See* H.R. 1, 119th Cong. § 80171(e) (as reported in House, May 20, 2025). Additionally, the Bureau has full discretion over what Information to Lessees it provides to potential bidders as part of the Final Notice of Sale. *See* BOEM169, 171–72 (discussing Information to Lessees as part of the "Discretionary Terms and Conditions of the Sale").

Furthermore, NEPA documents are often the vehicle for the Bureau to meet its statutory environmental mandates. Interior's NEPA Handbook provides that a record of decision for any Bureau determinations "may include any mitigation, monitoring, or enforcement plan as appropriate." 516 Department Manual § 6.1(v) (2026). In addition, working with other agencies such as the National Oceanic and Atmospheric Administration, the Bureau may add further terms and restrictions on lease activities as part of the Incidental Take Statement required by the ESA and the Marine Mammal Protection Act. 50 C.F.R. § 402.14(i)(1).

Finally, neither the Reconciliation Act's text nor its statutory history suggest that Congress intended to exempt this sale from NEPA. Courts require that Congress show a "clear and manifest" intent to impliedly repeal any statute, *Hunter v. FERC*, 711 F.3d 155, 159 (D.C.

Cir. 2013) (cleaned up), and will not repeal NEPA by implication without "very strong evidence in the legislative history demonstrating a congressional desire to [do so] or a direct contradiction between that Act and the new legislation," *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 367 (D.C. Cir. 1981). Here, no one has claimed any such contradiction between the Reconciliation Act and NEPA, and nothing in the Act's plain language reflects any "clear and manifest" intent to exempt its lease sales from NEPA compliance.

Moreover, the statutory history demonstrates just the opposite, not only with regard to NEPA compliance but also for the legal mandates of OCSLA and the ESA. As introduced, the bill would have (1) mandated that the Bureau's 2017 Final Programmatic EIS for the 2017–2022 Leasing Program satisfied its NEPA obligations; (2) authorized the Bureau to waive any OCSLA requirement that would delay leasing; (3) required the Bureau to accept the highest acceptable bid and issue a lease; and (4) mandated that compliance with a 2020 Biological Opinion on Gulf oil and gas activities satisfies the ESA. H.R. 1, 119th Cong. § 80171(c)–(e), (j)(1)–(2) (as reported in House, May 20, 2025). All of these provisions were removed from the final bill, *see generally* Pub. L. No. 119-21, § 50102, which strongly suggests that Congress did not intend to undermine the applicability of these laws to the mandated leasing or remove all of the Bureau's discretion to hold the sale. *See Chickasaw Nation v. United States*, 534 U.S. 84, 93 (2001) (courts "will not assume that Congress intended to enact statutory language that it has earlier discarded in favor of other language") (cleaned up); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (cleaned up)).

This Court considered an almost identical question of NEPA's applicability in recent

litigation over Lease Sale 259, another congressionally mandated sale. *See Healthy Gulf*, 775 F. Supp. 3d at 475–76. Industry intervenors in that case argued that because Congress had removed the Bureau's discretion to hold the sale, NEPA did not apply. *Id.* However, this Court warned against "erroneously conflat[ing] the removal of BOEM's discretion to *hold* the lease sale with the removal of BOEM's discretion to *determine the scope* of that sale, including its location, size, and environmental stipulations." *Id.* at 475 (emphasis in original). Because the Bureau retained discretion to determine the sale's scope, this Court held that the Bureau's "legal duty to comply with NEPA" survived. *Id.* at 475, 478; *see also Cook Inletkeeper*, 740 F. Supp. 3d at 777–78 (holding that another statutorily mandated lease sale could not evade NEPA because the statute "did not eliminate BOEM's usual discretion over the scope and conditions of the sale"). Just so here. The Bureau's failure to conduct any environmental review whatsoever—despite the agency's discretion to shape BBG1's conditions and dimensions—violates NEPA.

## II. The Bureau's Approval of BBG1 Violated the Endangered Species Act

In approving BBG1, the Bureau also violated the ESA and its implementing regulations by failing to ensure that this action would not jeopardize the critically endangered Rice's whale. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). As discussed above, Rice's whale is one of the most endangered marine mammals in existence, and federal wildlife experts have determined that the loss of even a single reproductive female could lead this species toward extinction. *See supra* at 11. The Rice's whale's entire known range is limited to the Gulf of Mexico and, specifically, a narrow band of waters between 100–400 meters in depth, which NMFS has proposed to designate as the species' critical habitat. 88 Fed. Reg. at 47453. The primary threats to this species are directly related to oil and gas activities in the Gulf, including from vessel strikes, seismic surveys, oil spills, and pollution. Ibanez Amador Decl. Ex. B, at 12, 38–45.

