# EXHIBIT A



OCS EIS/EA
BOEM 2024-032

# Gulf of Mexico Regional OCS Oil and Gas Lease Sales

## Draft Programmatic Environmental Impact Statement



**U.S. Department of the Interior**
**Bureau of Ocean Energy Management**
**Gulf of Mexico Regional Office**

The proposed action would provide the most flexible leasing approach, including satisfying the requirements in the Inflation Reduction Act to issue renewable energy leases and provide more frequent opportunity to bid on rejected, relinquished, or expired OCS lease blocks in all three GOM planning areas.  A proposed OCS oil and gas lease sale under this alternative may include proposed lease stipulations designed to reduce environmental risks.   The decisionmaker will make a determination to apply stipulations discussed below in **Chapter 2.3.1** and **Appendix F** in the Record of Decision for each proposed OCS oil and gas lease sale.



Figure 2.2-1.  *Proposed OCS Oil and Gas Lease Sale Area for Alternative B (a total of approximately 94.1 million acres with approximately 79.6 million acres available for lease as of April 2024).*

### 2.2.3    Alternative C (The Preferred Alternative) – Inflation Reduction Act Targeted OCS Lease Sale Area

Alternative C (**Figure 2.2-2**) would allow for a proposed OCS oil and gas lease sale area within a reduced geographic area by excluding targeted areas from Alternative B.  These exclusions were identified to focus future OCS leasing in areas of interest, for environmental considerations, to reduce marine spatial planning conflicts, and to satisfy the Inflation Reduction Act stipulations needed to issue offshore wind energy leases.  The Inflation Reduction Act stipulates that, in order to issue an offshore

wind energy lease, an aggregate of at least 60 million acres must be offered for offshore oil and gas leasing within the previous 12-month period.  Alternative C would allow for a proposed GOM oil and gas lease sale of approximately 64.7 million acres as of May 2024, satisfying this minimum aggregate lease acreage requirement in a single OCS oil and gas lease sale. Alternative C is the agency's Preferred Alternative because it offers more than 60 million acres for leasing to satisfy the Inflation Reduction Act requirements for holding offshore wind energy sales, reduces potential marina spatial planning conflicts, and avoids areas with the most vulnerable environmental resources.

This alternative would include all available unleased blocks in the WPA, CPA, and EPA Outer Continental Shelf oil and gas lease sale areas for OCS oil- and gas-related activities, with the following exceptions:

- blocks that were excluded from consideration under Alternative B;

- whole and partial blocks subject to the proposed Topographic Features Stipulation;

- whole and partial blocks subject to the proposed Live Bottom (Pinnacle Trend) Stipulation;

- whole and partial blocks subject to the proposed Blocks South of Baldwin County, Alabama, Stipulation;

- whole and partial blocks that contain Significant Sediment Resource Areas (SSRA);

- Wind Energy Area Options (Areas A, B, C, D, E, F, G, and H) as of April 2024, final Wind Energy Areas (Areas I, J, K, L, and N), and Wind Energy Lease(s) (i.e., OCS-G 37334);

- whole and partial blocks within the Rice's whale proposed core distribution area as of April 2024; and

- whole and partial blocks within the Rice's whale proposed critical habitat area as of April 2024.

The proposed stipulations are discussed below in **Chapter 2.3.1** and **Appendix F**.

contains deepwater coral communities that have been found as deep as 9,842 ft (3,000 m) (BOEM 2012; Brooks et al. 2012).

At least 330 chemosynthetic communities exist in the GOM (BOEM 2016). Deep-sea sponges, corals, and tubeworms are attracted to these chemosynthetic communities and associated substrates and then, in turn, attract relatively large numbers and species of invertebrates and fishes to these microhabitats for shelter, feeding, and nursery grounds (BOEM 2017; Fraser and Sedberry 2008). Gas hydrates are a naturally occurring "ice-like" combination of natural gas and water (gas trapped in ice crystals) that have the potential to be a significant new source of energy from the world's oceans and polar regions. Hydrates have been observed and sampled from the Gulf of Mexico OCS in association with naturally occurring oil and gas seeps in localized deepwater areas of very cold temperature and high pressure at or near the seafloor.

