ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
Environment and Natural Resources Division

SHANNON BOYLAN (D.C. Bar No. 1724269)
DAVIS A. BACKER (CO Bar No. 53502)
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-9584 (Boylan)
Tel: (202) 305-5469 (Backer)
Fax: (202) 305-0506
Email: shannon.boylan@usdoj.gov
Email: davis.backer@usdoj.gov

*Attorneys for Federal Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEALTHY GULF, *et al.*,<br><br>       *Plaintiffs*,<br><br>   v.<br><br>DOUG BURGUM, in his official capacity as SECRETARY OF THE INTERIOR, *et al.*,<br><br>       *Federal Defendants,*<br><br>   and<br><br>CHEVRON U.S.A. INC., AMERICAN PETROLEUM INSTITUTE,<br><br>       *Intervenor-Defendants*. | Civil Action No. 1:25-04016-APM |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................ 1

STATUTORY BACKGROUND ................................................................................................. 2

     I.     The National Environmental Policy Act ................................................................ 2

     II.    The Outer Continental Shelf Lands Act ................................................................ 3

     III.   The One Big Beautiful Bill Act .............................................................................. 4

     IV.   The Endangered Species Act ................................................................................. 5

          A.     The Endangered Species Committee .......................................................... 6

          B.     The Committee's Exemption ....................................................................... 6

FACTUAL BACKGROUND ...................................................................................................... 7

STANDARD OF REVIEW ......................................................................................................... 9

ARGUMENT .............................................................................................................................. 10

     I.     NEPA Does Not Apply to the BBG1 Lease Sale ................................................. 10

     II.    OCSLA Section 20 Does Not Apply to the BBG1 Lease Sale ............................. 17

     III.   BOEM's Notice Process Under OCSLA Was Adequate ...................................... 19

     IV.   The ESA Section 7 Procedural Consultation and Substantive "Jeopardy"
            Requirements Do Not Apply to the BBG1 Lease Sale ........................................ 21

     V.     Even if the ESA Applies to BBG1, the Court Lacks Jurisdiction Because the
            Endangered Species Committee's Exemption Mooted Plaintiffs' Claim ............. 23

     VI.   No Exception to Mootness Applies ...................................................................... 27

     VII.  Plaintiffs' Claim Concerning Alleged Improper Involvement by an Agency
            Official Fails on Multiple Grounds ...................................................................... 29

     VIII. Plaintiffs Lack Standing .......................................................................................... 30

CONCLUSION ........................................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**

*Akiachak Native Cmty. v. Dep't of the Interior*,
  827 F.3d 100 (D.C. Cir. 2016) ...................................................................... 23, 27

*Alaska v. U.S. Dep't of Agric.*,
  17 F.4th 1224 (D.C. Cir. 2021) ................................................................ 23, 26, 27

*Am. Bar Ass'n v. FTC*,
  636 F.3d 641 (D.C. Cir. 2011) .............................................................................. 27

*Am. Forest Res. Council v. Williams*,
  96 F.4th 417 (D.C. Cir. 2024) ........................................................................ 23, 26

*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997) ................................................................................................ 23

*Ass'n of Am. Physicians & Surgeons v. Sebelius*,
  746 F.3d 468 (D.C. Cir. 2014) .............................................................................. 32

*Bates v. United States*,
  522 U.S. 23 (1997) ................................................................................................ 16

*Chafin v. Chafin*,
  568 U.S. 165 (2013) .............................................................................................. 26

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
  267 F.3d 1144 (D.C. Cir. 2001) .................................................................. 2, 10, 15

*Clarke v. United States*,
  915 F.2d 699 (D.C. Cir. 1990) ........................................................................ 23, 27

*Del Monte Fresh Produce Co. v. United States*,
  570 F.3d 316 (D.C. Cir. 2009) .............................................................................. 28

*FDA v. Wages & White Lion Invs., L.L.C.*,
  604 U.S. 542 (2025) .................................................................................... 9, 16, 20

*Fed. Express Corp. v. Air Line Pilots Ass'n*,
  67 F.3d 961 (D.C. Cir. 1995) ................................................................................ 25

*Friends of the Earth v. Haaland*,
  No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) .................................. 15

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
  528 U.S. 167 (2000) .............................................................................................. 30

*Grand Canyon Tr. v. U.S. Bureau of Reclamation*,
  691 F.3d 1008 (9th Cir. 2012) ......................................................................... 5, 22

*Healthy Gulf v. Burgum,*
  775 F. Supp. 3d 455 (D.D.C. 2025) ................................................................ 16, 17, 30, 32

*Honeywell Int'l Inc. v. Nuclear Regul. Comm'n,*
  628 F.3d 568 (D.C. Cir. 2010) ........................................................................ 26

*Izaak Walton League of Am. v. Marsh,*
  655 F.2d 346 (D.C. Cir. 1981) ........................................................................ 15

*Kasza v. Browner,*
  133 F.3d 1159 (9th Cir. 1998) ........................................................................ 26, 27

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................ 23, 30

*Moharam v. Transp. Sec. Admin.,*
  134 F.4th 598 (D.C. Cir. 2025) ...................................................................... 28

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) .......................................................................................... 9

*N. Slope Borough v. Andrus,*
  642 F.2d 589 (D.C. Cir. 1980) ........................................................................ 12

*Narragansett Indian Tribal Historic Preservation Off. v. FERC,*
  949 F.3d 8 (D.C. Circ. 2020) .......................................................................... 31

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) ........................................................................................ 5, 21

*Nuclear Energy Inst., Inc. v. EPA,*
  373 F.3d 1251 (D.C. Cir. 2004) ...................................................................... 27

*Planned Parenthood of Wisc., Inc. v. Azar,*
  942 F.3d 512 (D.C. Cir. 2019) ........................................................................ 25

*Platte River Whooping Crane Critical Habitat Maintenance Tr. v. FERC,*
  962 F.2d 27 (D.C. Cir. 1992) .......................................................................... 21, 23

*Pub. Serv. Elec. & Gas Co. v. FERC,*
  783 F.3d 1270 (D.C. Cir. 2015) ...................................................................... 26

*Seven Cnty Infrastructure Coal. v. Eagle Cnty, Colo.,*
  605 U.S. 168 (2025) ........................................................................................ 2, 11, 13

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  803 F.3d 31 (D.C. Cir. 2015) .......................................................................... 2

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) .......................................................................................... 31

*Vill. of False Pass v. Clark,*
  733 F.2d 605 (9th Cir. 1984) .......................................................................... 18

*W. Watersheds Project v. Fish & Wildlife Serv.*,
  535 F. Supp. 2d 1173 (D. Idaho 2007) ...................................................................... 30

*Wash. Toxics Coal. v. EPA*,
  413 F.3d 1024, (9th Cir. 2005) ................................................................................ 5

**Statutes**

16 U.S.C. § 1531(b) ...................................................................................................... 5

16 U.S.C. § 1536(a) ...................................................................................................... 5

16 U.S.C. § 1536(a)(2) ................................................................................................ 25

16 U.S.C. § 1536(a)(2), (o)(1) ...................................................................................... 6

16 U.S.C. § 1536(b) ...................................................................................................... 5

16 U.S.C. § 1536(b)(4) .................................................................................................. 6

16 U.S.C. § 1536(e)(3)(A)-(F) ...................................................................................... 6

16 U.S.C. § 1536(e), (h) .............................................................................................. 27

16 U.S.C. § 1536(e), (h) .............................................................................................. 6

16 U.S.C. § 1536(j) ........................................................................................................ 6

16 U.S.C. § 1536(o)(1) ................................................................................................ 26

16 U.S.C. § 1536(o)(2) .................................................................................................. 6

42 U.S.C. § 4332(2)(C) .................................................................................................. 2

42 U.S.C. § 4336(a)(4) (2023) ................................................................................. 2, 15

43 U.S.C. § 1331 ............................................................................................................ 3

43 U.S.C. § 1331(a) ........................................................................................................ 3

43 U.S.C. § 1332(3) ........................................................................................................ 3

43 U.S.C. § 1334(d) ...................................................................................................... 14

43 U.S.C. § 1337(a)(1) .............................................................................................. 3, 14

43 U.S.C. § 1340(b) ........................................................................................................ 4

43 U.S.C. § 1340(c)(3) .................................................................................................... 4

43 U.S.C. § 1344 ............................................................................................................ 3

43 U.S.C. § 1344(a)(4) .................................................................................................. 14

