**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF, *et al.*,
*Plaintiffs*,

v.

BURGUM, *et al.*,
*Defendants*,

and

AMERICAN PETROLEUM INSTITUTE and CHEVRON U.S.A. INC.,
*Intervenors-Defendants*.

No. 1:25-cv-04016-APM

Hon. Judge Amit P. Mehta

**REPLY IN SUPPORT OF INTERVENORS-DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. Plaintiffs Do Not Have Standing ........ 1

A. Plaintiffs Lack Standing For Their NEPA Claims ........ 1

1. Plaintiffs have not shown any injury traceable to Lease Sale BBG1 ........ 1

2. The OBBBA defeats redressability ........ 8

B. Plaintiffs Lack Standing For Their ESA Claim ........ 14

C. Plaintiffs Lack Standing For Their OCSLA Claims ........ 16

D. Plaintiffs Lack Standing For Their Ethics Claim ........ 18

II. Plaintiffs' NEPA Claims Are Meritless ........ 19

III. Plaintiffs' ESA Claim Is Moot And Meritless ........ 21

A. Plaintiffs' ESA Claim Is Moot ........ 21

B. Plaintiffs' ESA Claim Is Meritless ........ 23

1. BOEM lacks sufficient discretion over OBBBA sales ........ 23

2. Plaintiffs have not shown likely jeopardy of Rice's whales ........ 24

IV. Plaintiffs' OCSLA Claims Are Meritless ........ 25

A. Plaintiffs' Information- Or Study-Based Claims Fail ........ 25

1. § 1346(d) is inapplicable and otherwise unhelpful to Plaintiffs ........ 26

2. There was no "study" requirement ........ 27

B. Plaintiffs' OCSLA-Notice Claim Is Meritless ........ 29

V. Plaintiffs' "Improper Involvement" APA Claim Is Baseless ........ 29

CONCLUSION ........ 30

CERTIFICATE OF SERVICE

EXHIBIT A: *Sierra Club* Administrative Record (Excerpts)

## TABLE OF AUTHORITIES

Page

**CASES:**

*Aera Energy LLC v. Salazar*,
642 F.3d 212 (D.C. Cir. 2011) .......... 30

*Alphabet Workers Union-Commc'ns Workers of Am., Loc. 9009 v. NLRB*,
134 F.4th 1217 (D.C. Cir. 2025) .......... 23

*Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*,
685 F.2d 678 (D.C. Cir. 1982) .......... 19

*Center for Biological Diversity v. Bureau of Reclamation*,
No. 1:16-cv-00307, 2025 WL 1798970 (E.D. Cal. June 30, 2025) .......... 23, 24

*Center for Biological Diversity v. Bureau of Reclamation*,
No. 25-5137, __ F.4th __, 2026 WL 2387095 (9th Cir. Aug. 17, 2026) .......... 24

*Center for Biological Diversity v. DOI*,
563 F.3d 466 (D.C. Cir. 2009) .......... 4, 27

* *Center for Biological Diversity v. DOI*,
144 F.4th 296 (D.C. Cir. 2025) .......... 2-5, 10, 16

* *Center for Biological Diversity v. DOT*,
180 F.4th 796 (5th Cir. 2026) (*Delfin*) .......... 2, 3, 5, 6, 8

*Center for Biological Diversity v. EPA*,
937 F.3d 533 (5th Cir. 2019) .......... 2

*Center for Biological Diversity v. FAA*,
804 F. Supp. 3d 86 (D.D.C. 2025) .......... 19

*Center for Biological Diversity v. FWS*,
No. 3:04-cv-04324, 2005 WL 2000928 (N.D. Cal. Aug. 19, 2005) .......... 30

*Center for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) .......... 4

*Citizens Against Rails-to-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) .......... 19

*Citizens for Const. Integrity v. Census Bureau*,
115 F.4th 618 (D.C. Cir. 2024) .......... 18

* Authorities upon which we chiefly rely are marked with an asterisk.

**TABLE OF AUTHORITIES—Continued**

Page

*Citizens for Resp. & Ethics in Wash. v. Cheney*,
593 F. Supp. 2d 194 (D.D.C. 2009) .......... 25

*Common Sense Salmon Recovery v. Evans*,
329 F. Supp. 2d 96 (D.D.C. 2004) .......... 25

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .......... 3

*Department of Com. v. New York*,
588 U.S. 752 (2019) .......... 30

*DOT v. Public Citizen*,
541 U.S. 752 (2004) .......... 19

*Douglas v. NPS*,
No. 1:26-cv-02016-APM, __ F. Supp. 3d __, 2026 WL 1701344 (D.D.C. June 12, 2026) .......... 2

*F. S. Bowen Elec. Co. v. J. D. Hedin Const. Co.*,
316 F.2d 362 (D.C. Cir. 1963) .......... 6, 7

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .......... 3

*Florida Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996) .......... 2, 6

*Fore River Residents Against the Compressor Station v. FERC*,
77 F.4th 882 (D.C. Cir. 2023) .......... 12

*Friends of Animals v. Ashe*,
808 F.3d 900 (D.C. Cir. 2015) .......... 25

*Friends of the Earth v. Haaland*,
583 F. Supp. 3d 113 (D.D.C. 2022) .......... 20

*Friends of the Earth v. Haaland*,
No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) .......... 4, 20

*Gulf Restoration Network v. Haaland*,
47 F.4th 795 (D.C. Cir. 2022) .......... 4

*Hall v. CIA*,
538 F. Supp. 2d 64 (D.D.C. 2008) .......... 8

**TABLE OF AUTHORITIES—Continued**

Page

*Hawkins v. Haaland*,
991 F.3d 216 (D.C. Cir. 2021) .......... 10

*Healthy Gulf v. Burgum*,
775 F. Supp. 3d 455 (D.D.C. 2025) .......... 12, 15

*Healthy Gulf v. Burgum*,
No. 1:23-cv-00604-APM, 2026 WL 1430514 (D.D.C. May 21, 2026) .......... 9

*Healthy Gulf v. DOI*,
152 F.4th 180 (D.C. Cir. 2025) .......... 3, 15

*Humane Soc'y of the U.S. v. Perdue*,
935 F.3d 598 (D.C. Cir. 2019) .......... 9

*In re ESA Section 4 Deadline Litig.-MDL No. 2165*,
704 F.3d 972 (D.C. Cir. 2013) .......... 17

*Karuk Tribe of Cal. v. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) .......... 23

*Kerr-McGee Corp. v. Watt*,
517 F. Supp. 1209 (D.D.C. 1981) .......... 13

*Londrigan v. FBI*,
670 F.2d 1164 (D.C. Cir. 1981) .......... 7

*Louisiana v. Haaland*,
86 F.4th 663 (5th Cir. 2023) .......... 4, 16

*Louisiana v. Haaland*,
No. 2:23-cv-01157, 2023 WL 6450134 (W.D. La. Sep. 21, 2023) .......... 18, 29

* *Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 2, 9, 10, 12, 14, 16

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 8

*Macht v. Skinner*,
916 F.2d 13 (D.C. Cir. 1990) .......... 20

*Martin v. United States*,
605 U.S. 395 (2025) .......... 24

**TABLE OF AUTHORITIES—Continued**

Page

*Midland Power Co-op. v. FERC*,
774 F.3d 1 (D.C. Cir. 2014) ....................4, 18

*Montana Wildlife Fed'n v. Burgum*,
No. 4:18-cv-00069, 2026 WL 1707576 (D. Mont. June 12, 2026) ....................24

*National Ass'n of Home Builders v. EPA*,
786 F.3d 34 (D.C. Cir. 2015) ....................16

*National Small Shipments Traffic Conf., Inc. v. ICC*,
725 F.2d 1442 (D.C. Cir. 1984) ....................29

*North Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) ....................14, 28

*North Slope Borough v. Andrus*,
486 F. Supp. 332 (D.D.C. 1980) ....................28

*Northern Valley Commc'ns, LLC v. FCC*,
717 F.3d 1017 (D.C. Cir. 2013) ....................17

*Oceana v. BOEM*,
37 F. Supp. 3d 147 (D.D.C. 2014) ....................24

*Piedmont Env't Council v. DOT*,
58 F. App'x 20 (4th Cir. 2003) ....................14

*Renal Physicians Ass'n v. HHS*,
489 F.3d 1267 (D.C. Cir. 2007) ....................10

*Royal Canin U.S.A., Inc. v. Wullschleger*,
604 U.S. 22 (2025) ....................5

*Save Long Beach Island v. Department of Com.*,
794 F. Supp. 3d 273 (D.N.J. 2025) ....................15

*Save the Sound, Inc. v. FAA*,
No. 24-1028, ___ F.4th ___, 2026 WL 2093931 (D.C. Cir. July 21, 2026) ....................20, 21

*Secretary of Interior v. California*,
464 U.S. 312 (1984) ....................21

* *Seven Cnty. Infrastructure Coal. v. Eagle County*,
605 U.S. 168 (2025) .................... 19-21

**TABLE OF AUTHORITIES—Continued**

Page

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) .......... 9, 10

* *Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 2, 9, 11, 15

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013) .......... 4

**STATUTES:**

One Big Beautiful Bill Act of 2025, Pub. L. No. 119-21, 139 Stat. 72, 139-142
§ 50102(a)(1)(A) .......... 28
§ 50102(b)(1)(A) .......... 12, 23