Although BBG1 offered over 80 million acres of the Gulf for oil and gas leasing, the

Bureau did not take any steps to ensure that this action would not jeopardize the continued existence of this critically endangered species. Such measures could have included restrictions on leasing in areas directly within and adjacent to Rice's whale's proposed critical habitat, as well as speed limits on vessels transiting through such areas. *See id.* Ex. B, at 12, 44–45.

Instead, the Bureau acted on Defendant Giacona's incorrect assessment in the Decision Memo that the ESA is not applicable "to actions that an agency is required by statute to undertake and where Congress in the [Reconciliation Act] did not provide the agency with discretion to add a new species protection pre-requisite at the lease sale stage." BOEM182 (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669, 671–72 (2007)). This position misrepresents both the holding of *Home Builders* and the factual circumstances here.

Under the joint consultation regulations issued by NMFS and the Fish and Wildlife Service, "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. *Home Builders* addressed a discrete situation under this regulation where one federal statute—the Clean Water Act—established nine exclusive criteria to govern EPA's decision whether to transfer water permitting authority to states. 551 U.S. at 661–62. Because none of those exclusive criteria left EPA room to decline to transfer that permitting authority on the grounds that a transfer could jeopardize endangered species, the Supreme Court concluded that the ESA did not apply. *Id.* at 662–64. As the Supreme Court found, where a statute establishes exclusive criteria to dictate whether an agency takes a specific action, and those criteria leave it no power to avoid jeopardizing endangered species, section 7 does not apply. *Id.* at 665, 667, 669.

Since *Home Builders*, several appellate court decisions have confirmed that agencies are

subject to section 7(a)(2) when they have "some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc) (section 7(a)(2) applies because Forest Service has some discretion to protect endangered species in approving mining activities); *NRDC v. Jewell*, 749 F.3d 776, 779, 785 (9th Cir. 2014) (en banc) (section 7(a)(2) applies whenever an agency has "some discretion" to benefit protected species; another legal obligation must "strip" the agency of all discretion to benefit the listed species); *In re Operation of Mo. River System Litig.*, 421 F.3d 618, 630–31 (8th Cir. 2005) (section 7 compliance would not prevent Army Corps from meeting statutory mandates to operate the Missouri River System to preserve downstream navigation).

While the Reconciliation Act imposes certain conditions on BBG1, the Bureau retains significant discretion to act in several ways for the benefit of endangered species. *See supra* Arg. § I. Consequently, because the Bureau retains at least "some discretion" to act for the benefit of listed species in its approval of BBG1, it must comply with ESA section 7. *Jewell*, 749 F.3d at 784 ("The agency lacks discretion only if another legal obligation makes it impossible for the agency to exercise discretion for the protected species' benefit").

Moreover, even though the Reconciliation Act required an outdated version of Lease Stipulation 4, nothing in section 50201 of the Act excuses the Bureau from compliance with its ESA obligations or suggests that the Bureau cannot act to protect listed species. Even the Bureau's outdated Lease Stipulation 4 reaffirms that the Bureau must "comply with [the ESA and OCSLA] on the OCS." BOEM221. To the extent the Bureau contends that ESA section 7 is repealed by implication for these mandated lease sales, implied repeals are strongly disfavored and will not be found unless an intent to repeal is "clear and manifest." *Rodriguez v. United States*, 480 U.S. 522, 524 (1987) (cleaned up); *Am. Forest Res. Council v. United States*, 77

F.4th 787, 799 (D.C. Cir. 2023) (noting the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute" (cleaned up)); *TVA v. Hill*, 437 U.S. at 189 (rejecting argument that Congressional appropriation for dam project implied repeal of ESA requirements).