### 4.0.1.6    Coastal Environment

The U.S. coastline in the GOM comprises more than 750 bays, estuaries, and sub-estuary systems (USEPA 2012). These coastal and estuarine habitats provide important nursery grounds and adult habitat for numerous species of fishes and invertebrates, while seagrass beds provide foraging habitat for sea turtles and manatees (Byrnes et al. 2017). Gulf of Mexico coastal waters support stocks of several commercially and recreationally valuable fishes and invertebrate species that are managed by NOAA and the Gulf of Mexico Fishery Management Council. The most common coastal habitats in the GOM include saltwater marshes, saltwater mangrove swamps, and non-vegetated areas such as sandbars, mudflats, and shoals (Dahl and Stedman 2013; Gulf Restoration Network 2004). Barrier islands are present on more than half of the U.S. Gulf of Mexico coastline (BOEM 2015; Dolan and Lins 1987) and protect the mainland from shoreline erosion by reducing wave action (Rosati 2009; Zinnert et al. 2019). Barrier islands also provide habitat for many species of birds, sea turtles, and sand-dwelling crustaceans. Submerged aquatic vegetation is a vital component of coastal aquatic ecosystems, with at least 26 species of seagrasses and attached macroalgae growing in the northern GOM (Carter et al. 2011; Cosentino-Manning et al. 2015; Heck et al. 2011). Seagrasses serve important ecological functions, including foraging material for grazers, habitat for marine life, and important nursery grounds for numerous commercially important fish and invertebrate species.

### 4.0.1.7    Human Environment

Communities in the GOM region depend on the ocean economy for employment and income. In 2019, over 616,000 people were employed in coastal industries (2.8% of total employment in the region), bringing in $115 billion dollars in gross domestic product (GDP) (4.3% of total GDP in the region). The GOM's ocean economy is heavily influenced by the recreation and tourism industry, which provides for over half of the jobs in this sector, and offshore oil and gas activities, which generate 70 percent of the GDP (NOAA 2021; 2022). The GOM contributes the highest percentage of GDP in the entire U.S. ocean economy, with Texas contributing a majority of that percentage due to the offshore oil and gas industry (NOAA 2019). The GDP in the GOM ocean economy increased by 41 percent from 2009 to 2019, driven by changes in resource pricing (NOAA 2021). The oil and gas industry sector as a whole has been operating for decades and plays a central role in the employment

Information on the long-term effects of recent hurricanes, such as Hurricane Ida, is also currently unavailable. Major hurricanes in the GOM have prompted demographic shifts and economic impacts. Studies of past hurricane impacts and responses, as well as the most currently available information on these recent hurricanes is considered (**Chapter 3.6.12**). Additionally, more specific connections between the potential health risks of personnel working on vessels in proximity to offshore facilities, as well as coastal communities' exposure to air pollutants related to routine oil- and gas-related offshore emissions, could be better explored in future research, especially in terms of location specificity and population exposure risks. Refer to **Chapter 4.1** for more information on potential air pollutants related to routine oil- and gas-related activities. Finally, obtaining detailed, location-specific information on environmental justice impacts, direct and indirect, from a proposed OCS oil and gas lease sale remains a challenge, as discussed more in **Chapter 4.16.2.4**. While relevant to this analysis, BOEM has determined that such information is not essential to a reasoned choice among alternatives based on the discussion above. BOEM has used the best available scientific information to date and reasonably accepted scientific methodologies to extrapolate from existing information. Therefore, the incomplete or unavailable information, while relevant, would not likely change the impact conclusions reached in this analysis and is not essential to a reasoned choice among alternatives.

## 4.16.4    Environmental Justice Determination

In accordance with 40 CFR §§ 1508.7 and 1508.8, BOEM has considered potential cumulative, direct, and indirect impacts to minority and low-income populations in the analysis area. Furthermore, in reaching this considered environmental justice determination, BOEM utilized guidance from CEQ (1997), USEPA (1998), and the NEPA Committee and Federal Interagency Working Group on Environmental Justice (2016).