43 U.S.C. § 1345 .................................................................................................. 3, 19, 20

43 U.S.C. § 1346(a)(1) .............................................................................................. 17, 18

43 U.S.C. § 1346(a)(2) ............................................................................................................. 17

43 U.S.C. § 1346(b) .................................................................................................................. 18

43 U.S.C. § 1351 ......................................................................................................................... 4

43 U.S.C. § 1802(1) ..................................................................................................................... 7

5 U.S.C. § 706 ............................................................................................................................. 9

5 U.S.C. § 706(2)(A) ................................................................................................................... 9

Pub. L. No. 119-21, 139 Stat. 72 (2025) ........................................................................... passim

**Regulations**

30 C.F.R. § 550.101 .................................................................................................................... 7

30 C.F.R. § 550.241 .................................................................................................................... 4

30 C.F.R. § 556.304 .................................................................................................................. 18

30 C.F.R. § 556.304(c) ..................................................................................................... 3, 19, 20

30 C.F.R. § 556.307 .................................................................................................................... 4

30 C.F.R. § 556.307(a) .............................................................................................................. 20

30 C.F.R. § 556.307(b)-(c) .................................................................................................. 19, 20

30 C.F.R. § 556.308(a) .............................................................................................................. 19

30 C.F.R. § 556.403 .................................................................................................................. 14

30 C.F.R. § 556.511(a) .............................................................................................................. 14

30 C.F.R. § 556.512 .................................................................................................................. 14

30 C.F.R. § 556.516 .................................................................................................................. 14

5 C.F.R. § 2635.502(a)(2) ......................................................................................................... 29

50 C.F.R. § 402.03 ................................................................................................................. 5, 21

50 C.F.R. § 402.14(a) ............................................................................................................. 5, 25

50 C.F.R. § 402.14(h) .................................................................................................................. 5

50 C.F.R. § 402.14(I) ................................................................................................................... 6

**Other Authorities**

91 Fed. Reg. 16,966 (Apr. 3, 2026) ............................................................................................ 7

Exec. Order No. 14156 ................................................................................................................. 7

**INTRODUCTION**

This case concerns a lease sale (the "BBG1 Lease Sale") that Congress expressly required the Bureau of Ocean Energy Management ("BOEM") to conduct on a specified timeline and under defined parameters. In the One Big Beautiful Bill Act ("OBBBA"), Congress directed BOEM to hold a Gulf of America ease sale by December 15, 2025, to offer not fewer than 80 million acres, and to apply prescribed lease terms, economic conditions, and stipulations. BOEM implemented those directives. Its role was to carry out Congress's instructions, not to revisit the policy choices reflected in the statute.

Plaintiffs' claims rest on the faulty premise that BOEM retained sufficient discretion to alter the scope or terms of the lease sale in ways that could affect environmental outcomes. The administrative record shows otherwise. Congress specified the core features of the sale, including its minimum size, location, and governing lease terms, leaving BOEM without authority to adopt materially different alternatives. And it directed BOEM to hold 30 such sales—two per year until March 2040—thus effectively ensuring that all remaining unleased and available acreage in the Gulf of America would at some point be offered for sale. That lack of discretion is fatal to each of Plaintiffs' claims. The National Environmental Policy Act ("NEPA") does not require analysis of alternatives that an agency is legally prohibited from adopting; the Outer Continental Shelf Lands Act's ("OCSLA") procedural provisions cannot be applied in a manner that would prevent the agency from complying with a later-enacted statutory mandate; and the Endangered Species Act "(ESA") does not require an agency to circumvent a separate statutory mandate—here, the OBBBA.

Plaintiffs' claims thus fail on the merits. But they also fail for lack of standing, because Plaintiffs cannot show that any alleged procedural deficiency could have affected the outcome.

Page 1 –    Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
            *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

BOEM was required to conduct the lease sale by the statutory deadline and to structure it in accordance with Congress's directives, regardless of any additional analysis or input. Because BOEM complied with the governing statutes and because Plaintiffs' claims depend on discretion the agency did not have, summary judgment should be entered for Federal Defendants.

## STATUTORY BACKGROUND

### I.    The National Environmental Policy Act

NEPA directs the federal government to "identify and assess in advance the likely environmental impacts of its proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015). Under NEPA, agencies are normally required to prepare detailed statements evaluating any "major Federal actions" that will have significant impacts on the quality of "the human environment." 42 U.S.C. § 4332(2)(C).

The purpose of NEPA is to inform agency decision-making, by ensuring the agency is "aware of the environmental consequences" if its actions. *Seven Cnty Infrastructure Coal. v. Eagle Cnty, Colo.*, 605 U.S. 168, 169, 177 (2025). But "[t]he touchstone of whether NEPA applies is discretion." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). Where the agency lacks "sufficient discretion" to modify its decision in response to the information that NEPA provides, "NEPA is inapplicable." *Id.*; *see also* 42 U.S.C. § 4336(a)(4) (2023) (specifying that NEPA does not apply where "the proposed action is a nondiscretionary action with respect to which [an] agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action").

## II.    The Outer Continental Shelf Lands Act

OCSLA grants authority to the Secretary of the Interior, and by delegation to BOEM, over the leasing, exploration and development of federally owned resources beneath the Outer Continental Shelf ("OCS"). 43 U.S.C. § 1331. The OCS is comprised of a span of ocean between the outer boundaries of state waters and the Exclusive Economic Zone of the United States. 43 U.S.C. § 1331(a). In passing OCSLA, Congress expressly stated that the OCS is a "vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3). A primary purpose of OCSLA, therefore, was to provide for the swift and efficient development of OCS resources. *Id.*

OCSLA prescribes a four-step process for resource development on the OCS. In the first stage, BOEM is required to design and implement a program consisting of a series of lease sales of OCS territory. 43 U.S.C. § 1344. This program is reevaluated and redesigned as necessary to meet projected national energy needs over a five-year window. *Id.* The second stage involves the lease sales themselves, where leases are awarded based on a competitive sale process. *Id.* § 1337(a)(1) . OCSLA prescribes certain elements of these sales, including bidder qualification requirements and minimum and maximum royalty rates. *Id.* § 1337(a)(1)(A-I) . During this stage, BOEM publishes a Proposed Notice of Sale in the Federal Register that states its intent to hold a sale and outlines the size, timing, location, applicable lease stipulations, mitigation terms, minimum bid, and royalty and rental rates. 30 C.F.R. § 556.304(c). BOEM then sends the proposed notice to the governors of states impacted by the potential sale, as well as the executives of impacted local governments. *See* 43 U.S.C. § 1345; 30 C.F.R. § 556.304(c). Those

Page 3 –    Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
        *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

governors and executives have a 60-day window to offer comments, which BOEM is required to consider. *See* 30 C.F.R. § 556.307.

The third stage of the leasing process requires lessees to submit exploration plans to BOEM, which must include a schedule of proposed exploration activities, a description of equipment that will be employed during exploration, the general location of each exploration well the lessee proposes to drill, and any other information that may be required by the agency. 43 U.S.C. § 1340(b), (c)(3) . At the fourth and final stage of the leasing program, lessees prepare and submit Development and Production Plans ("DPP"), or in some cases Development Operations Coordination Documents ("DOCD"). *See* 43 U.S.C. § 1351. DPPs and DOCDs must include a description of the developer's production plan and tentative schedule, the locations of proposed wells, a description of drilling equipment that will be used, and a description of the production facilities that will support development activities. 30 C.F.R. § 550.241.

### III.   The One Big Beautiful Bill Act

The OBBBA, also known as the Reconciliation Act of 2025, was enacted on July 4, 2025. Pub. L. No. 119-21, 139 Stat. 72 (2025). Section 50102, which deals with offshore oil and gas leasing, directs the Secretary of the Interior, acting through BOEM, to conduct at least 30 "region-wide" oil and gas lease sales in the Gulf of America, consisting of roughly two sales per year, from the year of enactment through 2040. Pub. L. No. 119-21 § 50102(a)(1)(A), (B)(i)-(iii). Section 50102 specifies that each sale must offer for lease not fewer than 80 million acres, unless there are fewer than 80 million acres that are unleased and available, in which case BOEM must offer all remaining unleased and available acres. *See Id*. § 50102(b)(3)(A)(i)–(ii) .