16 U.S.C. § 1536(n) .......... 22

42 U.S.C. § 4336e(10)(A) .......... 19

43 U.S.C. § 1332(3) .......... 13

43 U.S.C. § 1337(a) .......... 26

43 U.S.C. § 1337(d) .......... 14, 26

43 U.S.C. § 1345 .......... 17

43 U.S.C. § 1346(a) .......... 25-28

43 U.S.C. § 1346(a)(2) .......... 27

43 U.S.C. § 1346(b) .......... 27

43 U.S.C. § 1346(d) .......... 14, 25, 26

43 U.S.C. § 1349(a)(6) .......... 16

**RULES AND REGULATIONS:**

Fed. R. Civ. P. 56(c)(4) .......... 7

30 C.F.R. § 556.304(c) .......... 17

30 C.F.R. § 556.305(a) .......... 17

30 C.F.R. § 556.307(a) .......... 17, 18

**TABLE OF AUTHORITIES—Continued**

Page

30 C.F.R. § 556.307(b) .....18

30 C.F.R. § 556.307(c).....18

30 C.F.R. § 556.1300 .....27

30 C.F.R. § 556.1300(a).....27

30 C.F.R. § 556.1300(c).....27

74 Fed. Reg. 58,975 (Nov. 16, 2009).....18

91 Fed. Reg. 16,966 (Apr. 3, 2026) .....21

91 Fed. Reg. 20,784 (Apr. 17, 2026) .....15

**OTHER AUTHORITIES:**

BOEM, Gulf of America Regional OCS Oil and Gas Lease Sales and Post-Lease Activities, Final Programmatic EIS (Aug. 2025), https://perma.cc/H2P4-C3W7 .....7

NMFS, ESA Section 7 Biological and Conference Opinion (May 2025), https://perma.cc/9E5D-24Y4 (2025 BiOp).....8, 24

U.S. Energy Info. Admin., *Natural Gas Gross Withdrawals and Production*, https://tinyurl.com/2x4tc7xk (last visited Aug. 20, 2026) .....11

## INTRODUCTION

This case begins and ends with Plaintiffs' lack of standing. Plaintiffs' declarants are 60 or more miles away from any BBG1 lease, with zero evidence any will be affected. Plaintiffs cite no case finding standing on a similar record—and largely ignore Intervenors' many cases rejecting standing on similar facts. Plaintiffs' claims are also not redressable, which Plaintiffs agree turns on BOEM's (in)ability to alter the sale on remand. Yet Plaintiffs do not engage with the OBBBA's text foreclosing any alterations likely to lessen their claimed injuries.

Plaintiffs continue the same head-in-the-sand approach on their ESA claim, which is moot. Their sole answer is that an exemption with the explicit goal of ending their ESA litigation somehow does not end their ESA litigation—the exact argument that the District of Maryland recently rejected. Plaintiffs' claims also fail on the merits across the board. BOEM's marginal discretion over the sale's size or royalties is not significant enough to require environmental review under NEPA, the ESA, or OCSLA. And Plaintiffs' continued assault on the Acting Director of BOEM's role in the sale ignores both the law and the administrative record.

## ARGUMENT

### I. Plaintiffs Do Not Have Standing.

#### A. Plaintiffs Lack Standing For Their NEPA Claims.

##### *1. Plaintiffs have not shown any injury traceable to Lease Sale BBG1.*

Plaintiffs concede the key issue: Their declarants do not live or recreate *anywhere* near the leases sold in Lease Sale BBG1. Intervenors Br. 11-13. The closest declarant is more than 60 miles away, and most are more than 100 miles away; some many hundreds of miles. Although "geographic remoteness of those members . . . does not *necessarily* prevent" standing, "it assuredly does so" when Plaintiffs produce no evidence "showing that the impact . . . in those distant places

will in some fashion be reflected" where the members are. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567 n.3 (1992) (quotation marks omitted). That is the case here: Plaintiffs have not shown that any of the leases sold in BBG1—individually or collectively—will produce effects that will travel sixty miles (much less hundreds of miles) and cause "perceptible harm" to Plaintiffs' declarants. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (citation omitted); *see Douglas v. NPS*, No. 1:26-cv-02016-APM, __ F. Supp. 3d __, 2026 WL 1701344, at *3 (D.D.C. June 12, 2026) (Mehta, J.) ("Plaintiffs must be 'directly affected' ") (citation omitted).

Plaintiffs cannot fall back (at 35) on platitudes about how "the impacts of offshore oil and gas leasing . . . extend far beyond the lease blocks being leased." As the D.C. Circuit has explained, "[t]he point is not that we question whether the asserted harmful effects extend beyond the specific . . . sites, but that Plaintiffs have provided no information at all as to how far they typically extend." *Center for Biological Diversity (CBD) v. DOI*, 144 F.4th 296, 309 (D.C. Cir. 2025). Plaintiffs (at 36) brush off *CBD* as a case involving a challenge to multiple agency actions. But Article III is the same no matter how many actions are packed into a single suit: "[S]tanding depends on a showing of injury, causation, and redressability that implicates each individual challenged" action. *CBD*, 144 F.4th at 305; *e.g.*, *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 667 (D.C. Cir. 1996) (en banc) (same standard for single "broad rulemaking"); *CBD v. EPA*, 937 F.3d 533, 535 (5th Cir. 2019) (same standard for single Gulf-wide discharge permit); *CBD v. DOT*, 180 F.4th 796, 804 (5th Cir. 2026) (*Delfin*) (same standard for single deepwater port license).

Because Plaintiffs challenge a single sale, they do not have to show that a member will be injured by *each* of the 178 leases sold. But they *do* have to show that a member will be injured by *at least one*. Plaintiffs have not done so because they have not demonstrated "the geographic reach" of any BBG1 leases—individually or collectively—nor shown which declarants "routinely

recreate within the reach of those particularized effects." *CBD*, 144 F.4th at 308-309.

Plaintiffs' main response (at 34-35) is to gesture at a few previous cases involving oil-and-gas activities that found standing. But "standing is not dispensed in gross"; "standing to challenge one government action" does not afford standing to "challenge other governmental actions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 & n.5 (2006) (citation omitted). Indeed, the "connection between an alleged pollution source and an asserted injury is a fact-specific inquiry that turns on many factors, including the size of the waterway, the proximity of the source and the injury, forces like water currents, and whether discharges will evaporate or become diluted"—considerations that will necessarily differ across cases. *Delfin*, 180 F.4th at 804 (citation omitted); *see CBD*, 144 F.4th at 309 (scope of effect may depend on "variables like air currents or the specific topography or sightlines"); *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 384 (2024) (standing is "heavily fact-dependent and a 'question of degree' ") (citation omitted). "The Gulf's size makes those details indispensable, not technicalities." *Delfin*, 180 F.4th at 804.

Plaintiffs' cited cases, moreover, did not involve anything like the evidence here, where it is undisputed that members recreate dozens or hundreds of miles away. For example, *Healthy Gulf v. DOI*, 152 F.4th 180 (D.C. Cir. 2025), involving Plaintiffs' challenge to a five-year program of oil-and-gas leasing, found standing based on Robert Wiygul's contention that the program's three planned lease sales would harm his "favored fishing" spots based on a map Wiygul appended showing his "proximity." *Id.* at 190 (quoting Pet'rs Add., Wiygul Decl. ¶ 27 & Fig. 17, *Healthy Gulf v. DOI*, No. 24-1024 (D.C. Cir.)). Wiygul included no similar statement or map here. For good reason, as the only map in *this case* shows that Wiygul's fishing brings him no closer than 60 miles to the nearest BBG1 lease. Intervenors Br. 12-13. Plaintiffs have no evidence that the BBG1 leases will produce effects that will reach the places where Wiygul fishes.

Although Plaintiffs say that the sale's "ultimate results" do not affect the merits, they admit that the results *are* relevant to standing, which depends on if a declarant will feel effects from "the lease blocks being leased." Pls. Opp. 3, 35. Before a sale is held, it may be too speculative whether anyone "will even bid on a block within [the sale area] that overlaps" with a declarant's interests, given that sales often "receive[] bids on only 1-2% of the auctioned blocks." *Louisiana v. Haaland*, 86 F.4th 663, 666-667 (5th Cir. 2023). None of Plaintiffs' cited cases involved an agency action like this one—a single lease sale in a region replete with existing oil-and-gas development, where the sale's leased blocks are concededly nowhere near Plaintiffs' declarants.[1]

As for cases at the *lease-sale stage*, the Fifth Circuit held that some of these same Plaintiffs lacked standing to challenge the conditions of the sale preceding BBG1. *Louisiana*, 86 F.4th at 666-667. The last lease-sale-stage case to reach the D.C. Circuit was vacated as moot, *Friends of the Earth v. Haaland*, No. 22-5036, 2023 WL 3144203, at *1 (D.C. Cir. Apr. 28, 2023), and the only other offshore-lease-sale-stage case to reach the D.C. Circuit, *Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), did not address standing and thus has "no precedential value" on the issue, *Midland Power Co-op. v. FERC*, 774 F.3d 1, 6 (D.C. Cir. 2014). Plaintiffs dismissed their challenges to three other offshore sales, *Healthy Gulf v. Bernhardt*, No. 1:19-cv-00707-RBW (D.D.C. Mar. 3, 2023), and did not challenge Lease Sale 256 at all. And this Court's

---

[1] *See CBD v. DOI*, 563 F.3d 466, 471-472, 475, 479 (D.C. Cir. 2009) (cited at Pls. Opp. 36) (finding standing to challenge 2007-2012 Leasing Program including four planned sales in previously unleased Alaskan waters based on members' use of specific areas covered by the program); *Center for Sustainable Econ. (CSE) v. Jewell*, 779 F.3d 588, 593, 596 (D.C. Cir. 2015) (cited at Pls. Opp. 39) (finding standing to challenge 2012-2017 Leasing Program of 15 sales that "open[ed] up new areas of the OCS for leasing" that declarants averred they used); *WildEarth Guardians v. Jewell*, 738 F.3d 298, 304, 306 (D.C. Cir. 2013) (finding standing to challenge plan for multiple onshore lease sales on 4,100 acres—an area 0.005% the size of BBG1—where it was undisputed that the declarants "will be injured by the increase in local air, water and land pollution that will result from mining on" that specific land); *see also CBD*, 144 F.4th at 312 (distinguishing *CSE* and *WildEarth* as involving a "decision to authorize multiple parcels for leasing").

decision regarding Lease Sale 259 predated the D.C. Circuit's decision in *CBD*, *see* Intervenors Br. 15-16, as well as further case law reflecting that standing requires "a concrete, project-specific interest impaired by the challenged agency action," "distinguish[ed]" from "broader industrial development," *Delfin*, 180 F.4th at 803-804.