Nothing in the plain language or statutory history of the Reconciliation Act reflects a "clear and manifest" intent to exempt lease sales from ESA compliance. *See supra* Arg. § I. To the contrary, in the final version of the Reconciliation Act, Congress removed a provision that would have presumed ESA compliance for the mandated lease sales based on an outdated biological opinion. *See* H.R. 1, 119th Cong. § 80171(c)(1), (j)(2) (as reported in House, May 20, 2025). By removing this provision from the final version, the statutory history strongly suggests that Congress did not intend to exempt BBG1 from ESA compliance. *See Chickasaw Nation*, 534 U.S. at 93.

Moreover, NMFS's issuance of a biological opinion for Gulf oil and gas activities (the "2025 BiOp") also does not satisfy the Bureau's section 7 obligations. Even after the issuance of a biological opinion, it is up to the action agency—here, the Bureau—to "determine whether and in what manner to proceed with the action in light of its section 7 obligations and the [wildlife agency's] biological opinion." 50 C.F.R. § 402.15(a); *see Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1993) ("Consulting with [the Service] alone does not satisfy an agency's duty under the Endangered Species Act."). The action agency "must still establish conclusively its compliance with Section 7(a)(2)'s substantive obligations." *Hawksbill Sea Turtle v. FEMA*, 11 F. Supp. 2d 529, 549 (D.V.I. 1998).

Finally, the Bureau's reference to future ESA consultation and the 2025 BiOp[11] in its Information to Lessees does not relieve it of its section 7 obligations here. *See* BOEM204. As the Bureau itself admits, the 2025 BiOp is still "under review and discussion at the Department" and the reasonable and prudent alternative has not been adopted by the Bureau. *Id.*; Complaint ¶ 87; Answer ¶ 87. To meet the requirements of section 7(a)(2), an action agency's mitigation measures must be reasonably specific, certain to occur, and subject to deadlines or other forcible obligations. *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 253 (D.D.C. 2003) (a no jeopardy finding under the ESA must have a reasonable certainty of occurring, not just a reasonable chance) (citing *Nat'l Wildlife Fed'n v. NMFS*, 254 F. Supp. 2d 1196, 1213 (D. Or. 2003)). None of these circumstances are present here.

## III. The Bureau Violated OCSLA by Failing to Study the Impacts of Derelict Infrastructure or Consider Available Relevant Environmental Information in its Decision to Hold BBG1

In its rush to hold BBG1 on terms as friendly to industry as possible, the Bureau arbitrarily ignored OCSLA's mandate that oil and gas development be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2)(B). In fact, there is nothing in the record to suggest that the Bureau even considered its environmental obligations under section 20 of OCSLA (43 U.S.C. § 1346). *See*, *e.g.*, BOEM181–82 (listing six environmental laws that the Bureau deemed inapplicable, without mentioning OCSLA section 20). Yet OCSLA section 20 requires the Bureau to "consider available relevant environmental information in making decisions" and "developing appropriate . . . lease conditions." 43 U.S.C. § 1346(d). It also requires the Bureau, prior to

[11] On January 23, 2026, the Western District of Louisiana found that various aspects of the 2025 BiOp violated the ESA and APA. *Louisiana v. NMFS*, No. 2:25-CV-00691, 2026 WL 184236 (W.D. La. Jan. 23, 2026). The 2025 BiOp is also the subject of a legal challenge in the District of Maryland. *Sierra Club v. NFMS*, No. CV DLB-25-1627 (D. Md. filed May 20, 2025).

holding a lease sale, to "conduct a study of any area or region included in any oil and gas lease sale . . . in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments" that may be affected by oil and gas development. *Id.* § 1346(a)(1). With respect to the Gulf's growing decommissioning backlog, the Bureau did neither.

Information about this backlog is both "available" and "relevant" to the Bureau's decisionmaking.[12] The Bureau possesses or can readily obtain data allowing it to quantify how many wells, platforms, and pipelines are idle, how much idle and end-of-lease infrastructure is overdue for decommissioning, and how many miles of pipeline have been decommissioned-in-place instead of removed. *See, e.g.*, Ibanez Amador Decl. Ex. C (Ex. 4 p.12). It can also determine which companies are responsible for this infrastructure. The Bureau also possesses data on oil industry bankruptcy trends, including how many orphaned wells, platforms, and pipelines have been dumped onto the federal government by insolvent oil companies and how much it will cost taxpayers to safely decommission this infrastructure. Answer ¶ 82; Ibanez Amador Decl. Ex. C (Ex. 17). In addition, the Bureau possesses a pre-Reconciliation Act study predicting Gulf decommissioning trends, including information about idle infrastructure rates. *See id.* Ex. C (Ex. 7). This report suggests that the number of idle wells (i.e., unplugged, out-of-