Most of the OCS oil- and gas-related activities as a result of an OCS oil and gas lease sale are distant from human habitation, and would not have any direct impacts on low-income and minority populations. State offshore oil and gas leasing occurs in waters closer to land where petroleum-related activities are generally viewed as having a greater potential for directly impacting coastal communities. Indirect impacts to minority and low-income populations would occur onshore and would result from the operations of the extensive infrastructure system that supports all onshore and offshore OCS oil- and gas-related activities. This includes pipe coating, umbilical production, subsea equipment production, platform fabrication, shipbuilding and repair, exploration and production, crew transportation, product transportation, pipelines, above ground and underground storage and terminalling, exports, processing, refining, etc. Upstream infrastructure generally supports new developments, such as with platform fabrication, and this activity can generally be linked to the development of new leases. However, at the time of a lease sale the location of which upstream facilities might be utilized to support the development of the leased areas is unknown, and so an understanding of potentially impacted communities is unknown. Midstream and downstream infrastructure moves hydrocarbon product to market and includes gas processing facilities, petrochemical plants, transportation corridors, petroleum bulk storage facilities, and gas and

petroleum pipelines.    These components comprise a mature, widespread, and concentrated infrastructure system (refer to **Chapter 4.14.1**).

Much of this infrastructure is in coastal Louisiana and Texas, and to a lesser extent in Mississippi's Jackson County and Alabama's Mobile County.  While many fabrication and supply facilities are concentrated around coastal ports, downstream processing is concentrated in industrial corridors farther inland (Dismukes 2011; Kaplan et al. 2011a; 2011b).  The onshore downstream infrastructure exists to support all oil- and gas-related activities regardless of source (onshore, offshore, and imported product).  The proportion of Federal OCS oil- and gas-related activities' contribution to downstream infrastructure use has not yet and, most likely, may never be possible to determine as it is dependent on highly unpredictable market demands and prices.  Similarly, potential environmental justice impacts that may arise from downstream support activities associated with OCS oil- and gas-related activities are so attenuated from BOEM's decisionmaking and regulatory authority, it is difficult to discern the specific influence that BOEM's decisions have on these downstream support activities, including their location.  Many other Federal and State agencies regulate onshore oil- and gas-related infrastructure through air and wastewater discharge permitting and stream and wetland permitting.  Through these permitting processes, the Federal agencies are required to consider environmental justice impacts for their proposed Federal actions.  Therefore, BOEM has determined that a proposed lease sale would not directly adversely affect minority and low-income populations.

However, indirect impacts might interact with other cumulative burdens unevenly throughout the study region and could potentially disproportionately affect environmental justice populations, although the particular contributions of a lease sale cannot measurably be determined with available information in regard to the location, extent, or severity of these impacts due to the complications discussed above.  Some of the cumulative impacts to environmental justice communities are discussed in more detail in **Chapters 4.16.2.1 and 4.17.16**.  Additionally, BOEM strives towards improving its environmental justice considerations through the development of Best Practices ongoing in our national office and hosting a series of Environmental Justice Technical Workshops in the Gulf of Mexico region.  BOEM's Gulf of Mexico Region recently began a new study, "Cultural Heritage and Traditional Knowledge of Vulnerable Coastal Communities," to better understand the status of cultural heritage on Louisiana's coast, the threats to that heritage, and how coastal communities wish for State and Federal governments to consider that heritage in their planning and implementation efforts.  As many of these coastal communities qualify as environmental justice populations (especially prevalent are Indigenous groups, African-American descendant communities, and those of Southeastern Asian descent), this effort would assist with filling an important data gap as it relates to the "social factors" of coastal Louisiana environmental justice groups and also serve as a resource for future consultations, outreach, and planning.  While relevant to this analysis, BOEM has determined that such information is not essential to a reasoned choice among alternatives based on the discussion above.  BOEM has used the best available scientific information to date and reasonably accepted scientific methodologies to extrapolate from existing information.  Therefore, the incomplete or unavailable information, while relevant, would not likely change the impact conclusions reached in this analysis and is not essential to a reasoned choice among alternatives.