The OBBBA mandated that BOEM impose the same stipulations four through nine as were imposed for Lease Sale 254, which was held on March 18, 2020. *Id*. § 50102(b)(1)(A) .[1] Congress only allowed BOEM to adjust stipulations one through three, as well as stipulation ten from Lease Sale 254, "to reflect current conditions." *Id*. § 50102(b)(1)(B).[2] The OBBBA established an allowable royalty range of between 12.5 and 16.67 percent. *Id*. § 50102(b)(1)(C) .

## IV.     The Endangered Species Act

The ESA contains both substantive and procedural requirements designed to carry out the purposes of the Act. 16 U.S.C. § 1531(b). Plaintiffs' claims implicate the procedural provisions of Section 7 of the ESA. As with NEPA, the procedural requirements of Section 7 do not apply when an agency lacks discretion over a proposed action. 50 C.F.R. § 402.03; *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007); *Grand Canyon Tr. v. U.S. Bureau of Reclamation*, 691 F.3d 1008, 1017-18 (9th Cir. 2012), *as amended* (Sept. 17, 2012) ("the ESA consultation requirement applies only if the agency has the discretionary control to inure to the benefit of a protected [listed] species.") (citation modified) (quoting *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, (9th Cir. 2005)).

When Section 7 applies, Federal agencies proposing to take an agency action must consult with either the National Marine Fisheries Service or the U.S. Fish and Wildlife Service, depending on the species. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14(a). After formal consultation, the consulting agency issues a biological opinion as to whether the proposed action is likely to

---

[1] Stipulations 4 through 9 include environmental mitigation measures for protected species and in certain sensitive areas. *See* BOEM000213; BOEM000221-23 (Lease Stipulation 4 which relates to protected species).

[2] Stipulations 1 through 3 and 10 concern military use areas, coordination and evacuation requirements, and existing rights-of-use and easements, not environmental mitigation. *See* BOEM000213; BOEM000215-222, 232-51.

jeopardize the continued existence of any listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h). If the proposed action is not likely to result in jeopardy but may result in the incidental "take" of members of a listed species, the biological opinion must include an incidental take statement. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(I). Any take in compliance with the terms and conditions of an incidental take statement "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

### A.     The Endangered Species Committee

Congress created the Endangered Species Committee and gave it authority to exempt an agency action from the ESA's requirements. *See id.* § 1536(e), (h). The Committee consists of six permanent members: the Secretary of the Interior (who serves as chair), the Secretary of Agriculture, the Secretary of the Army, the Chairman of the Council of Economic Advisors, the Administrator of the Environmental Protection Agency, and the Administrator of the National Oceanic and Atmospheric Administration. *Id.* § 1536(e)(3)(A)–(F). "Notwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." *Id.* § 1536(j).

After an exemption, the ESA's procedural consultation requirements, the substantive duty to avoid jeopardy and adverse modification of critical habitat, and the ESA's take prohibitions no longer apply to the exempted agency action. *See* 16 U.S.C. § 1536(a)(2), (o)(1).

### B.     The Committee's Exemption

On March 13, 2026, the Secretary of War notified the Secretary of the Interior that it was necessary for reasons of national security to exempt from the ESA's requirements all Gulf of

America oil and gas exploration and development activities associated with BOEM's and BSEE's Outer Continental Shelf Oil and Gas Program.[3] On March 31, 2026, the Committee convened and granted an exemption for that oil and gas program, based on the Secretary of War's national security findings. *See* 91 Fed. Reg. 16,966, 16,967 (Apr. 3, 2026) ("Order").

<u>**FACTUAL BACKGROUND**</u>

Oil and gas reserves on the OCS make up a significant portion of the Nation's available energy resources. In 2024, the Gulf of America alone produced roughly 668 million barrels of oil and 700 billion cubic feet of natural gas. This production accounted for fourteen percent of national oil production and two percent of domestic natural gas.[4] Access to these resources is a critical element in the United States' pursuit of energy independence, which is itself central to the national security. *See* Exec. Order No. 14156 (EO), "Declaring a National Energy Emergency." The Executive Order explains that the United States' energy production, transportation, refining, and generation capacity are "far too inadequate to meet our Nation's needs," and identifies reliable and affordable domestic energy supply as critical to national security, economic stability, manufacturing, transportation, agriculture, and military preparedness. *Id*. Congress has long recognized the importance of Gulf oil and gas production, finding that oil and gas development on the OCS is needed to "assure national security." *See* 43 U.S.C. § 1802(1). BOEM's activities on the OCS are integral to these national priorities.

On July 4, 2025, the President signed the OBBBA into law, directing BOEM to hold at least 30 offshore oil and gas lease sales in both the Gulf of America and the Cook Inlet of Alaska

---

[3] Authority to hold lease sales and award and manage leases under OCSLA is delegated to BOEM, while compliance and enforcement is regulated by the Bureau of Safety and Environmental Enforcement ("BSEE"). 30 C.F.R. § 550.101.

[4] *See*, https://www.boem.gov/oil-and-gas-energy

Page 7 –      Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
              *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

through 2040. Pub. L. No. 119-21 § 50102(a)(1)(A), (a)(2)(A). The OBBBA set tight parameters for the lease sale program, including the timeline for lease sales, the sale location, the amount of acreage to be offered for lease, the terms and stipulations BOEM was to include in the resulting leases, rental rates, suspension terms, and the minimum bonus bid and royalty rate. *See* Pub. L. No. 119-21 § 50102; BOEM0000162-163.

In order to meet the OBBBA's aggressive lease sale schedule, BOEM announced in August 2025 that the first of the scheduled OBBBA lease sales would take place on December 10, 2025 – in place of a previously scheduled sale known as Lease Sale 262. BOEM000024. The next day, BOEM issued letters to the governors and executives of impacted states and local governments announcing that Lease Sale 262 would be deferred and that the BBG1 lease sale would occur in its place. Because the OBBBA precluded BOEM from offering a full 60-day comment period on the BBG1 lease sale, BOEM notified those same entities that the pending comment period for Lease Sale 262 would instead apply to the BBG1 lease sale. *Id*. No comments were received from the governors or executives of impacted states or local governments. BOEM0000254.

On November 5, 2025, BOEM's Acting Director, Matthew Giacona, signed a decision memorandum approving the proposed lease sale parameters consistent with the requirements of the OBBBA. BOEM0000161. That memo explained that BOEM did not analyze the BBG1 lease sale under the environmental statutes at issue in this civil action because, under the OBBBA, the agency lacked the necessary discretion over the sale:

> Given the strict OBBBA requirements, BOEM lacks the discretion to affect the outcome of the lease sale itself. The lack of discretion does not warrant nor allow BOEM to consider environmental effects, and thus NEPA, ESA, and the other environmental statutes listed above do not apply to this lease sale.

BOEM0000182. BOEM published the Final Notice of Sale along with the lease stipulations and information to lessees on November 10, 2025, BOEM0000187, and held the sale on December 10, 2025, offering a total of 81,180,600 acres for sale.[5] BOEM0000169. BOEM received 219 bids on 181 tracts, totaling 1,023,526.06 acres.[6] After three high bids were rejected, a total of 178 bids were deemed acceptable on March 4, 2025, accounting for a total leased acreage of 1,007,686.06 acres. Id.[7]

## STANDARD OF REVIEW

This case is governed by the Administrative Procedure Act ("APA"), which authorizes judicial review of final agency action and directs courts to "hold unlawful and set aside" agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). That review is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Review is limited to the administrative record before the agency at the time of its decision. 5 U.S.C. § 706. The harmless error principle under the APA allows a court to leave in place an agency decision when "it is clear that the agency's error had no bearing on the procedure used or the substance of [the] decision reached." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590 (2025).

---

[5] *See* BOEM, *Sale Day Statistics* 1 (Dec. 10, 2025), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-BBG1-Stats_0.pdf.

[6] *See* BBG1 Final Bid Recap, https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/BBG1-Final-Bid-Recap.pdf?VersionId=kZB1O4qDXFo.3BhCAvGUxDSM7zkCRy1m

[7] BOEM's final bid adjudication is available here: https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/BBG1-Phase-2-Acceptances-By-Submitter.pdf?VersionId=wbzR.8cUcco0il.fXGDrVANW3l.dtK8n.