Plaintiffs' lack of precedent aside, this case does not call for the Court to resolve questions about when pre-sale allegations are too speculative for standing to challenge a lease sale. The operative complaint here—filed in February 2026—postdates Lease Sale BBG1—held in December 2025—and "jurisdiction follows from (and only from) the operative pleading." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025). And Plaintiffs agree that standing depends on the scope of effects from the particular "lease blocks being leased." Pls. Opp. 35. The results of the sale—and the vast distances of the 178 leases from any declarant—are thus essential.

Plaintiffs ultimately concede (at 35) that they must show that "BBG1 will cause . . . harms 'where [the declarants] live, work, or travel.' " But they cite no declarations making the necessary link. Indeed, Plaintiffs' 77 pages of declarations refer to "BBG1" just five times. Fournier Decl. ¶ 10; Skrmetta Decl. ¶ 50; Reeves Decl. ¶¶ 20-22. Those sparse references do not "distinguish harm caused by this [sale] from harm caused by the region's broader industrial development." *Delfin*, 180 F.4th at 804, 806; *see CBD*, 144 F.4th at 306 (requiring "causal links between harms" where declarants live or recreate and the specific action "Plaintiffs seek to reverse").

The declarations also bear little resemblance to Plaintiffs' characterizations of them. For instance, Plaintiffs construe William Foster as saying that BOEM's "approval of BBG1 . . . harms his recreational, aesthetic, and spiritual interests and diminish his family's enjoyment." Pls. Opp. 33. That would be conclusory and insufficient on its own, *see Delfin*, 180 F.4th at 805 (asserting that "members are 'directly impacted' is a conclusion, not a showing of an Article III injury")—

but Foster didn't even go that far. He instead offers only generalities that "[i]t would be tragic if pollution, leaks or spills, or ship strikes from a new lease sale harm . . . sea turtle populations"; that "[c]ontinued oil and gas drilling in the Gulf steals from [his] and [his] children's future"; and that he "believe[s] if the Bureau had considered [the] risks, it would better understand potential impacts of this lease sale." Foster Decl. ¶¶ 9, 21, 23.

Plaintiffs' contention that Louis Skrmetta's interests "will be further impaired by BBG1," Pls. Opp. 32 (citing Skrmetta Decl. ¶¶ 29-54), has the same problem. The 26 cited paragraphs discuss his "fear" that existing development "may have worsened" habitat conditions, Skrmetta Decl. ¶ 29; speculate about hypothetical harms to his adventure tour business "[s]hould oil hit" from any source or due to climate change, *id.* ¶¶ 45-49; and say he "believe[s]" that BOEM's "compli[ance]" with environmental laws would give him "peace of mind," *id.* ¶ 50. Such "[g]eneralized concern for wildlife, greenhouse-gas emissions, and environmental quality cannot itself establish standing." *Delfin*, 180 F.4th at 805. And none of it proves a "demonstrably increased risk of serious environmental harm" from Lease Sale BBG1 generally, let alone one that "actually threatens the [declarants'] particular interests" a hundred miles away. *Florida Audubon*, 94 F.3d at 667; *see* Intervenors Br. 12. Plaintiffs say they are "not simply alleging harms 'that will be intensified by' BBG1," Pls. Opp. 36 (quoting Intervenors Br. 13, 16), yet identify no others.

Plaintiffs' declarations have other problems, too. As Intervenors explained (at 14), half the declarants do not aver that their declarations are based on personal knowledge—so they may "not [be] considered." *F. S. Bowen Elec. Co. v. J. D. Hedin Const. Co.*, 316 F.2d 362, 364 (D.C. Cir. 1963). Plaintiffs apparently agree as to Dale Hensley and Michael Guckian, whom Plaintiffs abandon. As for Kenneth Saxon and Jasmine Fournier, Plaintiffs get the standard wrong: It is not *Intervenors'* job to produce "evidence" showing Plaintiffs' declarations are insufficient, *contra*

Pls. Opp. 36; it is *Plaintiffs'* burden to "show affirmatively that the affiant is competent to testify to the matters stated," *F. S. Bowen*, 316 F.2d at 364; *see* Fed. R. Civ. P. 56(c)(4). Saxon's and Fournier's claims that their declarations are "based on [their] personal experience and from reviewing publicly available information," Pls. Opp. 36 (quoting Fournier Decl. ¶ 1, Saxon Decl. ¶ 1), do not mean that they have *personal knowledge* of the information. Case in point: Although Saxon may be "competent to testify to his own observations," a music teacher "cannot possibly have personal knowledge" of marine mammal stock assessments or abundance. *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981); *see* Intervenors Br. 14. And while Intervenors do not doubt that Saxon thinks he sees "oil tanker traffic" around Brownsville, Texas, Intervenors Br. 14 (quoting Saxon Decl. ¶ 19); *contra* Pls. Opp. 36-37, Saxon is *not* competent to opine that this is federal Gulf oil-and-gas traffic—as opposed to, say, foreign imports—or that Lease Sale BBG1 will increase the number of vessels Saxon sees. Indeed, Plaintiffs do not dispute that the tiny number of federal Gulf oil-and-gas tankers travel *nowhere near Brownsville*. Intervenors Br. 14.

Fournier's "understanding[s]" and "belie[fs]" are also not personal knowledge. Fournier Decl. ¶¶ 25-26; *see Londrigan*, 670 F.2d at 1174 ("information and belief is unacceptable"). And a recreational boater like Fournier is unqualified to opine that Gulf oil "extraction" is "one of the top ten sources of carbon emissions across the globe," Fournier Decl. ¶ 22, as her error reflects, *see* Programmatic EIS at 687, 689 (Gulf deepwater oil-and-gas production has "some of the lowest GHG intensity of global oil production," including "fewer upstream GHG emissions" than "oil substitutes" that would otherwise be "used to meet consumer demands"; "peak year OCS oil & gas activity . . . generate[s] about the same volume of emissions as the total generated in Hawaii [in] 2022," among the States with the lowest nationwide emissions). Fournier's allegations—like

other declarants'—are exactly the sort that cannot survive summary judgment.[2]

As for the declarants who do aver personal knowledge, Plaintiffs do not defend most of their baseless contentions. Intervenors Br. 14-15. What little Plaintiffs do say only proves Intervenors' point: Wiygul's two-orders-of-magnitude mistake about the size of a 2023 oil spill is not a "minor error," *contra* Pls. Opp. 37, particularly because Wiygul relies on that and other errors to insist that "continuing to allow oil and gas leasing" means that "oil spills . . . will inevitably" put his interests "at risk," Wiygul Decl. ¶ 29. Such a "conclusory"—and wrong—"statement concerning an alleged historical event" is "presumptively violative of Rule 56[(c)(4)]." *Hall v. CIA*, 538 F. Supp. 2d 64, 67-68 (D.D.C. 2008). And Skrmetta's alleged harms (at 32-33) "*if*" there are "reductions in the populations of loggerhead turtles and other marine life," Skrmetta Decl. ¶ 43 (emphasis added), are equivocal and baseless—as shown by loggerheads' "strong increase" in nest counts and "stabl[e] population," 2025 BiOp at 210, 555, and the "increases" in other species' populations, *id.* at 551-553 (green sea turtle); *id.* at 189, 559 (Kemp's ridley); *id.* at 560 (hawksbill); *id.* at 202, 563 (leatherback); *id.* at 564 (Gulf sturgeon).