---

[12] OCSLA does not define "available relevant environmental information," 43 U.S.C. § 1346(d), but the phrase naturally encompasses information that the agency could reasonably obtain or generate. The Department of the Interior has interpreted similar language—which requires agencies to "use the best scientific and commercial data available" in insuring federal actions do not jeopardize endangered species, 16 U.S.C. § 1536(a)(2)—to include "data available or which can be obtained," 50 C.F.R. § 402.14(d). The Environmental Protection Agency ("EPA") has similarly interpreted a requirement that it consider "reasonably available information," 15 U.S.C. § 2625(k), to include "information that EPA possesses or can reasonably generate, obtain, and synthesize," 40 C.F.R. § 702.33.

use wells) is growing significantly, as "[e]very four years or so 1,000 wells have dropped out of production." *Id.* Ex. C (Ex. 7 p.77). Finally, the Bureau possesses information about the environmental risks posted by aging, corroded wells, platforms, pipelines, and other infrastructure. *See, e.g.*, *id*. Exs. G, at 5–17, C at 1, 12–14. Yet the Bureau considered none of this information in its decision to hold BBG1.

The Bureau also failed to fulfill its duty to conduct a section 20 study designed to predict, *inter alia*, "the impacts of development offshore on the affected and coastal areas." 43 U.S.C. § 1346(a)(3); 30 C.F.R. § 556.1300(a). This is precisely the kind of study needed to understand how new oil and gas development will worsen the Gulf's growing decommissioning crisis—yet the Bureau made its decision without it. Unlike other environmental harms, the Bureau has *never* studied the environmental impacts of delayed decommissioning. *See, e.g.*, Ibanez Amador Decl. Ex. F, at L-97 ("While there is a potential that infrastructure would not be timely decommissioned or become orphaned, the analysis presumes . . . that the infrastructure will be decommissioned according to the regulations."). Nor has it attempted to predict how much infrastructure will be left idle as a result of BBG1 (and for how long), how many wells may become orphaned, the increased risk of "chronic low level pollution or large spills," and the other harmful environmental effects of delayed decommissioning from the lease sale alone or in combination with delayed decommissioning on existing or relinquished, expired, or terminated leases. *See* 43 U.S.C. § 1346(a)(3). It has also not predicted how congressionally mandated leasing under the Reconciliation Act will contribute to these impacts.

Moreover, the Bureau's duty under section 20(a) to conduct environmental studies is separate from and independent of its obligations under NEPA. *Cf. False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) (NEPA and section 20(a) are "complementary"); 30 C.F.R.

§ 556.1300(b) (a section 20 study "to the extent possible, will not duplicate studies done under other laws."). But even assuming an EIS could satisfy section 20(a) in certain circumstances, the Bureau has not relied on any EIS here.

As with NEPA and the ESA, nothing in the Reconciliation Act excuses the Bureau from complying with OCSLA's section 20 requirements. *See supra* Arg. §§ I-II. Nor does it limit the Bureau's discretion to take meaningful action based on available relevant environmental information. *Contra* BOEM161. Most importantly, the Bureau retains broad discretion to accept or reject any bids received on BBG1 and during the Information to Lessees process. *See supra* at 29. Thus, the Bureau has ample opportunity to act on available information about the Gulf's decommissioning crisis in holding the lease sale. It can reject bids from companies that are not "responsible," such as those with overdue decommissioning obligations, and it can provide Information to Lessees about its intention to do so.

## IV. The Bureau Violated OCSLA by Failing to Publish a Proposed Notice of Sale

The Bureau also violated OCSLA by failing to publish a Proposed Notice of Sale for BBG1, in violation of 30 C.F.R. § 556.304. As discussed above, the Bureau published a Proposed Notice of Sale for Lease Sale 262 on June 27, 2025, but waited several weeks following the enactment of the Reconciliation Act to determine that it would be "pivoting to BBG1 mid-process" and would not be issuing a Proposed Notice of Sale for BBG1. *See supra* pp. 4–5; BOEM19. The Center's comments on the Proposed Notice of Sale specifically expressed confusion about this situation and requested that the Bureau consider the comments—and Plaintiffs' prior comments on the Draft PEIS—in its decision to hold either sale. Ibanez Amador

Decl. Ex. G, at 1–2, 4–5, 19.[13] The Bureau has now admitted that it did not consider these comments, *id*. Ex. H, even though its own regulations provide that the Bureau "will consider *all* comments and recommendations received in response to the proposed notice of sale." 30 C.F.R. § 556.307(a) (emphasis added).