**ARGUMENT**

**I.     NEPA Does Not Apply to the BBG1 Lease Sale.**

Plaintiffs' NEPA claim fails because the OBBBA left BOEM insufficient discretion to meaningfully alter the environmental consequences of the BBG1 lease sale. NEPA is only applicable where an agency retains "sufficient discretion to affect the outcome of its actions" in a way that could affect the environment. *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001); *id*. at 1152 ("the absence of significant discretion in [the agency] . . . removes that [agency action] from the reach of NEPA"). Where Congress prescribes the essential features of an agency action, leaving the agency with no real ability to consider or adopt environmentally preferable alternatives, NEPA has no work to do. *See id.*

The OBBBA required BOEM to conduct a lease sale in the Gulf by a date certain; to offer not fewer than 80 million of the remaining "unleased and available acres" in the region; and to adhere to specific lease terms, economic conditions, and core stipulations. *See* Pub. L. No. 119-21, § 50102. BOEM, thus, could not decide based on NEPA review to decline to hold the sale, change its location, reduce its scale below the statutory minimum, or materially revise the lease stipulations. Congress made the relevant policy judgments itself, leaving BOEM to implement those directives.

To be sure, the statute leaves BOEM with minimal discretion to implement the BBG1 lease sale, but that modest control is not enough to meaningfully influence environmental outcomes. For example, Plaintiffs make much of the fact that BOEM offered 81,180,600 acres for leasing—amounting to 1.18 million acres over the statutory minimum of 80 million—making

Page 10 –     Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
              *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

up all of the remaining unleased and available acreage within the Gulf.[8] But as the Supreme Court recently reiterated, "inherent in NEPA is a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Seven Cnty.*, 605 U.S. at 183 (citation modified). Here, BOEM explained that it offered "only 1 percent" more than the statutory minimum of 80 million acres – a minuscule amount in the grand scheme of things. BOEM000181. And BOEM further explained that it was "unable to identify any specific blocks between the 80-million-acre-minimum required by OBBBA and the 80.9 million acres[9] recommended in Option A.1 that may warrant exclusion." BOEM000171. While Plaintiffs insist that a NEPA analysis might have helped BOEM find a basis for excluding some blocks, the fact is that BOEM had no meaningful discretion because even an exclusion of the 1.18 million acres that Plaintiffs focus on here would not have prevented that acreage from being offered— necessarily—in a subsequent lease sale. This is because the total amount of unleased and available acreage will inevitably total less than 80 million as more leases are held pursuant to the OBBBA. This is apparent from the fact that BBG1 offered 81.18 million acres, while the second sale under the OBBBA offered 80.4 million acres, almost 1 million acres less than BBG1.[10] The

---

[8] Plaintiffs imply that BOEM had discretion over what acres are "available" for leasing under the OBBBA. *See* Pls.' Br. 26. But BOEM does not decide what areas are "available," the OBBBA does. *See* Pub. L. No. 119-21 § 50102(a)(1)(A) (requiring BOEM to offer 30 lease sales "except within areas subject to existing oil and gas leasing moratoria"); BOEM000188 (detailing moratoria for a national marine sanctuary and a presidential decree).

[9] The discrepancy between the 80.9 million acres recommended in Option A.1 of the BBG1 Decision Memo and the 81,180,600 ultimately offered in the BBG1 Lease Sale is due to the fact that certain leases that were previously active or otherwise unavailable for leasing at the time of the Decision Memo subsequently became available within the sale area by the time the BBG1 sale was offered.

[10] *See* BOEM Sale Day Statistics (Mar. 11, 2026), https://www.boem.gov/oil-gas-energy/leasing/sale-bbg2-statspdf.

Page 11 –       Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
                *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

difference can be attributed to the over one million acres that were sold in the BBG1 lease sale. And a third sale must by statute occur no later than August 15, 2026. Pub. L. No. 119-21, § 50102 (a)(1)(B)(ii). It follows that even if BOEM could have excluded 1.8 million acres now, inevitably it would have to include those same acres in later sales to comply with the statutory minimum. In sum, the small amount of acreage BOEM offered over the statutory minimum of 80 million was not a consequential exercise of discretion; but even if it were, the NEPA analysis Plaintiffs demand would serve no purpose because the OBBBA effectively ensures that all unleased and available acreage within the Gulf will be offered for lease within the first few sales of the 30-sale timeline.

Plaintiffs' focus on proposed Rice's whale critical habitat as areas that BOEM could have excluded is misplaced in any event, because the habitat at issue has not been formally designated under the ESA and therefore does not carry the legal status or regulatory consequences that would require its exclusion from leasing at this stage. BOEM would not be obligated to treat the proposed habitat as if it were designated under any circumstances, and particularly not where the governing statute constrained the agency's ability to materially modify the scope of the sale.[11] In this case, NEPA review is most appropriately focused on post-lease activities—such as exploration, development, and production—where site-specific environmental impacts may actually be realized and where the agency retains discretion to impose mitigation measures or deny approvals. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 595 (D.C. Cir. 1980) (recognizing that OCSLA "contemplates future consideration by [BOEM] of environmental problems developing after the lease sale" and "authorizes [BOEM] to impose

---

[11] Moreover, even if the proposed critical habitat were designated under the ESA, any legal significance would still be null because the Endangered Species Committee exempted BOEM's OCS oil and gas program in the Gulf from the ESA's requirements. *See infra* Section V.

subsequent restrictions on the lessees as the need arises"). Those later stages remain subject to environmental review and regulatory oversight. BOEM0000183.[12] This is especially relevant because only a small fraction of leased acres are ultimately bid on and leased, as in this case where only 1.2 percent of the acres offered were successfully bid on. Against that backdrop, excluding such areas at the lease sale stage would not meaningfully alter environmental conditions, further underscoring the absence of any obligation to do so here.

Nor, as Plaintiffs next contend, did BOEM retain meaningful discretion under NEPA simply because it could set royalty rates within a statutory range. Pls.' Br. 27, Dkt. No. 51-1. The selection of a royalty rate within the narrow range prescribed by the OBBBA does not meaningfully affect environmental outcomes in a way that would require preparation of an EIS. While the selection of the 12.5 percent royalty rate for the BBG1 lease sale could result in slightly more activity and production than using the higher 16.67 percent allowed under the OBBBA, BOEM reasonably explained that any change would not be significant. BOEM000181 (explaining that "the royalty rate is not expected to significantly increase production, activities, or impacts as a result of the royalty rate options within the narrow 12 ½ percent to 16 ⅔ percent range afforded by Congress in the OBBBA"). And this conclusion is bolstered by BOEM's discussion of the declining rates of discoveries and leasing and drilling activity in the Gulf. *See* BOEM000173-174. Under these circumstances, BOEM reasonably "determine[d] whether . . . to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process," and its decision is entitled to deference. *Seven Cnty.*, 605 U.S. at 181.

---

[12] *See* Gulf of America Regional OCS Oil and Gas Lease Sales and Post-Lease Sale Activities, Final Programmatic Environmental Impact Statement at 1-6 (Aug. 2025), https://www.boem.gov/sites/default/files/documents/environment/environmental-assessment/Final%20GOA%20PEIS.pdf?VersionId=FTa_BneTGsgiXeA4Lj22pJgg471n0W7D.

Likewise, BOEM's limited authority to make minor updates to certain lease stipulations "to reflect current conditions" falls far short of the discretion that would be needed to reshape the environmental footprint of the sale. The OBBBA requires that the sale include "the same lease form, lease terms, economic conditions, and lease stipulations 4 through 9" as those in Lease Sale 254. Pub. L. No. 119-21, § 50102(b)(1)(A). BOEM had no authority to alter those stipulations, including those relevant to the environment. *See* BOEM000221-23 (Lease Stipulation 4 which relates to protected species). The statute permits updates only to stipulations 1 through 3 and 10, which concern military use areas, coordination and evacuation requirements, and existing rights-of-use and easements—not environmental mitigation measures. Pub. L. No. 119-21 § 50102(b)(1)(B); BOEM000215-222, 232-51. BOEM's role in updating those provisions was limited to reflecting current operational conditions, not to revisiting the environmental framework governing the sale.