2. *The OBBBA defeats redressability.*

Plaintiffs admit they must show that if BOEM corrected each procedural violation they assert, the "substantive outcome" of Lease Sale BBG1 "could still change" in a way that would likely redress at least one member's alleged injury. Pls. Opp. 43; *see* Intervenors Br. 17-18. Plaintiffs agree that this inquiry turns on whether the OBBBA "prevents the agency from

---

[2] *Compare, e.g.*, Fournier Decl. ¶ 25 ("recreational, aesthetic, and professional interests in the Gulf of Mexico environment and wildlife are, and will continue to be, adversely impacted by BOEM's failures"), *with Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (rejecting as insufficient allegations that "recreational use and aesthetic enjoyment of federal lands" in "Wyoming have been and continue to be adversely affected in fact by the unlawful actions of the Bureau"), *and Delfin*, 180 F.4th at 805 (rejecting conclusory claims of "direct[ ] impact[s]").

changing" the sale's terms. Pls. Opp. 43; *see* Intervenors Br. 17-22. And Plaintiffs do not dispute that the Court must have the power to grant their requested relief. Intervenors Br. 21-22.[3]

Despite conceding the law, Plaintiffs do not explain how any marginal flexibility BOEM retained could redress any declarant's injury, even in part. Plaintiffs largely just refer to the arguments "discussed above" in their NEPA response, disconnected from any member. Pls. Opp. 43. The few declaration paragraphs Plaintiffs do cite do not help. Plaintiffs cannot show redressability through the value of more procedure to their members' "peace of mind," Skrmetta Decl. ¶¶ 50-53, because "psychic satisfaction is not an acceptable Article III remedy," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *accord Lujan*, 504 U.S. at 573 n.8. Nor can they rely on conclusory assertions about how "informed decisionmaking . . . would serve to limit and mitigate the harm of oil and gas development," Saxon Decl. ¶¶ 25-27; *see Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 603 (D.C. Cir. 2019) ("cannot establish standing with conclusory allegations of an affidavit") (citation and quotation marks omitted), or on an analogy to Mark Twain and infant baptism, Wiygul Decl. ¶ 29; *see Summers*, 555 U.S. at 499 ("Standing . . . is not an ingenious academic exercise in the conceivable but requires a factual showing of perceptible harm.") (cleaned up). Not one of these declarants—or any other—says how BOEM could do anything with respect to Lease Sale BBG1 that would make their lives better in any concrete way. And to the extent that any remedial theory would depend on vacating the sale and holding it again, Plaintiffs may "not ask for full vacatur," because "Congress compelled the sale." *Healthy Gulf v. Burgum*, No. 1:23-cv-00604-APM, 2026 WL 1430514, at *4 (D.D.C. May 21, 2026).

---

[3] Of the nearly two dozen cases Intervenors cited on redressability (at 16-22), Plaintiffs try to "distinguish[]" only four, and only on factual grounds. Pls. Opp. 44-45. Plaintiffs do not dispute the legal rule from these and other cases: Plaintiffs must show that the agency could alter the challenged action on remand in a way that is likely to redress a member's supposed harms.

Plaintiffs make much of "relaxed" redressability for procedural-standing theories. Pls. Opp. 32, 43, 45. That "somewhat relaxed" standard means only that Plaintiffs need not show that BOEM *would* necessarily change its decision if it prepared an EIS. *CBD*, 144 F.4th at 304. But Plaintiffs must still show that BOEM "*could* reach a different conclusion," *id.* (citation omitted), *and* that *if* the agency changed its decision, it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed' " by the change, *Lujan*, 504 U.S. at 561; *see Hawkins v. Haaland*, 991 F.3d 216, 225 (D.C. Cir. 2021) ("relaxed [redressability] standards do not apply to the link between the government decision and the plaintiff's injury"); *Renal Physicians Ass'n v. HHS*, 489 F.3d 1267, 1276, 1279 (D.C. Cir. 2007) (similar). Plaintiffs do not make that showing for any of the areas of discretion they say BOEM had. And "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107.

***Sale size***. Plaintiffs correctly retreat from their suggestion that BOEM could have offered fewer than 80 million acres by deeming certain areas unavailable. *See* Intervenors Br. 33. All agree that BOEM had to offer at least 80 million acres for sale. *See* Pls. Opp. 3-4 (acknowledging the OBBBA's "80 million-acre minimum"). Plaintiffs have not shown that decreasing the sale's starting point from 81.18 million acres to 80 million acres is likely to make *any* environmental difference, let alone one that would matter in a concrete way to Plaintiffs' declarants.

Plaintiffs' primary problem is that the number of acres BOEM offers for sale is not correlated with the number of acres receiving bids. Plaintiffs do not dispute that the three sales preceding BBG1 leased far more acres despite offering many fewer. Intervenors Br. 18-19. Nor do Plaintiffs dispute that "overall activity levels would remain unchanged" even for a sale half BBG1's offering size. *Id.* at 18. Plaintiffs retort (at 9) that "[n]othing about the results indicates that a sale of different acreage would have the same results or environmental impacts." But that

flips the burden: Nothing indicates that offering fewer acres would result in *fewer* environmental impacts—let alone that a declarant is likely to be made better by the delta.

The only area Plaintiffs say (at 2-3) that BOEM should have withdrawn from the sale is a fraction of Rice's whales' proposed critical habitat—1.18 million acres out of about six million.[4] Yet Plaintiffs do not dispute that just four out of the 178 leases sold in BBG1 overlap with the proposed critical habitat. Intervenors Br. 32. Even if BOEM *could* do something differently as to those four leases on remand, Plaintiffs have not shown it is likely that would make any environmental difference, much less a difference to a declarant hundreds of miles away.

***Royalty rates***. Plaintiffs similarly have not shown that setting royalties at the maximum is likely to redress any declarant's injury. As with the sale size, Plaintiffs have not shown that higher royalties would likely result in fewer bids; indeed, they do not dispute that sales preceding BBG1 required higher royalties yet received more bids. Intervenors Br. 19.

Plaintiffs tout (at 5) BOEM's estimate that the minimum royalty could "increase gas production by over 4% compared" to the maximum royalty over 40 years. But that is practically a rounding error—only a 0.059% difference in daily gas production compared to the approximately two billion cubic feet of gas the Gulf ordinarily produces. *See* U.S. Energy Info. Admin., *Natural Gas Gross Withdrawals and Production*, https://tinyurl.com/2x4tc7xk (last visited Aug. 20, 2026) (reflecting 706.233 billion cubic feet of Gulf marketed gas production for 2025). Plaintiffs do not dispute that the number is even smaller for oil: only a 0.025% difference. Intervenors Br. 19. Plaintiffs insist (at 5) this tiny "difference in production could meaningfully alter the environmental impacts." But "speculation does not suffice," *Summers*, 555 U.S. at 499, and

[4] Plaintiffs abandon their argument for withdrawing any of the "core distribution area" or an additional buffer. *See* Intervenors Br. 31-32.

Plaintiffs do not show any declarant is likely to experience any reduced impacts they hypothesize.

***Lease stipulations***. Plaintiffs' invocation of unspecified "mandatory mitigation measures" in lease stipulations fares no better. Pls. Opp. 6. Their insistence (at 7) that BOEM could "meaningfully alter" the stipulations is puzzling, because Plaintiffs do not dispute that BOEM had to "offer *the same* . . . lease stipulations 4 through 9" and "*the same* . . . lease terms" as in Lease Sale 254. OBBBA § 50102(b)(1)(A) (emphases added). Plaintiffs also concede that the stipulations BOEM could update "are not themselves environmental mitigation measures." Pls. Opp. 6; *see* Intervenors Br. 35. Plaintiffs do not reconcile the plain statutory text with their claim that BOEM could nevertheless have made *different* mitigation measures "mandatory through lease stipulations." Pls. Opp. 6 n.3. The OBBBA forbade BOEM from altering "the terms of the leases issued." *Id.* at 43 (quoting *Healthy Gulf v. Burgum*, 775 F. Supp. 3d 455, 474 (D.D.C. 2025)).[5]

Plaintiffs also do not identify mitigation measures likely to redress any declarant's injury, insisting they do not have to. Pls. Opp. 44 n.19. But Plaintiffs acknowledge the Ninth Circuit held otherwise in an unpublished case, *see id.*, and they ignore Intervenors' cited published D.C. Circuit cases, Intervenors Br. 20. Both hold that plaintiffs lack standing where they "identify no specific procedural step that ought to have been done differently." *Fore River Residents Against the Compressor Station v. FERC*, 77 F.4th 882, 889 (D.C. Cir. 2023). Supreme Court precedent compels that rule: It is "the burden of the plaintiff[s] to adduce facts" showing their interests "will be altered or affected by the agency activity they seek to achieve." *Lujan*, 504 U.S. at 562, 571.

What Plaintiffs do say underscores the lack of redressability. They acknowledge (at 6) that complying with new Notices to Lessees or an updated biological opinion referenced in Stipulation

---

[5] Plaintiffs suggest BOEM could require different mitigation measures for "post-lease activities" in future approvals, Pls. Opp. 17, but Plaintiffs appropriately concede that the "possibility" of what BOEM may do in "future distinct agency actions" is "irrelevant to BBG1[]," *id.* at 4 (cleaned up).

4 is "voluntary," so even if the OBBBA did not foreclose alterations to the stipulation, Plaintiffs have not shown that third-party operators are likely to voluntarily comply with some unknown recommendation in a way that is likely to help any declarant. And Plaintiffs' acknowledgment (at 7) that BOEM sold no leases to which Stipulation 5 applies makes it purely speculative whether a redo with some enhanced version of Stipulation 5 would result in leases sold in the areas where that stipulation applies, let alone make any difference to any declarant.

***Post-sale bid evaluation***. Plaintiffs have not shown that BOEM could reject bids for environmental reasons. They insist (at 7) that the "rejection or acceptance of bids is *part of* the lease sale stage." But as Intervenors explained, Plaintiffs previously conceded that "none" of the steps between a sale and issuing leases involve further environmental review, Intervenors Br. 36, which Plaintiffs do not address. BOEM cannot reject bids because it disagrees with Congress's command to offer leases on certain terms. Doing so would make superfluous OCSLA's narrow provisions allowing BOEM to reject bids for antitrust reasons or for insufficient value, and it would nullify the OBBBA's command to hold twice annual sales of at least 80 million acres on the same terms as Lease Sale 254. Plaintiffs never explain how it would be faithful to Congress's design for BOEM to go through the motions of holding lease sales, only to reject every bid.