The Bureau's failure to provide a proposed notice of sale was not harmless error. *See Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002). The Bureau consciously chose not to publish the proposed notice because it did not want to slow down its original plan to hold a lease sale on December 10, 2025, despite dragging its feet for weeks while deciding what to do about Lease Sale 262. BOEM22–23. This failure created substantial public confusion and deprived the public of its only opportunity to comment on BBG1. And when the Center expressed its confusion to the Bureau and asked the Bureau to consider its comments, the Bureau ignored them entirely. *See* Ibanez Amador Decl. Ex. H, at 2 ("Regarding Plaintiffs' comments on the Proposed Notice of Sale for Lease Sale 262, BOEM did not consider these comments"); *see Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014) (holding that "we cannot conclude that the agency's [logical outgrowth] error was harmless" where the public comments received did not actually anticipate the final rule).

## V. Defendant Giacona's Improper Involvement Tainted the Decision to Finalize BBG1

To survive the APA's "arbitrary and capricious" standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned

[13] Creating further confusion, the Bureau's November 10, 2025 letter to governors announcing the Final Notice of Sale states that "the Bureau is treating the Section 19 comment period on Lease Sale 262 as the comment period for this Lease Sale BBG 1." BOEM254. This contradicts the Bureau's internal decision that there would be no Proposed Notice of Sale and, regardless, was never communicated publicly.

up). The improper involvement of an agency official in a particular decision can provide grounds for finding such decision to be arbitrary and capricious. *See, e.g.*, *W. Watersheds Project v. Fish & Wildlife Serv.*, 535 F. Supp. 2d 1173, 1188–89 (D. Idaho 2007) (finding involvement of Deputy Assistant Secretary to obtain to a preordained outcome in ESA listing decision to be "an independent reason" why the decision was arbitrary and capricious).

Prior to starting his tenure with the Bureau in March 2025, Defendant Giacona was the Vice President of Government Affairs with NOIA, where he engaged in advocacy on behalf of the full membership of NOIA regarding offshore energy matters. BOEM367–69. NOIA members include companies such as Chevron, Shell, BP, and Equinor[14]—that regularly bid on Gulf lease sales, including BBG1.[15] Along with other industry groups, NOIA submitted comments on the Draft PEIS, urging the Bureau to offer for oil and gas leasing "all unleased acreage not subject to moratorium" in the Gulf. Ibanez Amador Decl. Ex. D, at 1–2. Chevron also submitted comments on the Draft PEIS urging the Bureau "to offer maximum acreage for oil and gas leasing." *Id*. Ex. E, at 2.

On March 27, 2025, the Department of the Interior Ethics Office issued "Interim Ethics Guidance on Recusal Obligations" to Defendant Giacona. BOEM282-303. The interim guidance stated that Defendant Giacona should not participate in any matter without authorization "if you know that a person with whom you have a 'covered relationship' is or represents a party [in] a particular matter involving specific parties, and you determine that the circumstances would cause a reasonable person with knowledge of the relevant facts to question your impartiality in

[14] *See Membership by Industry Segment*, NOIA, https://www.noia.org/noia-membership-list-by-industry-segment/.
[15] *See* BOEM, Sale Day Statistics 1 (Dec. 10, 2025) at 3-4, https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-BBG1-Stats_0.pdf.

the matter." BOEM284. "Covered relationship" is defined to include "[a]ny person for whom you have, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee." BOEM284 n.2 (citing 5 C.F.R. § 2635.502(b)(1)). The interim guidance also stated that in other circumstances that raise a question regarding impartiality, Defendant Giacona "must consider the relevant facts about the particular matter in question and determine whether you believe that a reasonable person with knowledge of those facts would question your impartiality in performing your official duties in the particular matter." BOEM284 (citing 5 C.F.R. § 2635.502(a)(3)).