Plaintiffs' reliance on BOEM's authority to accept or reject bids fares no better. That authority is exercised after the lease sale is offered, and it is directed at ensuring the adequacy of bids and bidder qualifications, not shaping the environmental consequences of the sale. BOEM is "authorized to grant [a lease] to the highest responsible qualified bidder," 43 U.S.C. § 1337(a)(1), and must "assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government," *id*. § 1344(a)(4). Nothing in OCSLA or its implementing regulations allows BOEM to account for environmental factors in rejecting a bid. Rather, BOEM will disqualify bidders prior to a lease sale if it finds that they are failing to meet due diligence requirements under 43 U.S.C. § 1334(d). *See* 30 C.F.R. § 556.403. Should such a determination be made after a lease sale is held but before a bid is accepted, BOEM retains the authority to reject bids from the nonconforming parties. *Id*. § 556.516. BOEM also retains the ability to reject

bids from certain joint bidders, which prohibits joint bids from parties or associations who have been listed under BOEM's List of Restricted Joint Bidders. *Id*. § 556.512. This prevents large developers who are already producing more than 1.6 million barrels of oil or gas per day from forming joint ventures and thus harming the competitive format of the lease sale. *Id*. § 556.511(a) . Finally, because the authority to determine the adequacy of bids and bidder qualifications operates downstream of the lease sale and does not provide a mechanism to alter its scope or environmental parameters, it is not the type of discretion relevant under NEPA.[13]

Plaintiffs, in sum, have failed to show that BOEM retained "significant" or meaningful discretion under the OBBBA as to trigger a NEPA analysis for the BBG1 lease sale. *Citizens against Rails-to-Trails*, 267 F.3d at 1151. And their reliance on the presumption against repeal by implication does nothing to fill that gap. *See* Pls.' Br. 30. Plaintiffs note that the presumption is overcome when there is "very strong evidence in the legislative history demonstrating a congressional desire to [do so], or a direct contradiction between the Act and the new legislation." Pls.' Br. 30 (quoting *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 367 (D.C. Cir. 1981)). But we are not arguing that the OBBBA repealed NEPA. Indeed, NEPA itself recognizes—as of 2023—that an agency need not prepare an environmental analysis for a proposed action if "the proposed agency action is a nondiscretionary action with respect to which such agency does not have authority to take environmental factors into consideration in determining whether to take the proposed action." 42 U.S.C. § 4336(a)(4) (2023). The focal

---

[13] Plaintiffs also reference without argument BOEM's discretion regarding what information it provides to lessees. Pls.' Br. 19. But this information relates to "terms and conditions of the sale, other programs, and ongoing [Gulf of America] activities," and does not reflect "binding terms of the lease sale, but additional information for bidders to consider." BOEM000171. Plaintiffs fail to explain how BOEM's discretion over what information is shared with lessees could affect the environmental impacts of the sale.

point for this Court, therefore, is not whether Congress intended to repeal NEPA but instead whether the OBBBA as a practical matter left sufficient discretion to BOEM for a NEPA analysis to meaningfully inform its decision process. *See Friends of the Earth v. Haaland*, No. 22-5036, 2023 WL 3144203, at *2 n.1 (D.C. Cir. Apr. 28, 2023). For the reasons discussed above, there is insufficient discretion here. To the extent this Court nonetheless finds it necessary to examine Congressional intent, however, it is telling that the OBBBA, in directing the Bureau of Land Management to authorize the mining of certain Federal coal reserves, was explicit that "[n]othing in this section shall prevent a review under [NEPA]." Pub. L. No. 119-21 § 50204(c). By contrast, no such language was included in Section 50102. *See Bates v. United States*, 522 U.S. 23, 29–30 (1997) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted)).

Plaintiffs' reliance on *Healthy Gulf v. Burgum* is misplaced because that case turned on the very feature absent here: meaningful agency discretion. *See* Pls.' Br. 30-31; 775 F. Supp. 3d 455 (D.D.C. 2025). In *Healthy Gulf*, the court held that NEPA applied to the challenged offshore lease sale because, although the Inflation Reduction Act required BOEM to hold the sale, Congress did not dictate the sale's location, size, or environmental stipulations. 775 F. Supp. 3d at 475. Those features—and the agency's ability to define them—were central to the court's conclusion that BOEM retained discretion sufficient to trigger NEPA. Here, by contrast, those same features were fixed by statute, thus leaving the agency without the ability to adopt materially different alternatives.

Finally, even if the Court were to conclude that NEPA obligations were triggered by the BBG1 lease sale, BOEM's decision not to prepare an EIS would be harmless error. *See FDA*,

604 U.S. at 590. Under the APA, courts do not set aside agency action for procedural error unless that error could have affected the outcome, and Plaintiffs cannot make that showing here. *See id*. (the agency's error is harmless where it "had no bearing on the procedure used or the substance of [the] decision reached"). Regardless of whatever analysis it may have conducted, BOEM was required to hold the BBG1 lease sale by the statutory deadline, to offer at least 80 million acres, and to employ the prescribed lease terms and stipulations. No amount of additional environmental review could have led BOEM to adopt a materially different course. This case therefore differs not only from *Healthy Gulf*'s analysis of discretion, but also from its analysis of redressability, where the court reasoned that additional NEPA review could have resulted in different sale parameters. *See* 775 F. Supp. 3d at 474. *See also infra* Section VIII.

The actual results of the lease sale underscore the absence of any meaningful causal link between the alleged NEPA violation and environmental harm. *See infra* Section VIII. Of the more than 81 million acres offered, only 1,023,526 acres, or 1.26 percent, received bids.[14] That outcome reflects market dynamics, not agency discretion, and confirms that additional NEPA analysis would not have altered the scope of leasing activity in any meaningful way. Because BOEM lacked discretion to change the structure of the sale and because any additional analysis could not have changed the outcome, any alleged NEPA error was necessarily harmless.

## II.   OCSLA Section 20 Does Not Apply to the BBG1 Lease Sale.

Plaintiffs' claim under Section 20 of OCSLA fails for two reasons. First, BOEM was not required to conduct the decommissioning study that Plaintiffs demand. And second, BOEM

---

[14] *See* OIL and GAS LEASE SALE BBG1 Final Bid Recap at 1 (December 10, 2026), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/BBG1-Final-Bid-Recap.pdf?VersionId=kZB1O4qDXFo.3BhCAvGUxDSM7zkCRy1mhas.

Page 17 –     Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
              *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

lacked any meaningful discretion to alter the environmental consequences of the lease sale and thus had no obligation to undertake gratuitous environmental review.

First, BOEM is not required to conduct a study for a new lease sale in the Gulf of America. Section 20 requires BOEM to conduct studies "to establish information needed for assessment and management of environmental impacts," 43 U.S.C. § 1346(a)(1), but only for leasing in areas that have not previously been studied. *See id*. § 1346(a)(2) (requiring a study "prior to the holding of a lease sale with respect to any area or region where no lease sale has been held"). For previously studied areas, by contrast, only Section 1346(b) imposes any potentially relevant requirement, i.e., to "monitor the human, marine, and coastal environments of such area or region" and "conduct such additional studies to establish environmental information as [BOEM] deems necessary." *Id.* § 1346(b). Plaintiffs' arguments fail because they misinterpret Section 1346(a) and decline to pursue any relief under Section 1346(b).

But even if Plaintiffs had articulated an otherwise cognizable claim, OCSLA Section 20—like NEPA's procedural mandate—presupposes that the agency has some ability to use the information generated by an environmental analysis in shaping its action. *Cf. Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984) (recognizing that an environmental study under OCSLA Section 20 is equivalent to an environmental impact statement under NEPA). OCSLA Section 20 does not require agencies to generate environmental information for its own sake; it requires studies to inform later decisionmaking. *See* 43 U.S.C. § 1346(a)(1) (requiring study for "management of environmental impacts"). Where, as here, Congress has fixed the essential features of the decision, leaving the agency without authority to modify the scope, timing, or environmental terms of the lease sale, there is no decision for additional study to inform.

Page 18 –     Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
              *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

III.    **BOEM's Notice Process Under OCSLA Was Adequate.**

Plaintiffs' challenge to BOEM's notice procedures fails because the agency complied with the governing regulations, was not required to consider the type of comments Plaintiffs identify, and, in any event, could not have altered the outcome of the lease sale in response to such comments.

First, BOEM complied with 30 C.F.R. § 556.304 and the broader notice framework under OCSLA's implementing regulations. While OCSLA's implementing regulations contemplate issuance of a Proposed Notice of Sale, that provision must be read in context with the surrounding regulations, which make clear that the proposed notice serves a specific, limited function—facilitating consultation with Governors and local governments under Section 19 of OCSLA, 43 U.S.C. § 1345. *See* 30 C.F.R. § 556.304(c) ("BOEM will send a proposed notice of sale to the governors of affected States and publish the notice of its availability in the Federal Register"), *see also id.* at § 556.307(b)-(c). Those provisions anticipate circulation of the proposed notice to affected state and local officials and the receipt of their recommendations, not a broad, public-facing notice and comment process.