Plaintiffs next rely (at 8) on language in *Kerr-McGee Corp. v. Watt*, 517 F. Supp. 1209, 1211 (D.D.C. 1981) about "assuming" BOEM's power to reject bids. But *Kerr-McGee* held only that Interior did not act arbitrarily in rejecting bids it deemed insufficiently valuable—which *is* one of the few reasons BOEM may reject bids. Intervenors Br. 36. Plaintiffs' footnoted attempt to divine similar authority to reject bids on environmental grounds fails. Pls. Opp. 8 n.4. Section 1332(3) is a general declaration of policy, not authority to reject bids. And whatever role environmental information plays in developing "lease conditions" *before* holding a sale, 43 U.S.C.

§ 1346(d), does not allow BOEM to move the goalposts after the sale has been held.

Next, Plaintiffs' contention that BOEM could have rejected bids from operators that are not "responsible" with respect to decommissioning suffers from multiple problems. Pls. Opp. 12. For starters, BOEM may disqualify bidders for failing to meet due-diligence obligations on other leases *only before* holding a sale, and only after notice and a hearing. 43 U.S.C. § 1337(d); *see* Intervenors Br. 36. Moreover, Plaintiffs do not even identify any companies that could be disqualified for insufficient diligence. And Plaintiffs' speculation (at 7) that "decisions about which bids to accept can significantly alter the effects of a sale" does not make it likely that disqualifying an operator would make any difference to any declarant's interests.

***Information to Lessees***. Plaintiffs do not dispute they lack standing based on *nonbinding* Information to Lessees. Intervenors Br. 20-21. Plaintiffs instead insist that Information to Lessees *are* binding, Pls. Opp. 8, but their cherry-picked quotations do not say that. Although Information to Lessees often note the "existence" of *other* "obligations that bind the lessees," such as "State laws," federal laws like the "Marine Mammal Protection Act," or "International Treaties," *North Slope Borough v. Andrus*, 642 F.2d 589, 596 (D.C. Cir. 1980), Information to Lessees do not *themselves* create binding obligations. The record—which Plaintiffs ignore—confirms this, stating that "Information to Lessees . . . are not binding terms of the lease sale." AR 171.

**B. Plaintiffs Lack Standing For Their ESA Claim.**

Standing for an ESA claim—whether procedural or substantive—requires identifying a member with a concrete interest in the endangered species at issue. *Lujan*, 504 U.S. at 563; *see Piedmont Env't Council v. DOT*, 58 F. App'x 20, 24 (4th Cir. 2003) (no standing for ESA claim where "there is no evidence that the representative members who supplied the declarations derive any enjoyment or benefit from the endangered species"). Plaintiffs reference five declarants for

their ESA claim. Pls. Opp. 37-38. But while Plaintiffs quibble over whether James Reeves and Hensley "state[] that they first learned of the species" at a March 2026 festival, *id.*, Plaintiffs do not contend that either declarant knew the whales existed *when Plaintiffs filed the operative complaint*, which is when standing is measured, *see* Intervenors Br. 23.

As for other declarants, Plaintiffs cannot fall back (at 38) on past declarations in two *non-ESA* cases, where standing did not hinge on these members' claimed interests in Rice's whales.[6] Plaintiffs concede that Saxon and Wiygul do not attempt to observe whales anywhere near BBG1 leases—and ignore that *Save Long Beach Island v. Department of Commerce*, 794 F. Supp. 3d 273, 314 (D.N.J. 2025), rejected standing for exactly the same reason. Intervenors Br. 24. Plaintiffs' passing reference (at 38) to Skrmetta fares no better; he operates tour boats over 70 miles away from proposed critical habitat and over 150 miles away from the nearest BBG1 lease there, and his "vague desire" to see a whale someday does not suffice, *see Summers*, 555 U.S. at 496; Skrmetta Decl. ¶¶ 16, 25. No declarant shows that Lease Sale BBG1 "would directly affect his use or observation of [this] specific whale species." *Save Long Beach*, 794 F. Supp. 3d at 317.

Separately, Plaintiffs' objections to issue preclusion are misguided. Pls. Opp. 38. Standing theories are precluded when they are "materially the same as those . . . previously held to be

[6] The Lease Sale 259 case does not mention Rice's whales in its standing analysis. *Healthy Gulf*, 775 F. Supp. 3d at 468-475. The five-year program case found standing based on Wiygul's fishing plans. *Healthy Gulf*, 152 F.4th at 189-191. In a footnote, the court also noted that the petitioners said that issuing the five-year program had "immediately" spurred seismic survey activity disrupting "members' ability to observe marine species, including the Rice's whale." *Id.* at 190 n.7; *see* Pet'rs Add., Dr. Hildebrand Decl. ¶ 16, *Healthy Gulf v. DOI*, No. 24-1024 (D.C. Cir.) (marine mammal researcher claiming that imminent seismic surveying "directly harms [his] research interests"). Plaintiffs do not repeat those claims—or declarant—in this case. It is undisputed here that Wiygul recreates 80 to 160-plus miles away from the nearest of the four BBG1 leases in the area the whales supposedly inhabit. Intervenors Br. 24. Plaintiffs have no evidence that seismic surveys that far away are likely to disturb whales where Wiygul apparently looks for them. In fact, the science points the other way. 91 Fed. Reg. 20,784, 20,841 (Apr. 17, 2026) (existing seismic rules "eliminate the likelihood of auditory injury of Rice's whales").

insufficient[]." *National Ass'n of Home Builders v. EPA*, 786 F.3d 34, 36, 42 (D.C. Cir. 2015); *see* Intervenors Br. 23-24. Both here and in Lease Sale 261, Plaintiffs say a lease sale without adequate "protective measures" will "threaten[]" "the continued existence of Rice's whales," which Plaintiffs say "directly harms" members' interests in seeing the whale. Sierra Club Br. 13, 18-19, *Louisiana v. Haaland*, No. 23-30666, 2023 WL 6787195 (5th Cir. Oct. 6, 2023). The Fifth Circuit rejected the "highly attenuated chain" necessary for that theory of injury to come to pass, *Louisiana*, 86 F.4th at 667 (citation omitted), and Plaintiffs cannot relitigate it here. Preclusion aside, the Fifth Circuit was correct: Standing cannot be based on "injury at some indefinite future time," especially when the injury is contingent on the "impact upon animals in . . . distant places," and "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564, 567 & nn.2 & 3.

### C. Plaintiffs Lack Standing For Their OCSLA Claims.

Plaintiffs do not dispute that OCSLA's citizen-suit provision precludes vacating the sale or leases. Intervenors Br. 25. And they do not show that an injunction to "compel compliance" with OCSLA by doing a decommissioning study or providing additional notice about a completed sale could redress any injury. *Id.*; Pls. Opp. 38. BOEM cannot "reject bids" where bids have already been accepted and leases executed. Pls. Opp. 12, 15. That OCSLA may not restrict "other" causes of action does not change that Plaintiffs lack standing for this one. *Id.* at 39 (quoting 43 U.S.C. § 1349(a)(6)); *see CBD*, 144 F.4th at 304 ("must demonstrate standing for each claim").

On their decommissioning-study claim, Plaintiffs concede (at 39) that they cannot base standing on supposed harms from delayed decommissioning that "may happen later in time"—indeed, at least 40 years from now. Intervenors Br. 25. So Plaintiffs pivot to supposed "other harms" they say "may occur any time." Pls. Opp. 39. But Plaintiffs do not explain how ordering

a study about decommissioning is likely to help any declarant.

As for their notice claim, Plaintiffs do not dispute that four groups lack standing because they have not shown they would have commented on a proposed notice of sale. Intervenors Br. 26. And the Center, which at least commented on the proposed notice of sale for Lease Sale 262, has not shown that its two members—Reeves and Foster—have standing in their own right, or that they have any procedural right to comment. Plaintiffs correctly abandon any attempt to find a public-comment right in OCSLA itself, which requires only that BOEM consider the "recommendations of the Governor" of an affected State. 43 U.S.C. § 1345; *see* Intervenors Br. 26, 48. So Plaintiffs pivot to BOEM's regulations. Pls. Opp. 39. But Plaintiffs have not shown that rules outlining when BOEM will publish in the Federal Register a "notice of availability" of a proposed notice of sale, 30 C.F.R. § 556.304(c), or stating that BOEM "will consider all comments and recommendations received in response," *id.* § 556.307(a), are designed to protect Plaintiffs' private environmental interests. Neither rule compels issuance of a proposed notice of sale or creates public-comment rights on that notice, which is what Plaintiffs challenge. *See* Am. Compl. 48 ("Failure to Provide a Proposed Notice of Sale"); *cf. In re ESA Section 4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 979 (D.C. Cir. 2013) (no standing based on rule requiring agency to "publish its [decision] in the Federal Register," which did not "invite comment").

Moreover, the "comments and recommendations received" refer only to those from state governors and local governments. 30 C.F.R. § 556.307(a); *see* Fed. Defs. Br. 20. A preceding section specifies that the "comments and recommendations" solicited on a proposed notice of sale are from "governors of affected States" and "[l]ocal governments." 30 C.F.R. § 556.305(a); *see Northern Valley Commc'ns, LLC v. FCC*, 717 F.3d 1017, 1019 (D.C. Cir. 2013) (Kavanaugh, J.) ("identical terms . . . should be construed to have the same meaning"). A subsequent section then

explains what BOEM does with those "comments and recommendations received": BOEM "consider[s]" them, 30 C.F.R. § 556.307(a); "determines" whether to accept recommendations in "a governor's comments, [or] those of any affected local government," based on a "reasonable balance" between national and state interests, *id.* § 556.307(b); and then "send[s] to each governor written reasons for its determination to accept or reject each governor's recommendation," *id.* § 556.307(c). Nothing about that scheme includes public-comment rights.