On July 25, 2025, the Ethics Office finalized Defendant Giacona's "Ethics Guidance on Recusal Obligations." BOEM365-381. The Ethics Office determined that Defendant Giacona has a "covered relationship" with NOIA, and reaffimed that he should not participate personally and substantially in particular matters that effect NOIA's financial interest or where "a reasonable person with knowledge of the relevant facts would question your impartiality." BOEM367-68, 379. The Ethics Office further determined that Defendant Giacona does not have a "covered relationship" with NOIA's members, but reinterated that prior to participating in a particular matter in which "NOIA is a party or represents a party," Defendant Giacona "should carefully consider whether a reasonable person with knowledge of the relevant facts would question your impartiality in the matter." BOEM368. The Ethics Office stated that Defendant Giacona "must take steps to avoid any action that creates the appearance that you are violating the law or the ethics standards set forth in 5 C.F.R. Part 2635." BOEM369 (citing 5 C.F.R. § 2635.101(b)(14)).

Despite this direction from the Ethics Office, Defendant Giacona has been personally and substantially engaged in Gulf offshore lease sales throughout his tenure at the Bureau, including Lease Sale 262 and BBG1. *See* Answer ¶ 117. For example, Defendant Giacona's official

calendar reflects at least four meetings during April and May 2025 on Lease Sale 262. BOEM304, 332, 345, 354. This included directorate briefings on April 1 and 29, 2025, additional internal meetings on May 12 and 21, 2025, *id*., as well as meetings with industry groups regarding offshore leasing, *see, e.g.*, BOEM341 ("In-person: Chevron-Offshore & Onshore Leasing"). Defendant Giacona personally signed the Notice of Availability of the Proposed Notice of Sale for Lease Sale 262. 90 Fed. Reg. 27675 (June 27, 2025).

After the Bureau decided to defer Lease Sale 262 and move forward instead with BBG1, Defendant Giacona continued his close involvement in the matter. On November 5, 2025, Defendant Giacona issued the Decision Memo for BBG1 which recommended a lease sale of the maximum size with the lowest royalty rates. BOEM169, 179. Defendant Giacona also provided the Bureau's determination that the environmental review requirements of NEPA, the consultation provisions of the ESA, and several other environmental statutes do not apply to BBG1 or other Reconciliation Act lease sales. BOEM181–82. Defendant Giacona then signed the Final Notice of Sale for BBG1. BOEM196.

Consequently, despite his covered relationship with NOIA and the involvement of NOIA and its members, Defendant Giacona made no effort to avoid participation in BBG1 or maintain an appearance of impartiality with regard to this sale. To the contrary, the record shows that Defendant Giacona was extensively engaged with both Lease Sale 262 and BBG1 and directly advocated for a sale on terms that were the most favorable to his prior employer and its members. *See* BOEM169, 179, 181-82. The record does not show any attempt by Defendant Giacona to determine whether a reasonable person would question his impariality in this matter, or that Defendant Giacona sought any guidance or authorization from the Ethics Office to participate. *See* BOEM367–68, 379. Given Defendant Giacona's extensive involvement, the

Bureau's approval of BBG1 was arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706; *see State Farm*, 463 U.S. at 43.

## CONCLUSION

For the foregoing reasons, the Court should declare that the Bureau's decision to approve BBG1 violated NEPA, the ESA, OCSLA, and the APA and order briefing on the appropriate remedy.

Respectfully submitted this 3rd day of April, 2026.

*<u>/s/ George Torgun</u>*
George Torgun (*pro hac vice*)
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
gtorgun@earthjustice.org

Ava Ibanez Amador (*pro hac vice*)
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8043 Telephone
415-217-2040 Fax
alamador@earthjustice.org

Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
smashuda@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, and Center for Biological Diversity*

*/s/ Rachel Mathews*
Rachel Mathews (DC Bar No. VA211)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(828) 774-5636
rmathews@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

*/s/ Jared Solomon*
Jared Solomon (DC Bar No. 90033165)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-289-6868 Telephone
jsolomon@nrdc.org

Julia K. Forgie (pro hac vice)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

Irene Gutierrez (pro hac vice)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st Floor
San Francisco, CA 94104
415-875-6187 Telephone
igutierrez@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice*)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*