Here, BOEM had already undertaken the substantial work necessary to prepare a proposed notice in connection with Lease Sale 262, which was published prior to the enactment of the OBBBA. BOEM00022. BOEM then pivoted to Lease Sale BBG1, relying on the notice for Lease Sale 262 instead of issuing a new notice for BBG1, in order to comply with the OBBBA's mandate to hold the lease by December 15, 2025. *See* BOEM00022; BOEM00034. In doing so, BOEM ensured that the Final Notice of Sale was timely prepared and published in accordance with 30 C.F.R. § 556.308(a), which requires publication at least 30 days before the sale. *See* BOEM000019, 22. In order to make "a good faith effort to maintain the processes

outlined in [BOEM's] regulations while adhering to the sale deadline Congress set in the OBBBA," BOEM000019, BOEM sent letters to affected governments, notifying them that Lease Sale 262 was being deferred and that it was instead moving forward with BBG1. BOEM000033–42. Given the compressed timeline imposed by statute and the substantial overlap between Lease Sale 262 and the BBG1 sale, BOEM's approach satisfied the core purposes of the regulatory scheme—providing notice and ensuring intergovernmental coordination—while also complying with the OBBBA's binding statutory deadline.

Second, BOEM was not required to consider Plaintiffs' comments on the proposed notice. OCSLA's implementing regulations do not create a general right to public comment but instead implement the targeted consultation process set forth in Section 19 of OCSLA, which focuses on recommendations from Governors of affected states and executives of affected local governments. *See* 43 U.S.C. § 1345; 30 C.F.R. §§ 556.304(c), 556.307(b)-(c) . While Plaintiffs are correct that 30 C.F.R. § 556.307(a) directs BOEM to consider "all comments and recommendations received in response to the proposed notice of sale," the text and context of the statutory and regulatory scheme underscore that subsection (a) refers exclusively to intergovernmental comments. Sections 556.307(b) and (c), for instance, only discusses how BOEM is meant to handle comments from Governor's or local executives. Section 556.304(c), which lays out the comment period, only envisions the notice being sent out to Governors and executives of impacted local governments. *See also* 43 U.S.C. § 1345. While BOEM has the discretion to consider comments submitted by the public, it is not required to do so. Plaintiffs' attempt to transform OCSLA's intergovernmental consultation process into a broad public-comment obligation finds no support in the statute or regulations.

Finally, even if BOEM had solicited and considered additional comments, including from Plaintiffs, doing so would have been futile because the agency lacked discretion to alter the core features of the lease sale. *See FDA*, 604 U.S. at 590. As explained above, the OBBBA foreclosed any meaningful ability to modify the scope, timing, or environmental parameters of the sale in response to comments. BOEM's consideration of Plaintiffs' comments could not have changed the dispositive features of the lease sale fixed by Congress and therefore BOEM's failure to consider them would be harmless error.

For all of these reasons, Plaintiffs' challenge to BOEM's notice procedure under OCSLA fails.

## IV. The ESA Section 7 Procedural Consultation and Substantive "Jeopardy" Requirements Do Not Apply to the BBG1 Lease Sale.

Plaintiffs' ESA challenge to the BBG1 lease sale fails for a straightforward reason—the ESA does not apply to that agency action.

In *National Ass'n of Home Builders v. Defenders of Wildlife*, the Supreme Court held that Section 7(a)(2)'s consultation and no-jeopardy requirements, read together with 50 C.F.R. § 402.03, apply only to agency actions involving "discretionary Federal involvement or control." 551 U.S. 644, 656 (2007). The ESA requirements do not attach where Congress has required the agency to act once specified statutory conditions are satisfied and when Congress removed the agency's authority to impose conditions that inure to the benefit of ESA listed species. *Id*. In *Home Builders*, although the Environmental Protection Agency could exercise some judgment in administering enumerated statutory criteria, it lacked discretion to add "another entirely separate prerequisite" relating to protection of ESA-listed species that was not found in the governing statute. *Id*. at 671-72. The Court therefore held that ESA Section 7 cannot be used to "engraft[]" an additional ESA prerequisite onto a separate statute that commands agency action. *Id*. at 663; *see also Platte River*

*Whooping Crane Critical Habitat Maintenance Tr. v. Fed. Energy Regul. Comm'n*, 962 F.2d 27, 34 (D.C. Cir. 1992) (finding that the ESA directs agencies to "utilize their authorities" to carry out the ESA's objectives; it does not *expand* the powers conferred on an agency or allow an agency to circumvent an independent legal requirement).

These principles foreclose Plaintiffs' Section 7 challenge. The OBBBA directed BOEM to conduct at least one Gulf of America lease sale by December 15, 2025, and required BOEM to offer for lease not fewer than 80,000,000 acres (or all available unleased acres if fewer). Pub. L. No. 119-21 § 50102(a)(1)(B)(i), (b)(3)(A)(i)-(ii). Further, as particularly relevant here, the OBBBA required BOEM to offer the same lease form, lease terms, economic conditions, and lease stipulations as it used in Lease Sale 254. *See id.* § 50102(b)(1)(A)  (permitting only limited, non-substantive updates to reflect current conditions). Lease Stipulation No. 4 addresses protected species, including ESA-listed species. As BOEM explained, this stipulation serves to notify lessees that post-lease activities will be subject to requirements to protect listed species, including mitigation measures implemented as a result of ESA consultations. BOEM000167. While BOEM historically updated this stipulation to incorporate the results of ESA consultations, *see id*., the OBBBA now prohibits BOEM from doing so. BOEM instead is required to include the version of this stipulation as it appeared in Lease Sale 254, which was held March 28, 2020. *Id*.

Under the OBBBA, BOEM now has no discretion to modify (either to add to or subtract from) the mitigation measures and protocols that were in place as of March 2020. BOEM's decision memorandum therefore recognized that BBG1 had to be held on schedule as directed by statute and that the lease stipulations—including Stipulation 4 dealing with protected species—were mandatory. BOEM000164. As a result, BOEM properly determined that it lacked discretion to impose measures during the BBG1 lease sale that "inure to the benefit of a protected [listed]

species,'" and that the ESA consultation provisions do not apply. *See Grand Canyon Tr.,* 691 F.3d at 1017-18.

Disregarding the OBBBA, Plaintiffs fault BOEM for holding BBG1 and for not adopting additional Rice's-whale protections at the lease-sale stage. *See, e.g.,* Pls.' Br. 31-33 (arguing that BOEM failed to implement protective measures including restrictions on leasing in areas within and adjacent to Rice's whale proposed critical habitat). But, as noted above, Congress explicitly precluded BOEM from deferring the lease sale or assigning any protective measures beyond those outlined in Lease Sale 254. And the ESA does not supply a legal basis for BOEM to act in contravention of the OBBBA. *Platte River,* 962 F.2d at 34. Likely for this reason, Plaintiffs point to no law or legal basis that would allow BOEM to circumvent Congress's direction by grafting *new* requirements on the BBG1 lease sale. Because the OBBBA left BOEM with no discretion to refuse BBG1 or to add additional lease-sale conditions like those Plaintiffs suggest, Count VI fails as a matter of law.

## V.     Even if the ESA Applies to BBG1, the Court Lacks Jurisdiction Because the Endangered Species Committee's Exemption Mooted Plaintiffs' Claim.

"The mootness doctrine, deriving from Article III, limits federal courts to deciding 'actual, ongoing controversies.'" *Clarke v. United States,* 915 F.2d 699, 700-01 (D.C. Cir. 1990) (en banc) (citation omitted). To establish a "case or controversy," the party invoking the court's jurisdiction must establish, as the "irreducible constitutional minimum," that they have suffered an "injury in fact," traceable to the allegedly illegal actions of the defendant, that can be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560-61 (1992). All three of those requirements "must be extant at all stages of review, not merely at the time the complaint is filed." *Akiachak Native Cmty. v. Dep't of the Interior,* 827 F.3d 100, 105 (D.C. Cir. 2016) (quoting *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67 (1997)).

If intervening events make it impossible for a court to grant effective redress to the prevailing party, then the case is moot and must be dismissed for lack of jurisdiction. *Clarke*, 915 F.2d at 700-01. Indeed, courts have long recognized that an intervening change in the governing legal regime can render moot challenges to an agency decision. *See Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1226 (D.C. Cir. 2021) (explaining that, "[f]inding a case plainly moot when the agency order has been superseded by a subsequent order is so routine that court usually would handle such a matter in an unpublished order)(citation modified); *see also Am. Forest Res. Council v. Williams*, 96 F.4th 417, 421 (D.C. Cir. 2024) (finding a challenge to two rules issued by FWS moot once both rules had expired or had been withdrawn).