BOEM's consultation process with state governors may incidentally "facilitate . . . comment by the public" through their governors, but that does not create a freestanding right to public comment; only *a State* may be "deprived" of comment rights. *Louisiana v. Haaland*, No. 2:23-cv-01157, 2023 WL 6450134, at *8 (W.D. La. Sep. 21, 2023). Finally, Plaintiffs cannot derive a procedural right from BOEM's recognition that it would have to "defend" this sale from Plaintiffs' litigiousness, Pls. Opp. 40, or from the one time 17 years ago that BOEM's predecessor agency voluntarily solicited and considered public comments on a sale, *id.* at 20; *see* 74 Fed. Reg. 58,975, 58,976 (Nov. 16, 2009)—an invitation BOEM has not since repeated.

**D. Plaintiffs Lack Standing For Their Ethics Claim.**

Plaintiffs confuse standing—which depends on whether Interior's ethics rules are "designed to protect" Plaintiffs' environmental interests—with a merits issue: whether the ethics rules are reviewable under the APA. Intervenors Br. 26; *see* Pls. Opp. 40. The D.C. Circuit has cautioned against exactly this error, explaining that whether plaintiffs are "entitled to a procedure" is a "threshold jurisdictional question," not a merits one. *Citizens for Const. Integrity v. Census Bureau*, 115 F.4th 618, 627-628 (D.C. Cir. 2024) (cleaned up). Neither of Plaintiffs' cited cases (at 40) "even mention[s] the issue of jurisdiction, and as to jurisdiction, therefore, those cases have no precedential value." *Midland*, 774 F.3d at 6. That Plaintiffs ignore the D.C. Circuit precedents

foreclosing their claims, *see* Intervenors Br. 27, confirms Plaintiffs cannot distinguish them.

## II. Plaintiffs' NEPA Claims Are Meritless.

Case after case confirms that an EIS is not required if it will not assist the agency's decisionmaking, and an agency's determination of usefulness is subject to substantial deference. The D.C. Circuit has long held that "NEPA is inapplicable" if an "agency does not have sufficient discretion to affect the outcome of its actions." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). The Supreme Court confirmed that "rule of reason" in *DOT v. Public Citizen*, 541 U.S. 752, 767 (2004), which Congress codified in the 2023 Builder Act, *see* Intervenors Br. 3-4, 27; 42 U.S.C. § 4336e(10)(A) (NEPA's applicability turns on whether "*the agency . . . determines*" the action "is subject to substantial Federal control and responsibility") (emphasis added). And the Supreme Court has admonished that an agency's decision whether to prepare an EIS must be upheld if "within a broad zone of reasonableness." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 181 n.3, 183 (2025). BOEM appropriately found that the OBBBA left it without "significant discretion" requiring an EIS at the lease-sale stage. AR 181-182 (citing *Public Citizen* and *Citizens Against Rails-to-Trails*).

Plaintiffs insist that *Seven County* is "irrelevant" to a decision not to prepare an EIS. Pls. Opp. 2 n.1. But *Seven County* says otherwise, explaining that "*whether* and to what extent to prepare an EIS" demands "judicial deference." 605 U.S. at 180-181 (quoting *Public Citizen*, 541 U.S. at 767) (emphases altered). Even before *Seven County* and *Public Citizen*, the D.C. Circuit recognized that "whether an EIS should be prepared is left to the agency's informed discretion." *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 684 (D.C. Cir. 1982). And since *Seven County*, another judge in this district rejected the Center's same argument. *CBD v. FAA*, 804 F. Supp. 3d 86, 94 (D.D.C. 2025). As here, the Center pressed that

"*Seven County* requires courts to defer only to an agency's choice about the level of detail to include in an EIS, not to its determination as to whether it must prepare an EIS in the first place." *Id.* That view, the court explained, "finds no support in *Seven County*, which states that 'the central principle of judicial review in NEPA cases'—not just in cases involving review of an EIS—'is deference.' " *Id.* (quoting *Seven Cnty.*, 605 U.S. at 179).

Plaintiffs ultimately agree on the substantive legal standard: BOEM had to prepare an EIS only if it had "meaningful" or "substantial discretion" over Lease Sale BBG1. Pls. Opp. 2; *see also id.* at 9 n.5. Plaintiffs quibble (at 3) with Intervenors' citation to *Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990), because *Macht* involved a "federalization" issue. But Plaintiffs do not contest the rule from *Citizens Against Rails-to-Trails* for which Intervenors cited *Macht*: An agency must retain "significant" discretion over a decision for an EIS to be required. Intervenors Br. 31.

Plaintiffs also take issue with BOEM's decision that "any NEPA review would more appropriately focus on 'post-lease activities' where site-specific impacts may be realized." Pls. Opp. 4 (quoting Fed. Defs. Br. 12-13). Plaintiffs say BOEM must do an EIS at the lease-sale stage because not every subsequent activity on a lease—despite separate permitting and approvals—will necessarily require an EIS. *Id.* But all Plaintiffs cite for their view that an EIS is "definitively required" at the lease-sale stage is dicta in a vacated, pre-*Seven County* decision that relied on since-rescinded agency guidance. *Id.* (quoting *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 134 & n.8 (D.D.C. 2022), *vacated*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023)).

To the extent Plaintiffs say that BOEM could not have reserved consideration of post-lease activities for another day, Plaintiffs again run headlong into *Seven County*, which tells courts to "give[] agencies wide latitude to define the relevant project." *Save the Sound, Inc. v. FAA*, No. 24-1028, __ F.4th ___, 2026 WL 2093931, at *3 (D.C. Cir. July 21, 2026) (quoting *Seven Cnty.*,

605 U.S. at 190). BOEM "drew a reasonable line" at the sale itself; BOEM "need not evaluate the environmental effects" of every "possible future project" stemming from those leases somewhere down the line. *Id.* at *1 (citation and quotation marks omitted). After all, "[l]eases are sold before it is certain if, where, or how exploration [and development] will actually occur," making any attempt at thorough environmental review now "at best inefficient, and at worst impossible." *Secretary of Interior v. California*, 464 U.S. 312, 342 (1984). BOEM had discretion to decide that "possible effects are better analyzed in 'later projects' when they 'become better known.' " *Save the Sound*, 2026 WL 2093931, at *4 (citation omitted).

## III. Plaintiffs' ESA Claim Is Moot And Meritless.

### A. Plaintiffs' ESA Claim Is Moot.

The plain text of the Endangered Species Committee's order exempts "the full scope of the Gulf of America Oil and Gas Activities" from the ESA. 91 Fed. Reg. 16,966, 16,966 (Apr. 3, 2026). The exemption had an explicit and targeted purpose: To remove the threat that Plaintiffs' ESA litigation—including *this case*, which the Secretary of War identified by name and docket number—posed to predictable and reliable oil-and-gas development, and, in turn, to the country's national security. Sec'y Hegseth Letter ¶¶ 31 & n.9, 50 & n.18. Plaintiffs nonetheless make the remarkable argument that despite the Committee's express goal of neutralizing Plaintiffs' ESA claim, the Committee's order was not, in fact, comprehensive enough to do so.

The District of Maryland recently rejected the same argument in holding Plaintiffs' challenge to the 2025 BiOp moot. ECF No. 64-1 (Hr'g Tr., *Sierra Club v. NMFS*, No. 8:25-cv-01627 (D. Md. June 24, 2026)). As the court explained, "Secretary Hegseth could not have made his intentions clearer." *Id.* at 78. Like here, he "repeatedly cited this very case by name and docket number, and claimed that the plaintiffs' challenge . . . in this case represent[s] an intolerable threat

to Gulf oil and gas production." *Id.* Because BOEM "no longer need[s] to comply with the underlying ESA mandates" after the exemption, Plaintiffs' ESA claim is moot. *Id.* at 69.

Plaintiffs insist that the exemption is "limited" to "activities analyzed in the May 2025 biological opinion." Pls. Opp. 21, 23. The District of Maryland rejected the same theory as "faulty": "Rather than being limited to actions analyzed in the BiOp, the exemption applies broadly to *all* oil and gas activities in the Gulf." *Sierra Club* Tr. 72, 74 (emphasis added). "The exemption defines the agency action . . . to which it applies by reference to Paragraphs 90 and 103 of Secretary Hegseth's memorandum," which states that the exemption "encompasses the full suite of agency actions that BOEM and BSEE identified when initiating and pursuing ESA consultation with NMFS." *Id.* at 72 (quoting Sec'y Hegseth Letter ¶ 90). That "proposed action includes *all* ongoing and future oil and gas related activity on the Outer Continental Shelf in the Gulf . . . through March [20]30 authorized by either BOEM or BSEE." *Id.* (quoting *Sierra Club* AR 1896, attached as Exhibit A) (emphasis added). All means all, Lease Sale BBG1 included.