That is exactly what has happened here. Plaintiffs' sixth claim raises alleged violations of a statute—the ESA—that no longer applies to the underlying agency action. Plaintiffs allege that BOEM violated the ESA's Section 7 consultation requirements by failing to consult and ensure that the BBG1 lease sale would not jeopardize the continued existence of the endangered Rice's whale. Am. Compl. ¶¶ 154-158, Dkt. No. 40. They then ask that the Court enter "appropriate" injunctive relief to ensure that Federal Defendants comply with the ESA. *Id*. at 52. But even if the ESA's consultation requirements initially applied to the BBG1 lease sale—and they did not, *see supra* Section V—the Committee's March 31, 2026 exemption definitively exempted the action from the ESA's requirements, thus mooting this claim.

On March 31, 2026, the Endangered Species Committee exempted BOEM's outer continental shelf oil and gas program in the Gulf from the ESA's requirements. *See* Order at 16966-67. The Committee's Order identifies the agency action subject to the exemption broadly, including "all oil and gas exploration, development, and production activities associated with [the Bureaus'] Outer Continental Shelf Oil and Gas Program." *Id*. at 16966. This Order specified that the action is

Page 24 –     Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
              *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

the same one the Secretary of War identified in his National Security Finding, which also broadly defined the agency action under consideration "[as] encompass[ing] the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS, which NMFS then reviewed in its 2025 biological opinion…"[15]

NMFS' 2025 programmatic biological opinion echoed this capacious reading, stating that it was taking a "comprehensive, Gulf-wide, programmatic consultation approach" given the scale of the Bureaus' oil and gas program and identified the action submitted for consultation as a five-year leasing schedule (through 2030), plus all actions associated with the 40-year projected life of a given lease.[16]

The Committee's Order applies the exemption to the full scope and duration of the covered activities. Order at 16967. And once that Order issued, any previously cognizable ESA claim ceased to present a live controversy. Plaintiffs' single ESA claim underscores the point. Plaintiffs assert that "[b]y failing to ensure that the Gulf Lease Sale is not likely to jeopardize the continued existence of the Rice's whale, Defendants violated the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. § 402.14(a)." Am. Compl. ¶ 157. But the Committee's Order, by virtue of its exemption, now independently displaces the very statutory requirements on which this claim depends. And the action agencies' underlying legal obligations are now set by the Committee's Order and other applicable laws, not the ESA. Therefore, remand requiring BOEM to engage in formal Section 7 consultation with NMFS would not alter the governing legal framework

---

[15] *See* Secretary of War's National Security Findings at 11 ¶ 90, https://www.doi.gov/sites/default/files/documents/2026-03/act-exemption-osd070136-26-res-final.pdf (last visited May 8, 2026).

[16] *See* NMFS' Section 7 Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America at 16-17, https://repository.library.noaa.gov/view/noaa/71211 (last visited Ma 8, 2026).

for BOEM's offshore oil and gas program. Under this scenario, where the legal basis for Plaintiffs' claim has been superseded by intervening events, Plaintiffs' affected claim is rendered moot.[17] *See Alaska*, 17 F.4th at 1226 (holding challenge to a rule prohibiting road construction on National Forest System lands became moot when agency issued an exemption to the rule as applied to the Forest System land at issue); *Kasza v. Browner*, 133 F.3d 1159, 1168–69 (9th Cir. 1998) (holding that challenge to statutory compliance obligations became moot when the President issued a national-security exemption covering the same conduct).

Plaintiffs' requests for relief are likewise moot. Plaintiffs' request that the Court order "appropriate" injunctive relief (presumably in the form of formal ESA consultation with NMFS) is no longer relief this Court can award. The Committee already exempted BOEM's offshore oil and gas program—including the BBG1 lease sale and any future sales held through 2029—from Section 7's procedural and substantive requirements. Order at 16966 (citing 16 U.S.C. § 1536(o)(1)) (explaining that the federal agencies implementing the Gulf oil and gas program "are not required to comply with the section 7(a)(2) procedural consultation and substantive 'jeopardy' and 'adverse modification' mandates when they authorize, fund, or carry out covered agency actions."). So, even if Plaintiffs were correct on the merits that BOEM failed to ensure against jeopardy in authorizing

---

[17] Nor can Plaintiffs preserve jurisdiction by pointing to their request for declaratory relief. A declaratory judgment is not an end in itself; it must redress a live injury. *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) ("The [Constitution's] requirement of a case or controversy is no less strict when a party is seeking a declaratory judgment than for any other relief." (citation omitted)). But, here, a declaration that BOEM failed to engage in Section 7 consultation "would amount to nothing more than an advisory opinion" because Section 7's procedural and substantive requirements no longer apply to the BBG1 lease sale. *Accord Planned Parenthood of Wisc., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019) (explaining that "[a case] becomes moot if intervening events make it impossible for us to grant 'effectual relief' to the prevailing party") (citation omitted). And federal courts "will not give advisory opinions." *Pub. Serv. Elec. & Gas Co. v. FERC*, 783 F.3d 1270, 1274 (D.C. Cir. 2015) (citation omitted).

this offshore lease sale, the Court could not order BOEM to undertake Section 7 consultation for an action that is now exempt from Section 7. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (explaining that a case becomes moot when it is impossible for a court to grant any effectual relief whatever to the prevailing party"); *Honeywell Int'l Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (same); *Am. Forest Res. Council v. Williams*, 96 F.4th 417, 421 (D.C. Cir. 2024) (same).

In short, the scope of a federal court's jurisdiction is "defined by the affirmative claims to relief sought in the complaint." *Akiachak Native Cmty.*, 827 F.3d at 106. Plaintiffs' ESA claim here is premised on a legal framework that no longer governs following the Committee's exemption Order. Thus, even if the ESA applied to the BBG1 lease sale in the first instance, it certainly does not apply now that the Committee has definitively exempted it from the ESA's requirements. As a result, Plaintiffs' sixth claim for relief is constitutionally moot.

## VI.    No Exception to Mootness Applies.

Courts recognize two exceptions to mootness: (1) when a litigant voluntarily ceases the challenged conduct to avoid judicial review; and (2) when the challenged action is capable of repetition but evades review. *Clarke*, 915 F.2d at 703. Neither exception applies here.

First, Plaintiffs' claim is not saved by the voluntary-cessation doctrine. That exception is "focused on preventing a private defendant from manipulating the judicial process by voluntarily ceasing the complained of activity, and then seeking a dismissal of the case, thus securing freedom to 'return to his old ways.'" *Id*. at 705; *accord Alaska*, 17 F.4th at 1227 (same). "The established law of this circuit is that 'the "voluntary cessation" exception to mootness has no play' when the agency did not act 'in order to avoid litigation.'" *Alaska*, 17 F.4th at 1229 (quoting *Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011)). Such is the case here. BOEM's actions are not the cause

of mootness. Instead, mootness is caused by a different actor—the Committee, operating pursuant to independent statutory authorities. *See* 16 U.S.C. § 1536(e), (h). The voluntary cessation doctrine, which guards against a defendant's strategic manipulation of judicial proceedings, has no application where the intervening event is an action by a different governmental body exercising independent statutory authority. *See Kasza*, 133 F.3d at 1172 (holding that President's exemption of classified facility from Resource Conservation and Recovery Act disclosure requirements rendered claims moot); *cf. Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1309 (D.C. Cir. 2004) (citations omitted) ("Where Congress enacts intervening legislation that definitively resolves the issues a litigant seeks to put before us, the claims are moot and we are precluded from deciding them.").

Second, this claim is not capable of repetition, yet evading review. That doctrine "permits departure from settled rules of mootness only in an exceptional situation." *Moharam v. Transp. Sec. Admin.*, 134 F.4th 598, 609 (D.C. Cir. 2025) (citation omitted). To apply, "the plaintiff must demonstrate that (1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (citation modified). The action that must be "capable of repetition" is the "precise controversy" between the parties, "put in terms of the *legal questions* it presents for decision." *Id.* at 323.