Indeed, not even Plaintiffs believe their argument. They challenged the Committee's exemption in separate litigation as "sweeping" precisely because it covers "*all* oil and gas activities in the Gulf." Am. Compl. ¶¶ 2, 20, 87, *Healthy Gulf v. Burgum*, No. 1:26-cv-01118-RC (D.D.C. May 26, 2026), ECF No. 19 (emphasis added); *see* Am. Compl. ¶¶ 8-9, *CBD v. Burgum*, No. 1:26-cv-00940-RC (D.D.C. Mar. 31, 2026), ECF No. 18 (same); Am. Compl. ¶¶ 135, 139, *NRDC v. Burgum*, No. 1:26-cv-01116-RC (D.D.C. May 26, 2026), ECF No. 22 (same).[7]

Once Plaintiffs' misreading is corrected, mootness follows. Plaintiffs do not dispute that

---

[7] The judge hearing Plaintiffs' suits already held that he likely "lacks subject matter jurisdiction," Order 1, *CBD v. Burgum*, No. 1:26-cv-00940-RC (D.D.C.), ECF No. 17, because judicial review lies exclusively in the "Court of Appeals," 16 U.S.C. § 1536(n). The environmental-group petitions for review Plaintiffs reference (at 22 n.9) have since been dismissed with prejudice. *American Energy Ass'n v. Burgum*, No. 26-60240 (5th Cir.), ECF Nos. 87, 90, 91, 92.

the exemption, if applicable, is "a change in the legal framework governing the case that renders the [ESA claim] moot." *Sierra Club* Tr. 71; *see* Intervenors Br. 41. And Plaintiffs have not attempted to "prov[e] that a mootness exception applies." *Alphabet Workers Union-Commc'ns Workers of Am., Loc. 9009 v. NLRB*, 134 F.4th 1217, 1225 (D.C. Cir. 2025).

**B. Plaintiffs' ESA Claim Is Meritless.**

*1. BOEM lacks sufficient discretion over OBBBA sales.*

Mootness aside, the ESA claim is meritless. Plaintiffs agree that the ESA is inapplicable if the agency lacks "discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe of Cal. v. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc) (cited at Pls. Opp. 24). Plaintiffs do not say what BOEM could have done to "change the activity" at issue here—Lease Sale BBG1—"for the benefit of Rice's whales." All Plaintiffs point to is Stipulation 4, which refers to the ESA. Pls. Opp. 24-25. But Plaintiffs do not dispute that BOEM had to use "the same . . . lease stipulation[] 4" as in Lease Sale 254. OBBBA § 50102(b)(1)(A); *see* Intervenors Br. 43. Same means same; BOEM was not free to make changes.

Plaintiffs also point to language in Stipulation 4 that future approvals must comply with the ESA. Pls. Opp. 24-25. But even before the exemption, BOEM's ability to impose new mitigation on future approvals was far from clear. Plaintiffs acknowledge that Stipulation 4 merely "allows" lessees to comply with a new biological opinion, rather than mandating it. *Id.* at 25. Even if BOEM could have conditioned approvals of *future* actions on new mitigation, Plaintiffs do not explain how that would change anything for *this* agency action, which is Lease Sale BBG1.

Plaintiffs repeat (at 26) their incorrect implied-repeal and legislative-history arguments. As Intervenors explained, there is no implied repeal; nondiscretionary duties do not trigger Section 7 obligations. *See CBD v. Bureau of Reclamation*, No. 1:16-cv-00307, 2025 WL 1798970, at *42

(E.D. Cal. June 30, 2025) (rejecting similar implied repeal argument), *aff'd*, No. 25-5137, __ F.4th __, 2026 WL 2387095, at *9 n.9 (9th Cir. Aug. 17, 2026) (no implied repeal where "the ESA [and] NEPA . . . do not apply"). In any event, the OBBBA's "notwithstanding" language and series of "shall" clauses satisfy the "clear and manifest" standard Plaintiffs demand. Intervenors Br. 38, 43-44. And although Plaintiffs still say (at 26) that they rely on "statutory history," even their unpublished out-of-circuit case admittedly used only "*legislative* history" in interpreting an unrelated OBBBA amendment. *Montana Wildlife Fed'n v. Burgum*, No. 4:18-cv-00069, 2026 WL 1707576, at *5 (D. Mont. June 12, 2026) (emphasis added). "[L]egislative history is not the law." *Martin v. United States*, 605 U.S. 395, 408 (2025) (citation omitted).

*2. Plaintiffs have not shown likely jeopardy of Rice's whales.*

Plaintiffs do not address—and thus concede—that the law puts the burden on them to "proffer . . . evidence" of likely jeopardy. *Oceana v. BOEM*, 37 F. Supp. 3d 147, 180 (D.D.C. 2014). Yet Plaintiffs have submitted *no* evidence that jeopardy is likely. Their cursory claim (at 27) that a "single" whale death "would jeopardize" the species is unsupported by their reference to the 2025 BiOp, which said only that NMFS assumed that the "death of one female" of reproductive capacity would "affect vital rates." 2025 BiOp at 547. Plaintiffs have no evidence that Lease Sale BBG1 is likely to cause the death of a female reproducing Rice's whale. And Plaintiffs have no response to the fact that the 2025 BiOp looked at only cumulative effects of all oil-and-gas activities over 45 years—not a single lease sale—and that another court rejected the 2025 BiOp's Rice's whale findings as unlawfully pessimistic. Intervenors Br. 44. Nor do Plaintiffs contest the case law reflecting that lease sales are not jeopardy-causing events. *Id.* at 45.

Plaintiffs instead pivot and now argue that BOEM failed to "consult[] with NMFS." Pls. Opp. 26. But Plaintiffs never brought a procedural failure-to-consult claim; they claimed only that

BOEM "violate[d] [its] *substantive obligations*" by failing to adopt sufficient measures to avoid jeopardy to Rice's whales. AR 394 (notice of suit); *see* Am. Compl. 49; Pls. Br. 34. Plaintiffs understand the difference: Their recent challenge to Lease Sale BBG2 adds the procedural "Failure to Engage in Section 7 Consultation" claim they belatedly raise now. Compl. 39, *Healthy Gulf v. Burgum*, No. 1:26-cv-02150-APM (D.D.C. June 17, 2026), ECF No. 1. But "[i]t is well-established that a plaintiff cannot add or amend claims through an opposition to a motion for summary judgment." *Citizens for Resp. & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009). And it would be futile for Plaintiffs to seek amendment, because their notice of intent to sue did not raise a failure-to-consult violation—a "mandatory, not optional, condition precedent for suit." *Friends of Animals v. Ashe*, 808 F.3d 900, 903 (D.C. Cir. 2015) (citation omitted); *see Common Sense Salmon Recovery v. Evans*, 329 F. Supp. 2d 96, 104 (D.D.C. 2004) (notice that "made no mention of the claim" about "the ESA consultation process" "failed to satisfy the notice requirement"). And even if Plaintiffs could belatedly raise a failure-to-consult claim, it would fail for the reasons already discussed, plus another: BOEM consulted with NMFS, culminating in the 2025 BiOp covering "all ongoing and future oil and gas related activity on the Outer Continental Shelf in the Gulf . . . through March [20]30." *Sierra Club* Tr. 72 (quoting Ex. A, *Sierra Club* AR 1896); *e.g.*, AR 67 ("2025 NMFS BiOp" was "ESA Section 7 consultation").

## IV. Plaintiffs' OCSLA Claims Are Meritless.

Plaintiffs triple the length of their OCSLA arguments from their opening brief. But they do not dispute that if their NEPA claims fail for insufficient discretion, then their OCSLA claims must fail too. Intervenors Br. 47; Fed. Defs. Br. 21. Plaintiffs' various other contentions fail.

### A. Plaintiffs' Information- Or Study-Based Claims Fail.

Plaintiffs cite no case setting aside an agency action under 43 U.S.C. § 1346(a) or (d) in

the nearly five decades those provisions have been on the books. This case should not be the first.

*1. § 1346(d) is inapplicable and otherwise unhelpful to Plaintiffs.*

"Plaintiffs agree" that § 1346(d) "does not require a 'study.' " Pls. Opp. 11. So they now press what they say is the "independent" claim that § 1346(d) imposed a separate "overarching requirement" on BOEM to "consider available relevant environmental information." *Id.*

That reformulation has several problems. At the outset, Plaintiffs cite nothing holding that § 1346(d) obligates BOEM to consider "environmental information" apart from OCSLA's environmental-study requirements. Statutory context reflects that § 1346(d) is narrow. It is located in a section titled "Environmental studies," is nested after three subsections detailing when environmental studies should be conducted and the procedures to be used, and therefore requires BOEM to "consider" "available" environmental information *from those studies*—to the extent that studies were required—and only then if the information is "relevant" to BOEM's decision. Because a § 1346(a) study was not required, *see infra* pp. 27-28, § 1346(d) is inapplicable.

In any case, although Plaintiffs insist that BOEM had "plenty of available . . . information about delayed decommissioning," Pls. Opp. 17, Plaintiffs do not adequately explain how any of it was *relevant* to Lease Sale BBG1. They say that BOEM could "reject bids from companies" with "overdue decommissioning obligations" or "provide Information to Lessees about its intention to do so." *Id.* at 12. But disqualifying bidders on due-diligence grounds would have required *presale* notice and hearings, 43 U.S.C. § 1337(d); BOEM cannot refuse leases to "qualified bidder[s]" on environmental grounds, *id.* § 1337(a); *see supra* pp. 13-14. If delayed decommissioning information was not relevant in crafting the sale's terms, it was not relevant after the sale was held but before bids were accepted.