Here, the BBG1 lease sale is not capable of repetition—it is a one-time lease sale that has already occurred. Plaintiffs therefore cannot be "subjected to the *same action* at some time in the future." *Moharam*, 134 F.4th at 609 (emphasis added) (citation omitted). But, even if the "action" is characterized as lease sales generally, lease sales are not so short in duration that they would evade review—as demonstrated by this case.

Page 28 –   Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
          *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

Plaintiffs' sixth cause of action no longer presents a live Article III controversy. The Endangered Species Committee has exempted BOEM's outer continental shelf oil and gas program in the Gulf—including any existing and future lease sales through 2029—from the procedural and substantive requirements of ESA Section 7. Because the Court can no longer grant effective relief, Plaintiffs' claim is moot and must be dismissed for lack of subject-matter jurisdiction.

## VII.    Plaintiffs' Claim Concerning Alleged Improper Involvement by an Agency Official Fails on Multiple Grounds.

Plaintiffs' final claim—that BOEM's decision is invalid due to an alleged violation of internal ethics guidance—fails for multiple independent reasons. Significantly, there is no basis for Plaintiffs' contention that Acting Director Giancona was improperly involved in the challenged decision. The referenced ethics guidance memos advised that the Acting Director should not participate in a matter involving a "covered relationship," such as with the National Ocean Industries Association, but made clear that no covered relationship existed with respect to members of the Association, including the companies referenced in Plaintiffs' brief. BOEM000367-68. Moreover, the relevant regulations recommend recusal only for "particular matter(s) involving specific parties" in which a covered relationship is directly involved. *See* 5 C.F.R. § 2635.502(a)(2); BOEM000367. A region-wide lease sale mandated by statute is not such a matter because it is a broadly applicable government action affecting an entire industry, or a "particular matter of general applicability," as opposed to an adjudication or contract involving identified parties. *See* BOEM000373.

Plaintiffs' ethical allegations also have no bearing on their APA claims because even a demonstrated deviation from Interior's internal ethics guidance would have had no effect on BOEM's decision, much less render it arbitrary and capricious. As explained above with respect to Plaintiffs' other claims, Congress dictated the terms of the BBG1 lease sale. Those statutory

Page 29 –    Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
        *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

directives eliminated any meaningful discretion over whether to hold the sale or how to structure its core features. Accordingly, Mr. Giacona's alleged involvement—whatever its precise contours—could not have altered the outcome.

Plaintiffs' reliance on *Western Watersheds Project v. Fish & Wildlife Service* is misplaced because that case involved egregious and outcome-determinative misconduct requiring an investigation by the Office of Inspector General, circumstances wholly absent here. There, the court found that a senior official had "extensive involvement" in a discrete ESA listing decision and repeatedly altered or suppressed the scientific record, including deleting unfavorable findings, pressuring and bullying staff to reach a predetermined outcome, and bypassing established processes to manipulate the agency's "best science." 535 F. Supp. 2d 1173, 1187–89 (D. Idaho 2007). The decision rested on a documented pattern of coercion and interference that preordained the substance of the agency's determination. Nothing comparable is alleged, much less established, here. Even more importantly, the decisionmaker there, unlike Mr. Giacona, was not implementing a policy decision that Congress dictated by statute.

## VIII.    Plaintiffs Lack Standing.

For the same reasons explained above, Plaintiffs also lack standing. For associational standing, as is applicable here, Plaintiffs must demonstrate that at least one member satisfies the three-part test for Article III standing: (1) the member has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is "likely" to be "redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Plaintiffs fail to establish at a minimum the second and third elements. As to traceability (or causation), "[i]n NEPA procedural-injury cases, an adequate causal chain contains two links: one connecting the [allegedly deficient] EIS to some substantive government decision that may have been wrongly decided because of the lack of an adequate EIS, and one connecting that substantive decision to the plaintiff's particularized injury." *Healthy Gulf*, 775 F. Supp. 3d at 472. Plaintiffs fail this test because they cannot show a connection between the lack of an EIS— or any other alleged procedural violation—and the substance of the BBG1 lease sale. As explained above, the OBBBA mandated the sale, including its scope and core lease terms and stipulations. Therefore, Plaintiffs cannot show that their asserted injury flows from any of the alleged procedural defects above. Their injury, if any, flows from the OBBBA itself, not BOEM's actions, which were merely in furtherance of OBBBA's directives.

The flaw in Plaintiffs' basis for standing is laid bare by their members' declarations, which repeatedly opine that BOEM might have identified and implemented mitigation measures if it had analyzed the impacts from the sale. *See, e.g.*, Foster Decl. ¶ 23 (Dkt. No. 51-18); Saxon Decl. ¶ 12 (Dkt. No. 51-14); Wiygul Decl. ¶ 29 (Dkt. No. 51-17). In fact, BOEM could not have imposed additional mitigation measures regardless of any analysis it might have completed, because the lease terms and stipulations were fixed by the OBBBA. Therefore, any lack of any additional mitigation measures in the BBG1 lease sale that purportedly injure Plaintiffs' interests does not flow from the lease sale itself, but from the OBBBA.

Plaintiffs cannot establish redressability for the same reasons. Even under the "relaxed" standard applicable to procedural injuries, Plaintiffs must show that the relief they seek "could still change the substantive outcome in [their] favor." *Narragansett Indian Tribal Historic Preservation Off. v. FERC*, 949 F.3d 8, 13 (D.C. Circ. 2020). They cannot do so here. Because

Page 31 –    Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
             *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

the BBG1 lease sale's core features were fixed by the OBBBA, requiring additional analysis would not allow BOEM to adopt a materially different outcome. Plaintiffs' own declarations confirm that their theory of redress depends on the possibility that additional analysis would lead BOEM to "consider, minimize, or possibly remediate impacts." Skrmetta Decl. ¶ 51 (Dkt. No. 51-15). But where the agency lacks authority to change the decision in response to that analysis, such relief is not redress. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). Indeed, "all the procedure in the world could not lawfully lead" BOEM to "a conclusion that would redress [Plaintiffs'] substantive injury." *Ass'n of Am. Physicians & Surgeons v. Sebelius*, 746 F.3d 468, 472 (D.C. Cir. 2014).

Finally, this case is distinguishable from *Healthy Gulf v. Burgum* to the extent the court there found standing. In that case, the court's analysis rested on a materially different statutory framework in which BOEM retained discretion over key aspects of the lease sale, allowing for a plausible argument that additional environmental review could influence the outcome. In finding the redressability prong met, the court reasoned that "Plaintiffs could still obtain meaningful relief from a court order directing BOEM to augment its NEPA analysis, which could, in turn, prompt BOEM to reexamine the terms of the leases issued." *Healthy Gulf*, 775 F. Supp. 3d at 474. Here, by contrast, Congress removed any discretion to reexamine lease terms or apply mitigation measures. Because BOEM lacked authority to alter the BBG1 lease sale in a way that could meaningfully address environmental concerns, Plaintiffs cannot show that any judicial relief would redress their asserted injuries.

**CONCLUSION**

For all these reasons, Plaintiffs' challenge to the BBG1 lease sale fails at every turn. Congress, through the OBBBA, required BOEM to conduct this sale on a fixed timetable and under prescribed parameters, leaving the agency without the meaningful discretion on which Plaintiffs' NEPA, OCSLA, and ESA claims depend. Plaintiffs likewise cannot show that any alleged procedural deficiency could have altered the outcome, which defeats both their merits theories and their attempt to establish standing. Their remaining claim based on alleged ethics violations fares no better, because it rests on non-enforceable internal guidance and, in any event, identifies no error that could have affected a statutorily mandated lease sale. The Court therefore should deny Plaintiffs' motion for summary judgment, grant Federal Defendants' cross-motion, and enter judgment in favor of Federal Defendants on all claims.

Respectfully submitted this 8th day of May 2026.

<div style="margin-left:40%">

ADAM R. F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division

*s/ Shannon Boylan*
SHANNON BOYLAN (D.C. Bar No. 1724269)
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 598-9584; Fax: (202) 305-0506
Email: shannon.boylan@usdoj.gov

DAVIS A. BACKER (CO Bar No. 53502)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, North Terrace, Suite 600
Denver, CO 80202

</div>

Page 33 –    Fed. Defs.' Memo. in Support of Cross-Mot. for Summ. J.
            *Health Gulf, et al. v. Burgum, et al.*, Case No. 1:25-cv-04016-APM

Tel: (202) 305-5469
Email: davis.backer@usdoj.gov

*Attorneys for Federal Defendants*