2. *There was no "study" requirement.*

Plaintiffs continue to insist (at 14-18) that an environmental study was required. Intervenors explained how Plaintiffs' "study" claim fails for four independent reasons, *see* Intervenors Br. 45-48, and Plaintiffs must run the table on all four to win. Yet Plaintiffs entirely ignore the first—and biggest—problem: § 1346(a) specifies that a "study" need be conducted *only* in areas where "no lease sale has been held or scheduled" before. 43 U.S.C. § 1346(a)(2); *see* Intervenors Br. 45-46. Plaintiffs ignore that statutory limitation and instead press that BOEM's regulation requires studies before "*any*" sale because it does not explicitly "exclude . . . previously leased area[s]." Pls. Opp. 12 (citing 30 C.F.R. § 556.1300). But Plaintiffs' opening brief never claimed that BOEM's regulation imposed a study requirement over and above the statute's, and Plaintiffs cannot change course now. Anyway, the regulation is consistent with § 1346(a), saying only that BOEM "will conduct a study"—singular—of areas to be leased, and that BOEM "may use information collected in any prior study" in lieu of conducting a new one. 30 C.F.R. § 556.1300(a), (c). The regulation does not require BOEM to conduct a new study of a region that BOEM has extensively studied and leased for decades.

Given that Plaintiffs do not dispute that § 1346(a) is limited to first sales, it is puzzling that they so vigorously dispute that the Center conceded the same 18 years ago.[8] Plaintiffs' resistance to *North Slope*, which held that cleanup studies are not required under § 1346(a), is similarly odd. Plaintiffs (at 14) make much of the fact that BOEM's predecessor "initiated" other kinds of studies

[8] The Center "adopt[ed]" the view that § 1346(a) is limited to first sales. Center Reply Br. 1 n.1, 2008 WL 4103997 (D.C. Cir. Sep. 2, 2008); *see* Native Village Br. 35, 2008 WL 11642379 (D.C. Cir. Sep. 8, 2008) (emphasizing § 1346(a)'s limit to "original research requirements" for "the first leases in a given area"); Center Br. 55, 2008 WL 4103998 (D.C. Cir. Sep. 2, 2008) ("join[ing]" Native Village brief). The D.C. Circuit agreed with that "first" sale framing, *see* Intervenors Br. 46, rejecting the OCSLA claim as "wholly without merit" for other reasons, *CBD*, 563 F.3d at 486.

in *North Slope*, but Plaintiffs ignore that the Beaufort Sea sale at issue was *a first lease sale*: "there ha[d] been no drilling—not even of an exploratory nature"—in the Beaufort Sea before, so § 1346(a) applied. *North Slope*, 642 F.2d at 593. The court nevertheless held that a "cleanup study" was not required. *See id.* at 613; *North Slope Borough v. Andrus*, 486 F. Supp. 332, 359 (D.D.C. 1980); Intervenors Br. 47. Plaintiffs eschew that holding on the ground that they do not know if "cleanup" refers to decommissioning. Pls. Opp. 14. But their opening brief refers to decommissioning as "cleanup obligations," Pls. Br. 14, and although Plaintiffs contend that decommissioning information "did not yet exist" in 1980 when *North Slope* was decided, they cite a chart that tracks decommissioning data since 1947, Pls. Opp. 14 (citing ECF No. 51-8, Fig. 3.2-3). In any event, the "kind[ ] of cleanup" does not matter, *contra* Pls. Opp. 14, because studying *any* kind of "cleanup" necessarily means the area was previously leased—rendering § 1346(a) inapplicable. Any "subsequent" monitoring of already-leased areas would fall under § 1346(*b*), *North Slope*, 486 F. Supp. at 359 & n.101, a claim that Plaintiffs do not bring, *see* Pls. Opp. 13.

Plaintiffs' claims (at 14-18) about whether the OBBBA displaced a study obligation are both irrelevant—Plaintiffs concede that § 1346(a) did not impose a study requirement—and wrong. The OBBBA's "notwithstanding" language overrides BOEM's ordinary OCSLA leasing process where it would "not satisfy the requirements of" the OBBBA. OBBBA § 50102(a)(1)(A); *contra* Pls. Opp. 15. Plaintiffs acknowledge (at 15) that the OBBBA required Lease Sale BBG1 be held "under six months" later, which is about as clear a conflict as there can be with § 1346(a)'s requirement that a study "be commenced not later than six months" before a first sale. Plaintiffs' retort (at 16) that BOEM need not have "*complet*[*ed*]" a study before holding the sale underscores only that any study could not have been relevant to BOEM's lease-sale decision.

Finally, Plaintiffs' quip (at 18) that any study obligation is unmet because BOEM had only

"raw data," not a "study," contradicts their opening brief touting an existing "*study* predicting Gulf decommissioning trends." Pls. Br. 36 (emphasis added). Plaintiffs cannot have it both ways.

**B. Plaintiffs' OCSLA-Notice Claim Is Meritless.**

Plaintiffs do not contest that OCSLA omits any public-comment right, and they cannot create that right out of BOEM's rules. *Supra* pp. 17-18. Nor do Plaintiffs dispute that courts have turned away OCSLA-notice claims not brought by a State. Intervenors Br. 48. Plaintiffs nonetheless argue that they may proceed because Intervenors once joined an APA suit asserting insufficient notice. Pls. Opp. 18-19 (citing *Louisiana*, 2023 WL 6450134, at *8). But as the caption reflects, Louisiana was a co-plaintiff, and the asserted violation was of "OCSLA's requirement that BOEM provide *affected States' Governors* notice and an opportunity to comment"—not private parties. Appellee Br. 13, *Louisiana v. Haaland*, No. 23-30666, 2023 WL 6964972 (5th Cir. Oct. 13, 2023) (emphasis added). Plaintiffs' attempted gotcha falls flat.

**V. Plaintiffs' "Improper Involvement" APA Claim Is Baseless.**

For Plaintiffs' ethics claim to even get off the ground, they must show that "NOIA is a party or represents a party" in Lease Sale BBG1. AR 368. But all Plaintiffs have (at 27) is their assertion of "NOIA's . . . involvement in the BBG1 lease sale process"—a claim without record support. Plaintiffs' retort (at 28) that "Defendants provide no evidence" of Giacona's compliance with Interior's ethics rules gets the standard backwards: "Because a presumption of procedural regularity . . . attaches to final agency action, *aggrieved parties* bear the burden of demonstrating to a reviewing court that challenged agency action merits reversal." *National Small Shipments Traffic Conf., Inc. v. ICC*, 725 F.2d 1442, 1455 (D.C. Cir. 1984) (emphasis added).

Plaintiffs hardly contest the separate reasons dooming their claim. They do not dispute that if BOEM lacked sufficient discretion over the sale's terms, the ethics claim must fail too. *See*

Intervenors Br. 50; Pls. Opp. 29. Plaintiffs try to sidestep *Department of Commerce*, which held that agency action may not be set aside for unstated motivations, labeling it "irrelevant" because "Plaintiffs do not contend" Giacona was "influenced by political considerations." Pls. Opp. 30 (citation omitted). But Plaintiffs impugn Giacona's motives based on his past employment with NOIA, and *Department of Commerce* is equally clear that agency action may not be set aside on speculation that it was motivated by "interest group relations." *Department of Com. v. New York*, 588 U.S. 752, 781 (2019); *see* Intervenors Br. 49-50. Plaintiffs also ignore pre-*Department of Commerce* Circuit precedent, *see* Intervenors Br. 50, and Plaintiffs' invocation (at 29-30) of a decades-old, unpublished case involved well-documented "irregularity" that is absent here, *CBD v. FWS*, No. 3:04-cv-04324, 2005 WL 2000928, at *15 (N.D. Cal. Aug. 19, 2005).

Finally, Plaintiffs do not dispute that the ultimate decisionmaker was Deputy Assistant Secretary Tyner—not Giacona. Pls. Opp. 30. Plaintiffs apparently believe Tyner was "influenced" by Giacona because both signed the Decision Memo a half hour apart. *Id.* But BOEM provided the same recommendations to Tyner's office two months before he signed the Decision Memo, *see* AR 104, and nothing in the APA required Tyner wait some arbitrary period of time before giving the final go-ahead. In any case, pre-*Department of Commerce* case law considered only the "nexus between the [improper] pressure and the actual decision maker," *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011) (citation and emphases omitted), and Plaintiffs identify no term of Lease Sale BBG1 that was improper *because of* Giacona's involvement. Indeed, Giacona merely sent along the *same* recommendations that BOEM staffers first made to the Regional Director, AR 43, two weeks before BOEM staffers briefed Giacona, AR 75.

## CONCLUSION

The Court should grant summary judgment to Federal Defendants and Intervenors.

Respectfully submitted,

/s/ Tommy P. Beaudreau
Tommy P. Beaudreau (D.C. Bar 474313)
Daniel S. Volchok (D.C. Bar 497341)
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 663-6000
tommy.beaudreau@wilmerhale.com
daniel.volchok@wilmerhale.com

*Counsel for Intervenor-Defendant American Petroleum Institute*

/s/ Sean Marotta
Sean Marotta (D.C. Bar 1006494)
Dana A. Raphael (D.C. Bar 1741559)
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
sean.marotta@hlc.com
dana.raphael@hlc.com

Sarah C. Bordelon (D.C. Bar 987135)
HOLLAND & HART LLP
5470 Kietzke Lane, Suite 100
Reno, NV 89511
(775) 327-3000
scbordelon@hollandhart.com

*Counsel for Intervenor-Defendant Chevron U.S.A. Inc.*

Dated: August 21, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on August 21, 2026, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Sean Marotta
Sean Marotta